1  COUGHLIN STOIA GELLER
2     RUDMAN & ROBBINS LLP
   JOHN J. STOIA, JR. (141757)
   RACHEL L. JENSEN (211456)
3  THOMAS J. O'REARDON II (247952)
   655 West Broadway, Suite 1900
4  San Diego, CA 92101
   Telephone: 619/231-1058
5  619/231-7423 (fax)
   johns@csgrr.com
6  rachelj@csgrr.com
   toreardon@csgrr.com
7
   WHATLEY, DRAKE & KALLAS, LLC          KELLER ROHRBACK LLP
8  JOE R. WHATLEY, JR.                   LYNN LINCOLN SARKO
   EDITH M. KALLAS                       JULI E. FARRIS
9  JOSEPH P. GUGLIELMO                   GRETCHEN FREEMAN CAPPIO
   1540 Broadway, 37th Floor             1201 Third Avenue, Suite 3200
10 New York, NY 10036                    Seattle, WA 98101-3052
   Telephone: 212/447-7070               Telephone: 206/623-1900
11 212/447-7077 (fax)                    206/623-3384 (fax)
   jwhatley@wdklaw.com                   lsarko@kellerrohrback.com
12 ekallas@wdklaw.com                    jfarris@kellerrohrback.com
   jguglielmo@wdklaw.com                 gcappio@kellerrohrback.com
13
   Co-Lead Counsel for Plaintiffs        Chair of Plaintiffs' Executive
14                                       Committee

15 [Additional counsel appear on signature page.]

16             UNITED STATES DISTRICT COURT

17             CENTRAL DISTRICT OF CALIFORNIA

18                    WESTERN DIVISION

19
   In re MATTEL, INC., TOY LEAD    )    No. 2:07-ml-01897-DSF-AJW
20 PAINT PRODUCTS LIABILITY        )
   LITIGATION                      )    MDL 1897
21 _____ )
                                   )    SECOND CONSOLIDATED
22                                      AMENDED COMPLAINT

23                                      DEMAND FOR JURY TRIAL

24

25

26

27

28

FILED
CLERK, U.S. DISTRICT COURT

MAY 16 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1    Plaintiffs, by their attorneys, bring this nationwide Class Action against
2    defendants Mattel, Inc.; Fisher-Price, Inc. ("Mattel" or "Manufacturer Defendants");
3    Target Corporation; Toys "R" Us, Inc.; Wal-Mart Stores, Inc.; KB Toys, Inc.; and
4    Kmart Corporation ("Retailer Defendants") (collectively "Defendants") on their own
5    behalf and on behalf of a class of all others similarly situated, including all persons
6    who purchased and/or acquired toys manufactured, sold and/or distributed by
7    Defendants from May 2003 through the present ("Class Period"), that contained lead,
8    lead paint and/or magnets that could become loose as a result of a design defect (the
9    "Class").   Plaintiffs bring this action for compensatory damages and equitable,
10   injunctive, and declaratory relief against Defendants, who designed, manufactured,
11   marketed, sold and/or distributed the Hazardous Toys (defined below).   Plaintiffs
12   allege the following upon their own knowledge, or where there is no personal
13   knowledge, upon information and belief and the investigation of their counsel:

14                        **JURISDICTION AND VENUE**

15   1.    This Court has jurisdiction over the subject matter of this action pursuant
16   to 28 U.S.C. §1332, as amended by the Class Action Fairness Act of 2005, because
17   the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a
18   class action in which some members of the Class are citizens of different states than
19   the Defendants.   *See* 28 U.S.C. §1332(d)(2)(A).[1]   This Court has supplemental
20   jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.   This Court has
21   personal jurisdiction over Defendants because they are authorized to do business and
22   to conduct business in California, they have specifically marketed and sold the
23   Hazardous Toys in California, and have sufficient minimum contacts with this state
24   and/or sufficiently avail themselves to the markets of this state through their

25

26

27   [1]    Original jurisdiction is also proper pursuant to 28 U.S.C. §1331 because the
     claims asserted herein arise under the Consumer Product Safety Act, 15 U.S.C. §2072.

28

- 1 -

1  promotion, sales, and marketing within this state to render the exercise of jurisdiction
2  by this Court permissible.

3      2.    Venue in this Court is proper pursuant to the December 18, 2007 Transfer
4  Order by the United States Judicial Panel on Multidistrict Litigation and  pursuant to
5  28 U.S.C. §1391(a) because Mattel has its principal place of business in this District, a
6  substantial part of the events giving rise to the claims asserted herein occurred in this
7  District, and Mattel is subject to personal jurisdiction to the federal court in this
8  District.  Moreover, Defendants inhabit and/or may be found in this District and the
9  interstate trade and commerce described herein is and has been carried out in part
10  within this District.  Plaintiffs in the transferred actions reserve their rights of remand
11  to the districts from which they were transferred at or before the conclusion of the pre-
12  trial proceedings.  *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523
13  U.S. 26 (1998).

14                        **NATURE OF THE ACTION**

15      3.    This action arises out of the nationwide recall of millions of children's
16  toys that were designed, manufactured, distributed and/or sold by Defendants to
17  Plaintiffs and other Class members.  Defendants marketed and sold these toys as age-
18  appropriate and represented that they maintained and upheld the highest standards for
19  toy quality and safety.  Additionally, Defendants sold these toys as fit for use as young
20  children's playthings and compliant with all relevant state and federal laws, free from
21  any defect.

22      4.    However, as discussed in detail below, Defendants' representations were
23  false.  Defendants failed to take necessary precautions to prevent hazardous
24  substances from being used in the toys that were sold and failed to prevent design
25  defects that could result in potentially fatal consequences for children.

26      5.    Specifically, despite the fact that lead and lead paint have been banned on
27  children's toys for approximately 30 years, on August 1, 2007, Mattel, the world's
28  largest toy company, announced a massive recall of approximately 1.5 million toys for

1   lead paint contamination, one million of which were sold in the United States,

2   including popular Sesame Street and Nickelodeon toys that were marketed and sold to

3   young children.

4         6.     Just as fearful parents were combing through their toy bins to confiscate

5   their children's toys associated with the August 1 recall, two weeks later Mattel

6   announced the biggest recall in its history, totaling over 18 million toys worldwide,

7   over half of which were sold in the United States.  The August 15, 2007 recalls

8   concerned both lead paint, which could cause lead poisoning, and small magnets,

9   which could cause massive internal injuries and death particularly if two or more such

10  magnets were swallowed and attracted each other inside a child's body.  All of the

11  recalled toys were reportedly made in China, but followed Mattel design

12  specifications for the use of magnets, heavy elements and surface paint.  Parents were

13  shocked to learn that the paint on some of the Mattel toys ***exceeded legal lead limits***

14  ***by 180 times***.  Similar recalls continued throughout the summer and into October of

15  2007, yet surprisingly the recalls did not include all of Mattel's toys containing lead.

16        7.     As detailed below, Defendants manufactured, distributed, marketed

17  and/or sold over 11.2 million children's toys that were subsequently recalled in the

18  United States, due to toxic lead, lead paint and/or loose magnets.  Also, as detailed

19  below, Defendants have manufactured, distributed, marketed and/or sold other toys

20  that contain lead or lead paint but, to date, have not been recalled nationwide.

21        8.     This Complaint concerns the millions of dangerous toys that were, or

22  should have been, the subject of Mattel's history-making 2007 recalls, and the

23  millions of children and families who have been harmed by Defendants' conduct.

24        9.     Defendants did not adequately monitor the manufacture and design of

25  their toy products in China, and allowed the Hazardous Toys to be sold in the United

26  States, thereby posing extreme dangers to young children who typically put such toys

27  in their mouths.

28

10.    Additionally, Defendants failed to adequately monitor and inspect the safety of the Hazardous Toys when they were imported from China to the United States, thereby allowing such toys to be sold for use by young children.  Indeed, Defendants knew that these toys were intended for young children who would lick, taste, bite or swallow toys and should have prevented toys containing hazardous lead, lead paint and/or loose magnets from being sold in the United States.

11.    Despite Defendants' knowledge that young children would play with these dangerous toys and their representations to consumers that their toys complied with certain requirements and were safe, quality, and age-appropriate products, Defendants continued to manufacture, distribute, market and/or sell toys containing lead, lead paint or hazardous magnets without proper manufacturing quality control measures and safety inspections.

12.    As a result of Defendants' failure to put adequate controls in place, Mattel was forced to announce at least six recalls between August 2, 2007 and October 25, 2007, after discovering that the surface paints on certain of their toys contained impermissible levels of lead ("Recalled Lead Toys").  During this three-month period, approximately two million toys in the United States were recalled by Mattel due to contamination by lead paint.  During this period, an additional one million toys were recalled in other countries.

13.    Additionally, on August 14, 2007, Mattel announced four separate recalls of over 18 million toys, including 9 million in the United States, that contained tiny, aspirin-sized magnets that could become loose and be swallowed by children ("Recalled Magnetic Toys").[2]  One of the magnet recalls was an expansion of a previous recall of hazardous toys containing magnets from November 21, 2006.

---

[2]    All the Recalled Lead Toys; Recalled Magnetic Toys; all other toys that contain lead, lead paint, and/or small, loose magnets, including the toy blood pressure cuff withdrawn from certain retail stores in December 2007, and those toys that contain

Case 2:07-ml-01897-DSF-AJW    Document 60    Filed 05/16/08    Page 6 of 118    Page ID #:891

14.     Despite all of the negative publicity concerning lead paint toys made in China, Mattel has not yet recalled all of the Hazardous Toys.  For example, blood pressure cuffs that are part of Fisher-Price and Sesame Street medical kits have been found to contain high levels of lead, but have only been recalled in Illinois and have *not* been recalled nationwide.  In fact, blood pressure cuffs from one or both of these kits were still available for purchase as of May 15, 2008 on the Toys "R" Us website, as well as the Fisher-Price Shop Online Catalog, and Amazon.com.  Plaintiffs believe that there are other toy products made in China and manufactured, designed, sold and/or distributed by Defendants that may contain lead, lead paint, and/or hazardous magnets.

15.     As a result of Defendants' conduct, Plaintiffs and the Class have been injured in the form of exposure to lead and hazardous magnets, serious health risks that require medical screening, as well as the purchase of defective and dangerous toys.  As further explained herein, lead exposure can lead to permanent health damage, including, *inter alia*, lasting neurological problems.  Moreover, small detachable loose magnets, pose aspiration and intestinal hazards, and if swallowed, present a serious risk of intestinal perforation or blockage which can be fatal.

## PARTIES

**I.     Plaintiffs**

### A.     Lead Toy Plaintiffs

16.     Plaintiff Keile Allen ("Plaintiff Allen") is a resident of Florida.  Plaintiff Allen purchased a Hazardous Toy designed, manufactured, and sold by Defendants: The Fisher-Price Medical Kit which includes a toy blood pressure cuff containing lead.  Plaintiff Allen purchased this product from Toys "R" Us in North Miami, Florida for her children, ages 5, 10, and 13.  Plaintiff Allen has been injured due to her

---

lead in excess of applicable standards or unsafe magnets that have not yet been recalled, shall be collectively referred to herein as "Hazardous Toys" or "Toys."

1   children's increased exposure to lead and because she purchased a product that was

2   defective and not fit for ordinary purpose as a plaything for her children.  Plaintiff

3   Allen would not have purchased the Hazardous Toy had she known that her children

4   would be put at risk for lead exposure.

5          17.   Plaintiff Jacob Chow is a resident of Pennsylvania.  Plaintiff Chow is a

6   minor, named by his parents and natural guardians, Tim and Tracy Chow ("P/N/G

7   Tim and Tracy Chow").  P/N/G Tim and Tracy Chow received as gifts for their 2-year

8   old the following products designed, manufactured, sold and later recalled by

9   Defendants: Sing With Elmo's Greatest Hits (product no. G5112); Elmo and Pals –

10  Cookie and Ernie (product no. H5569).  P/N/G Tim and Tracy Chow have been

11  injured due to their child's increased exposure to lead and because they acquired

12  products that were defective and not fit for their ordinary purposes as playthings for

13  their child as a result of the recalls.  P/N/G Tim and Tracy Chow would not have

14  accepted the Toys into their households or allowed their child to play with the Toys

15  had they known that their child would be put at risk for lead exposure.

16         18.   Plaintiff Jennifer DiGiacinto ("Plaintiff DiGiacinto") is a resident of

17  Washington, D.C.  Plaintiff DiGiacinto purchased the following product designed,

18  manufactured, sold and later recalled by Defendants: Go Diego Go Mobile Rescue

19  Unit (product no. K3571).  Plaintiff DiGiacinto purchased this product from Toys "R"

20  Us, 11810 Rockville Pike, Rockville, Maryland, for her child, age 3.  Plaintiff

21  DiGiacinto has been injured due to her child's increased exposure to lead and because

22  she purchased a product that was defective and not fit for its ordinary purpose as a

23  plaything for her child as a result of the recalls.  Plaintiff DiGiacinto would not have

24  purchased the Hazardous Toy had she known that her child would be put at risk for

25  lead exposure.

26         19.   Plaintiff Carrie Entsminger ("Plaintiff Entsminger") is a resident of North

27  Carolina.    Plaintiff Entsminger purchased the following products designed,

28  manufactured, sold and later recalled by Defendants: Go Diego Go Talking Rescue

1   (product no. J0346); Blue 3 pack figures in Tube (product no. H8237); Dora Figures
2   in Tube (product no. H8236); Go Diego Go Animal Rescue (product no. K3413).
3   Plaintiff Entsminger purchased these products from KB Toys, 211 Four Seasons Town
4   Center, Greensboro, North Carolina, and from Target, 1212 Bridford Pkwy,
5   Greensboro, North Carolina, for her children, ages 6 and 2. Plaintiff Entsminger has
6   been injured due to her children's increased exposure to lead and because she
7   purchased products that were defective and not fit for their ordinary purpose as
8   playthings for her children as a result of the recalls. Plaintiff Entsminger would not
9   have purchased the Hazardous Toys had she known her children would be at risk for
10  lead exposure.

11      20.    Plaintiff Seth Goldman ("Plaintiff Goldman") is a resident of Florida.
12  Plaintiff Goldman purchased the following product designed, manufactured, sold and
13  later recalled by Defendants: Pixar Cars "Sarge" (product no. 0727EA). Plaintiff
14  Goldman purchased this product from Target Mid-Town, 3401 N Miami Ave. Ste.
15  100, Miami, Florida, for his children, ages 2 and 6 months. Plaintiff Goldman has
16  been injured due to his children's increased exposure to lead and because he
17  purchased a product that was defective and not fit for its ordinary purpose as a
18  plaything for his children as a result of the recalls. Plaintiff Goldman would not have
19  purchased the Hazardous Toy had he known that his children would be put at risk of
20  lead exposure.

21      21.    Plaintiff Amy Harrington ("Plaintiff Harrington") is a resident of
22  California. Plaintiff Harrington purchased or received as gifts the following products
23  designed, manufactured, sold and later recalled by Defendants: Silly Parts Talking
24  Elmo (product no. B7989); two sets Dora's Talking Pony Place (product no. J9692);
25  Sesame Street Cookie Saxophone (product no. 93492). Plaintiff Harrington purchased
26  these products from Target, 1150 El Camino Real # 300, San Bruno, California , and
27  from Walgreens, 790 Van Ness Ave., San Francisco, California, or received them as
28  gifts from Costco, Sacramento, California, for her children, ages 4 and 1. Plaintiff

1  Harrington has been injured due to her children's increased exposure to lead and

2  because she purchased or acquired products that were defective and not fit for their

3  ordinary purposes as playthings for her children as a result of the recalls. Plaintiff

4  Harrington would not have purchased the Hazardous Toys had she known that her

5  children would be put at risk for lead exposure.

6        22.    Plaintiff Nathan Hughey ("Plaintiff Hughey") is a resident of South

7  Carolina. Plaintiff Hughey purchased the following products designed, manufactured,

8  sold and later recalled by Defendants: Pixar Cars "Sarge" (product no. 0907EA);

9  Boots, Tico Figure Pack (product no. C6911); Diego Figure Pack (product no.

10  C6909); Dora Talking Vamonos Van (product no. G3825).  Plaintiff Hughey

11  purchased these products from Toys "R" Us,  7800 Rivers Ave., Charleston, South

12  Carolina, and from Target, 1300 Long Grove Dr., Mt. Pleasant, South Carolina, for his

13  children, ages 4 and 7 months. Plaintiff Hughey has been injured due to his children's

14  increased exposure to lead and because he purchased products that were defective and

15  not fit for their ordinary purposes as playthings for his children as a result of the

16  recalls.  Plaintiff Hughey would not have purchased the Hazardous Toys had he

17  known that his children would be put at risk for lead exposure.

18        23.    Plaintiffs Erick Jimenez and Jennifer Perez ("Plaintiffs Jimenez and

19  Perez") are residents of California.  Plaintiffs Jimenez and Perez purchased the

20  following product designed, manufactured, sold and later recalled by Defendants:

21  Diego Talking Gadget Belt (product no. K3413).  Plaintiffs Jimenez and Perez

22  purchased this product from Target, 11051 Victory Blvd., N. Hollywood, California,

23  for their child, age 4.  Plaintiffs Jimenez and Perez have been injured due to their

24  child's increased exposure to lead and because they purchased a product that was

25  defective and not fit for its ordinary purpose as a plaything for their child as a result of

26  the recalls.  Plaintiffs Jimenez and Perez would not have purchased the Toy or

27  allowed their child to play with it had they known that their child would be put at risk

28  for lead exposure.

24.     Plaintiff Adam Luttenberger ("Plaintiff Luttenberger") is a resident of Florida.    Plaintiff Luttenberger purchased the following product designed, manufactured, sold and later recalled by Defendants: Pixar Cars "Sarge" (product no. 1207EA).   Mr. Luttenberger purchased this product from Toys "R" Us, 20429 State Road Seven, Boca Raton, Florida,  for his child, age 2.   Plaintiff Luttenberger has been injured due to his child's increased exposure to lead and because he purchased a product that were was defective and not fit for its ordinary purpose as a plaything for his child as a result of the recalls.   Plaintiff Luttenberger would not have purchased the Hazardous Toy had he known that his child would be put at risk for lead exposure.

25.     Plaintiff Stacy Massengill ("Plaintiff Massengill") is a resident of South Carolina.  Plaintiff Massengill owns the following products designed, manufactured, sold and later recalled by Defendants: Elmo Collectible (product no. 90609); Zoe Collectible (product no. 90612); Ernie Collectible (product no. 90613); Big Bird Collectible (product no. 90614); Sesame Street Giggle Tool Belt (product no. J6537); Music and Lights Phone (product no. 93780).   Plaintiff Massengill purchased the Music and Lights Phone at Target, 694 Fairview Rd., Simpsonville, South Carolina and received remaining products as gifts for her children, ages 7 and 18 months. Plaintiff Massengill has been injured due to her children's increased exposure to lead and because she purchased and acquired products that were defective and not fit for their ordinary purposes as playthings for her children as a result of the recalls. Plaintiff Massengill would not have purchased and allowed her children to play with the Hazardous Toys had she known that her children would be put at risk for lead exposure.

26.     Plaintiff Ann Mayhew ("Plaintiff Mayhew") is a resident of Alabama. Plaintiff Mayhew purchased the following products designed, manufactured, sold and later recalled by Defendants: Fairytale Adventure Dora, including Fairytale Adventure Dog (product no. K3580); Royal Boots and Tico (product no. J6763); Elmo in the Giggle Box (product no. B7987); Ernie Splashin' Fun Trike (product no. 90267).

Plaintiff Mayhew purchased these products from Trussville Super Target, 1654 Gadsden Hwy., Birmingham, Alabama, for her child, age 3. Plaintiff Mayhew has been injured due to her child's increased exposure to lead and because she purchased products that were defective and not fit for their ordinary purposes as playthings for her child as a result of the recalls. Plaintiff Mayhew would not have purchased the Hazardous Toys had she known that her child would be put at risk for lead exposure.

27. Plaintiff Nydia Monroe is a resident of Pennsylvania. Plaintiff Monroe is a minor, named by her parents and natural guardians, Arthur Monroe and Nicole Clark ("P/N/G Monroe and Clark"). P/N/G Monroe and Clark purchased the following products designed, manufactured, sold and later recalled by Defendants: Carnival (product no. J2248); Carnival "Boots" figure (product no. J2248); Carnival pony figure (product no. J2248); Carnival tent (no product code available); Sesame Street Giggle Doodler (product no. M0527); Royal Boots and Tico (product no. J6763); Dora Talking Vamonos Van (product no. G3825); and Fairytale Adventure Dora (product no. K3580). P/N/G Monroe and Clark purchased these products from Wal-Mart Store # 5495, 50 N. MacDade Blvd., Glenolden, Pennsylvania for Plaintiff Nydia Monroe, age 3. P/N/G Monroe and Clark have been injured due to their child's increased exposure to lead and because they purchased products that were defective and not fit for their ordinary purposes as playthings for her child as a result of the recalls. P/N/G/ Monroe and Clark would not have purchased the Hazardous Toys had they known that their child would be put at risk for lead exposure.

28. Winter Reisinger ("Plaintiff Reisinger") is a resident of Pennsylvania. Plaintiff Reisinger purchased the following products designed, manufactured, sold and later recalled by Defendants: Sing with Elmo's Greatest Hits (product no. G5112); Sesame Street Tub Pots & Pans (product no. 7983); Shake, Giggle & Roll (product no. B7888); 2 sets of Sesame Street Giggle Tool Belt (product no. J6537); and Elmo in the Giggle Box (product no. B7987). Plaintiff Reisinger purchased these products from Target, 6416 Carlisle Pike, Mechanicsburg, Pennsylvania, and from Wal-Mart,

6520 Carlisle Pike, Suite 550, Mechanicsburg, Pennsylvania, for her child, age 2. Plaintiff Reisinger has been injured due to her child's increased exposure to lead and because she purchased products that were defective and not fit for their ordinary purposes as playthings for her child as a result of the recalls. Plaintiff Reisinger would not have purchased the Hazardous Toys had Plaintiff Reisinger known that her child would be put at risk for lead exposure.

29. Plaintiff Joy Sarjent ("Plaintiff Sarjent") is a resident of Indiana. Plaintiff Sarjent purchased the following product designed, manufactured, sold and later recalled by Defendants: Diego Talking Field Journal (product no. J0338). Plaintiff Sarjent purchased this product from Target, 10209 E. US Highway 36, Avon, Indiana, for her children, ages 4 and 1. Plaintiff Sarjent has been injured due to her children's increased exposure to lead and because she purchased a product that was defective and not fit for its ordinary purpose as a plaything for her children as a result of the recalls. Plaintiff Sarjent would not have purchased the Hazardous Toy had she known that her children would be put at risk for lead exposure.

30. Plaintiff Farrah Shoukry ("Plaintiff Shoukry") is a resident of Florida. Plaintiff Shoukry purchased the following product designed, manufactured, sold and later recalled by Defendants: Dora Talking Vamonos Van (product no. G3825). Plaintiff Shoukry purchased this product from Target, 20500 SW 112th Ave., Miami, Florida, for her child, age 3. Plaintiff Shoukry has been injured due to her child's increased exposure to lead and because she purchased a product that was defective and not fit for its ordinary purpose as a plaything for her child as a result of the recalls. Plaintiff Shoukry would not have purchased or allowed her child to play with the Hazardous Toy had she known that her child would be put at risk for lead exposure.

31. Plaintiffs Rod Underhill and Leah Dunsmore ("Plaintiffs Underhill and Dunsmore") are residents of California. Plaintiffs Underhill and Dunsmore purchased the following product designed, manufactured, sold and later recalled by Defendants: Giggle Doodler (product no. G9717). Plaintiffs Underhill and Dunsmore purchased

1  this product from Kmart, 1855 Main St., Ramona, California, for their children, ages 8

2  and 2. Plaintiffs Underhill and Dunsmore have been injured due to their children's

3  increased exposure to lead and because they purchased a product that was defective

4  and not fit for its ordinary purpose as a plaything for their children as a result of the

5  recalls. Plaintiffs Underhill and Dunsmore would not have purchased the Hazardous

6  Toy had they known that their children would be put at risk for lead exposure.

7       32.    Plaintiff Nicole White ("Plaintiff White") is a resident of Michigan.

8  Plaintiff White purchased the following products designed, manufactured, sold and

9  later recalled by Defendants: Shake, Giggle & Roll (product no. B7888); Dora's

10  Talking House (product no. B9620); Boots, Tico Figure Pack (product no. C6911);

11  Royal Boots & Tico (product no. J6763). In addition, Plaintiff White purchased a

12  Fisher-Price Medical Kit which includes a toy blood pressure cuff containing lead.

13  Plaintiff White purchased these products from Toys "R" Us, 3725 Washtenaw, Ann

14  Arbor, Michigan, and from Meijer, Inc. for her children, ages 4 and 2. Plaintiff White

15  has been injured due to her children's increased exposure to lead and because she

16  purchased products that were defective and not fit for their ordinary purposes as

17  playthings for her children as a result of the recalls. Plaintiff White would not have

18  purchased the Hazardous Toys had she known that her children would be put at risk

19  for lead exposure.

20       **B.**    **Magnet Hazard Plaintiffs**

21       33.    Plaintiff Julie A. Probst ("Plaintiff Probst") is a resident of California.

22  Plaintiff Probst purchased the following products designed, manufactured, sold and

23  later recalled by Defendants: Polly Pocket!™ Quik-Clik™ Boutique (product no.

24  G8605); Polly Pocket!™ Quik-Clik™ City Pretty™ Playset (Lila®) (product no.

25  H1537); Polly Pocket! ™ Quik-Clik™ Sporty Style™ Playset (Lea®) (product no.

26  H1538); Polly Pocket! ™ Quick Click™ House of Style™ Playset (product no.

27  G8614). Plaintiff Probst purchased these products from Wal-Mart Supercenter, 78950

28  Highway 111, La Quinta, California and from Target, 72549 Highway 111, Palm

Desert, California, for her child, age 8.  Plaintiff Probst has been injured due to her child's exposure to hazardous magnets and because she purchased products that were defective and not fit for its ordinary purpose as a plaything for her child as a result of the recalls.  Plaintiff Probst would not have purchased the Hazardous Toys had she known that her child would be exposed to loose magnets.

34.    Plaintiff Stacy Rusterholtz ("Plaintiff Rusterholtz") is a resident of California.  Plaintiff Rusterholtz purchased or received as gifts the following products designed, manufactured, sold and later recalled by Defendants: Polly Pocket!™ Quik-Clik™ Boutique (product no. G8605); Polly Pocket!™ Pollywood™ LimoScene™ Vehicle (product no. J1659); Polly Pocket!™ Pollyworld™ Quick Clik™ Polly™ Doll (product no. J4169); Polly Pocket!™ Pollyworld™ Quick Clik™ Lea™ Doll (product no. J4171).  Plaintiff Rusterholtz purchased these products from Target, 1061 Cochrane Rd., Morgan Hill, California, and from Wal-Mart Supercenter, 7150 Camino Arroyo, Gilroy, California, or received them as gifts for her child, age 5. Plaintiff Rusterholtz has been injured due to her child's increased exposure to hazardous magnets and because she purchased or acquired products that were defective and not fit for its ordinary purpose as a plaything for her child as a result of the recalls. Plaintiff Rusterholtz would not have allowed her child to play with the Hazardous Toys had she known that her child would be exposed to loose magnets.

## II.    Defendants

### A.    Manufacturer Defendants

35.    Defendant Mattel, Inc., ("Mattel") is a Delaware corporation with its principal executive offices located at 333 Continental Boulevard, El Segundo, California.  Mattel designs, manufactures, and markets a variety of toy products throughout the United States and worldwide.  According to Mattel's Form 10-K for the period ended December 31, 2007, Mattel's products are grouped into three specific categories: (i) *Mattel Girls & Boys Brands* which includes toys such as Barbie® and Hot Wheels®; (ii) *Fisher-Price Brand* which includes products such as Little

1    People®, Sesame Street® and Dora the Explorer®; (iii) and *American Girl Brands*

2    which includes products such as Just Like You™ and Bitty Baby®.    Mattel

3    manufacturers its products in both company-owned facilities and through third-party

4    vendors.  Mattel's principal manufacturing facilities are located in China, Indonesia,

5    Thailand, Malaysia and Mexico.

6         36.    Defendant Fisher-Price, Inc. ("Fisher-Price") is a wholly-owned

7    subsidiary of Mattel with its corporate headquarters located at 636 Girard Avenue,

8    East Aurora, New York.  Fisher-Price markets and sells products principally for

9    children under the age of five.  Fisher-Price's products include Little People® play

10   sets, Power Wheels® vehicles, as well as a number of toys which are licensed

11   products of Sesame Street™, Disney™, Dora the Explorer™ and Winnie the Pooh™.

12   Fisher-Price represents that it is the world's largest maker of preschool products for

13   children.

14   **B.    Retailer Defendants**

15        37.    Defendant Target Corporation ("Target") is a Minnesota corporation with

16   its principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota.

17   Target Corporation operates Target and SuperTarget stores and Target.com.  Mattel,

18   Fisher-Price and Target distributed and sold the Hazardous Toys through Target

19   during the Class Period.

20        38.    Defendant Toys "R" Us, Inc. ("Toys 'R' Us") is one of the leading

21   retailers of children's toys and baby products in the United States.  The company is

22   owned by an investment group consisting of affiliates of Bain Capital Partners LLC,

23   Kohlberg Kravis, Roberts & Co. (KKR), and Vornado Realty Trust (NYSE: VNO).

24   Toys "R" Us operates four divisions: Toys "R" Us, U.S.; Toys "R" Us, International;

25   Babies "R" Us and Babiesrus.com; and Toysrus.com.  The company sells merchandise

26   through approximately 850 toy stores in the U.S. as well as through its Internet sites.

27   Toys "R" Us is a Delaware corporation with its principal executive offices in Wayne,

28

1    New Jersey.  Mattel, Fisher-Price and Toys "R" Us distributed and sold the Hazardous

2    Toys through Toys "R" Us during the Class Period.

3        39.    Defendant Wal-Mart Stores, Inc. ("Wal-Mart") is one of the world's

4    largest retailers with $345 billion in sales for the fiscal year ending 2007.  Wal-Mart

5    operates Wal-Mart Discount Stores, Wal-Mart Supercenters, Sam's Club warehouse

6    stores, Neighborhood Markets, and walmart.com.   Wal-Mart is a Delaware

7    corporation with its principal executive offices in Bentonville, Arkansas.  Mattel,

8    Fisher-Price and Wal-Mart distributed and sold the Hazardous Toys through Wal-Mart

9    during the Class Period.

10        40.    Defendant KB Toys, Inc. ("KB Toys") is owned by Prentice Capital

11   Management and operates KB Toys stores and, during the holiday season, KB Toys

12   Express. KB Toys' principal executive offices are located at 100 West St., Pittsfield,

13   Massachusetts.  Mattel, Fisher-Price and KB Toys distributed and sold the Hazardous

14   Toys through KB Toys during the Class Period.

15        41.    Defendant Kmart Corporation ("Kmart") bought and merged with Sears,

16   Roebuck in 2005 and is now owned by Sears Holdings Corporation. Sears Holdings

17   operates Big Kmart stores, traditional Kmart discount stores, Kmart Super Centers,

18   and Kmart.com.  Kmart's principal executive offices are located in Hoffman Estates,

19   Illinois.  Mattel, Fisher-Price and Kmart distributed and sold the Hazardous Toys

20   through Kmart during the Class Period.

21                      **FACTUAL ALLEGATIONS**

22   **I.    DEFENDANTS' TOYS ARE HAZARDOUS TO CHILDREN'S
            HEALTH**
23
             **A.    It is Unlawful to Manufacture or Sell Toys Containing
24                   Hazardous Amounts of Lead**

25        42.    Due to the catastrophic health effects on children, it is unlawful to

26   manufacture or sell children's toys containing lead.   The Federal Hazardous

27   Substances Act ("FHSA"), 15 U.S.C. §1261(f)(1), defines household products that

28   expose children to hazardous quantities of lead as "hazardous substances."  Toys

- 15 -

1    intended for use by children containing a hazardous substance in such manner as to be

2    susceptible of access by children are automatically banned under 15 U.S.C. §1261(q).

3        43.    Additionally, the federal Consumer Product Safety Act ("CPSA") (15

4    U.S.C. §§2051-2084), which created the Consumer Product Safety Commission

5    ("CPSC"), authorized the CPSC to promulgate rules declaring a consumer product to

6    be a "banned hazardous product" if the product presents an unreasonable risk of injury

7    that is not otherwise addressed by the CPSA.  *See* CPSA §8, 15 U.S.C. §2057.

8        44.    The CPSC has banned toys and other articles intended for use by children

9    that contain paint with a lead content exceeding 0.06% because lead presents a risk of

10    lead poisoning to young children.  *See* 16 C.F.R. §1303.  Therefore, the CPSC has

11    ruled that toys and other articles intended for use by children that bear "lead-

12    containing paint" are "banned hazardous products."  16 C.F.R. §1303.4; 16 C.F.R.

13    §1303.1(a)(1).

14        **B.    The Dangers of Lead Exposure to Young Children**

15        45.    It is well established in the scientific community that lead exposure is

16    hazardous to human health.  Lead is toxic to almost every organ system, most

17    importantly, the central nervous system, peripheral nervous system, kidneys, and

18    blood.  Lead has also been found to impair hearing acuity, and has been associated

19    with hypertension, chronic kidney disease, delayed puberty, decreased growth in

20    children, and periodontal disease.

21        46.    Further, young children are far more susceptible to lead exposure than

22    their adult counterparts.  According to the National Safety Council, "[y]oung children

23    under the age of six are especially vulnerable to lead's harmful health effects, because

24    their brains and central nervous system are still being formed."[3]  The National Safety

25    Council further noted that for children under the age of six, "even very low levels of

---

26

27    [3]    National Safety Council Fact Sheets – Lead Poisoning, http://www.nsc.org/
library/facts/lead.htm (last visited Mar. 30, 2008).

28

exposure can result in reduced IQ, learning disabilities, attention deficit disorders, behavioral problems, stunted growth, impaired hearing, and kidney damage."[4]

47.    Additionally, according to Dana Best, MD, MPH, FAAP, who testified on behalf of The American Academy of Pediatrics before the United States Congress Energy and Commerce Subcommittee on Commerce, Trade, and Consumer Protection on September 20, 2007, there is no "safe" level of lead exposure.[5]  If a developing embryo, fetus or child is exposed to a poison of some kind, development can be impacted negatively.[6]  There are lasting effects of lead exposure on behavior, with higher rates of behavioral problems reported in teens and adults exposed to lead during childhood.[7]  Children with elevated lead levels are more likely to have problems with attention deficit and reading disabilities, and to have an increased chance of failing to graduate from high school.[8]

48.    Even at low levels of exposure, children can experience a reduced IQ, learning disabilities, attention deficit disorders, behavioral problems, stunted growth, impaired hearing and kidney damage.  Numerous studies indicate that IQ and cognitive functioning can be adversely affected by *less than* 10 micrograms per deciliter.[9]

---

[4]    *Id.*

[5]    Protecting Children from Lead-Tainted Imports: Hearing Before the Subcomm. on Commerce, Trade, and Consumer Protection, 110th Cong. 3 (2007) (statement of Dana Best, MD, MPH, FAAP on behalf of the American Academy of Pediatrics).

[6]    *Id.*

[7]    *Id* at 4.

[8]    *Id.*

[9]    *See Richard L. Canfield et al., Intellectual Impairment in Children with Blood Lead Concentrations below 10 µ per Deciliter*, 348 NEW ENG. J. MED. 1517 (2003); Todd A. Jusko, *et al., Blood Lead Concentrations Less than 10 Micrograms per Deciliter and Child Intelligence at 6 Years of Age*, 116 ENV'T HEALTH PERSP. 243 (2008); and Bruce P. Lanphear, MD MPH, et al., *Cognitive Deficits Associated with*

49.     Children may be exposed to lead from consumer products through normal hand-to-mouth activity, which is part of their development.  In fact, children often place toys, fingers and other objects in their mouth, bite, chew, and even ingest them, directly exposing themselves to lead paint on the toy, or place fingers in their mouths after handling toys.

## C.     Defendants' Defective Design and Hazards Posed By Magnets

50.     Defendants designed, manufactured and sold toys that posed a substantial risk to children due to magnets that could become loose and if swallowed, cause a potentially fatal injury.  Specifically, toys containing loose magnets are hazardous to children's health.  When magnets become loose and are swallowed by children, they can cause serious intestinal injury, including intestinal perforation.  In November 2004, Dr. Alan Oestreich of the Cincinnati Children's Hospital wrote a highly publicized letter to the medical journal Radiology, explaining the serious injuries posed by small magnets:

> The message in brief is that any time more than one magnet passes beyond the pylorus of a child (or, for that matter, an adult), an emergency danger of necrosis and perforation exists, and urgent surgical consideration is required.[10]

The CPSC is aware of hundreds of complaints that magnets have fallen out of various toys and, in some cases, have caused injury to children.[11]  Since 2003, the CPSC has

---

*Blood Lead Concentrations <10 µ /dL in US Children and Adolescents*, 115 PUB. HEALTH REP. (2000).

[10]     *See* Alan E. Oestreich, M.D., Letters to the Editor: Multiple Magnet Ingestion Alert, *Radiology*, November 2004, http://222/radiology.rsnajnls.org/ cgi/content/full/233/2/615 (last visited on May 7, 2008).

[11]     *Id.*

identified one death resulting from ingestion of loose magnets and approximately 33 cases which required emergency surgery.[12]

51.    In fact, on August 1, 2007, the CPSC named magnets the number one hidden home hazard.  The CPSC stated that, since 2005, magnets have been the cause of one death and 86 injuries, and has prompted the recall of approximately 8 million magnetic toys.[13]

52.    On April 19, 2007, the CPSC issued a press release entitled "Small Magnets Are Injuring Children: CPSC Releases Stronger Warning to Parents."  The CPSC press release echoed Dr. Oestrich's warning about the serious dangers of magnet ingestion and . . . presented the grim reality of what happens when two or more magnets are swallowed:

> [P]arents and physicians may think that the materials will pass through the child.  But with magnets this is often not the case.  The magnets become trapped in the body and can twist or pinch the intestine, causing holes, blockage and infection in the intestine or blood poisoning.  All of which can lead to death.[14]

## II.    DEFENDANTS' MISREPRESENTATIONS OF THE HAZARDOUS TOYS

### A.    Defendants Misrepresented Their Hazardous Toys Are Safe, Quality Products

53.    Mattel and Fisher-Price have consistently represented in their advertising materials that their products are safe, high quality toys that meet or exceed safety

---

[12]    *Id*.

[13]    *See* CPSC Press Releases: the "Top Five Hidden Home Hazards," (Aug. 1, 2007), http://www.cpsc.gov/CPSCPUB/PREREL/prhtml07/07256.html (last visited on Apr. 30, 2008).

[14]    *See* Press Release, CPSC Small Magnets Are Injuring Children; CPSC Releases Stronger Warning to Parents (Apr. 19, 2007), http://www.cpsc.gov/cpscpub/prerel/prhtml07/07163.html (last visited on Apr. 30, 2008).

requirements.  Mattel and Fisher-Price have sought to promote their brands and present themselves as leaders in offering safe toys.  Further, Mattel and Fisher-Price represent that their quality and inspections programs ensure that all of their toys are safe for children.

54.    Specifically, Mattel goes to great lengths to market and advertise that their toys are safe for children and are part of a brand that families can trust.  Indeed, Mattel has made the following representations on its website:

> At Mattel, we are serious about safety and quality and are very concerned about how consumers use our products.
>
> Our product safety policies are based on our core value of protecting our consumers from unforeseen harm.  We set global standards on health and safety exposures at or more stringent than legal limits.
>
> Mattel products are designed and manufactured to meet or exceed all applicable safety standards from around the world.[15]

55.    Mattel's Code of Conduct, also available on its website, includes the following specific representations about its commitment to quality, and implies that its brand is synonymous with creating safe, high quality toys that comply with all legal standards.  Under the section "Our Responsibility to Consumers," subsection "Product Quality and Safety," Mattel made the following statements:

> Mattel's reputation for product quality and safety is among its most valuable assets, and our commitment to product quality and safety is essential.  Children's health, safety and well-being are our primary concern.  We could damage our consumers' trust if we sell products that do not meet our standards.

---

[15]    Mattel-About Us- Corporate Social Responsibility-Product Safety, http://www.mattel.com/about_us/Corp_Responsibility/cr_productsafety.asp (last visited Mar. 30, 2008).

> Our commitment to product quality and safety is an integral part of the design, manufacturing, testing and distribution processes. We will meet or exceed legal requirements and industry standards for product quality and safety. We strive to meet or exceed the expectations of our customers and consumers.[16]

56.     Moreover, Mattel's 2007 Global Citizenship Report, published January 30, 2007, made the following statements further demonstrating that consumers equated Mattel and Fisher Price products with safety and quality: "Our research indicates that consumers associate Mattel with safe, high-quality products."[17] Under the heading "Commitment to Responsible Manufacturing," the report states: "At Mattel, the loyalty of consumers will never be taken for granted as we continually strive to earn their trust by delivering on our promise of quality, safety and innovation and ensuring that our toys are manufactured responsibly and ethically."[18]

57.     To further support their claims that Mattel products are safe and of high quality, the Mattel 2007 Global Citizenship Report, under the heading "Product Safety Procedures" further made the following representations regarding compliance with specific safety standards:

> The integrity, safety and quality of our products are all fundamental to Mattel's success in the marketplace. We strive to meet or exceed the laws and regulations for manufacturing toys, which are enforced by the U.S. Consumer Product Safety Commission (CPSC) and similar safety agencies in other countries. Moreover, we have an ongoing commitment

---

[16]     Mattel-About Us-Corporate Governance-Code of Conduct, http://www.mattel.com/about_us/Corp_Governance/ethics.asp (last visited Mar. 30, 2008).

[17]     *See Mattel 2007 Global Citizenship Report*, Jan. 30, 2007, at 4 http://www.mattel.com/about_us/Corp_Responsibility/Mattel_07GCReport.pdf.

[18]     *Id*. at 7.

to the development of toy safety standards and dedicate professional time and testing resources to regularly update and enhance our safety requirements. Mattel products are designed and manufactured according to our proprietary Quality and Safety Operating Procedures (QSOPs) which meet or exceed the safety regulations of every country in the world.[19]

58.    The 2007 Mattel Global Reporting Initiative (GRI) Report, accessible from Mattel's website, further represents that Mattel products and the Mattel brand are known to meet and exceed safety standards. Specifically, the Report states that the Product Integrity Department "is committed to provide 'Quality and Value the World Can Trust.' We accomplish this by using a highly integrated approach to new product development and regulatory compliance. Our products are designed and manufactured to meet our proprietary Quality and Safety Operating Procedures (QSOPs)."[20] However, Mattel's QSOPs are not included in the report and do not appear to be available to the public.

59.    In addition, the GRI Report states: "We work closely with our design, engineering and manufacturing teams to design safety and quality into our products and to build them in a consistent, predictable manner to ensure the products meet our specifications."[21]

60.    In a Letter to Stakeholders which is posted on Mattel's website and included in the company's 2007 Global Citizenship Report, CEO Robert Eckert wrote that "Mattel's strength is our company culture, which for generations has been

---

[19]    *Id* at 18.

[20]    *See Mattel 2007 GRI Report*, Mar. 16, 2007, at 35, http://www.mattel.com/about_us/Corp_Responsibility/MATTEL_2007_GRI_REPORT.pdf.

[21]    *Id.*

focused on creating innovative, safe and high quality toys that inspire children to play, learn and have fun."[22]

61.     Mattel's brand for preschoolers, Fisher-Price, is a key part of its advertising and marketing of a safe and high quality brand. Like Mattel, Fisher-Price represents on its website that it maintains high safety standards: "As the world's most trusted name in quality toys, Fisher-Price® has been enriching childhood for generations.  From sensory-stimulating infant toys, to preschool toys that engage active imaginations, to baby gear that blends safety, comfort and convenience, Fisher-Price products help partners get their families off to the best possible start."[23]

62.     Furthermore, Fisher-Price advertises: "In keeping with our long-standing tradition of innovation, quality, durability, safety and good value, we offer products and services consumers can trust to improve their family's lives."[24]

63.     However, contrary to Defendants' representations, the Hazardous Toys were not in fact safe, nor were their inspection and quality assurance programs sufficient to prevent millions of toys contaminated with lead, lead paint or containing small magnets that could become loose from being sold to the public.  Plaintiffs and members of the Class would not have purchased the Hazardous Toys had they known of the lead contamination and/or that the toys contain magnets that could become loose.

**B.     Mattel Represented that the Hazardous Toys Are Age-Appropriate**

64.     Age grading practices are important to ensure that a toy is appropriate and safe at particular stages of children's physical and mental development.[25]

---

[22]     *See* Mattel 2007 Global Citizenship Report, note 53, at 1.

[23]     Mattel – Our Toys – Fisher-Price, http://www.Mattel.com/our_toys/ot_fish.asp (last visited Mar. 30, 2008).

[24]     Fisher-Price® Human Resources –About Us, http://www.fisher-price.com/us/ hr/aboutus.asp (last visited Mar. 30, 2008).

1    Children under three years of age are more prone to placing objects in their mouths

2    than older children.[26]  In its packaging of toys and elsewhere, Mattel represents that its

3    toys are appropriate for certain specific ages.  Moreover, the packaging on certain of

4    its toys carries images of children playing with the products.  Plaintiffs and members

5    of the Class purchased the Hazardous Toys believing that the toys were safe for their

6    children to play with as children normally do.

7        65.    In Mattel's 2007 Global Citizenship Report, Mattel represented that toys

8    are age graded based in part on the observation of children playing with specific

9    toys.[27]  The report states: "With each product, Mattel strives to create toys that are

10   safe, age-appropriate and help children learn as they grow."  The report continues:

11        As part of Mattel's design process, we age grade toys to ensure that our

12        products are safe and age-appropriate for children.  Age grades are

13        determined by both internal and external tests and by observing children

14        playing with specific toys.  For instance, we recognize that toys created

15        for our youngest consumers must be designed such that they are able to

16        enjoy and be rewarded by every feature the toy offers.

17        Mattel's toy products include an age grade on the outside packaging.

18        The process of determining the correct age grade helps ensure that our

19        products are safe, and we believe it enables parents to make wise

20        purchases of age-appropriate toys for their children to enjoy.[28]

21        66.    According to the report, "beginning sensory and imaginary play" is

22   included under "skills and behavior" for Mattel's "Stage 1" of age grading, 0-2 years

23   _____

24   [25]    See ASTM F963-07e1, Standard Consumer Safety Specification for Toy Safety, at 44.

25   [26]    Id. at 45.

26   [27]    See Mattel 2007 Global Citizenship Report, note 53 at 16.

27   [28]    Id.

28

old. One of the brands best represented in Mattel's Stage 1 is the Fisher-Price Infant and Preschool Toys brand, which includes a number of the recalled toys.[29] Defendants claim to observe young children at play and thus should know that mouthing and sucking on toys is a sensory-play behavior that is typical of children aged zero to three years.

67.    Additionally, on Fisher-Price's website, Defendants market toys directly to "infants," "toddlers," and "preschoolers."[30]

68.    Plaintiffs and members of the Class relied on Mattel's advertising to assure them of the safety of the toys they purchased for their children. Mattel's statement on advertising in the 2007 GRI report follows:

> Specifically, Mattel's brand and product promotion activities, including advertising, packaging, point-of-purchase displays and promotional programs and sweepstakes, are to be conducted in a manner that is consisted [sic] with applicable laws, in accordance with high standards of commercial fairness and in a manner that is neither misleading nor deceptive. Under Mattel international procedures, all US advertising is reviewed by experienced engineering and legal professionals during development and in final form prior to public use, to ensure . . . that any claims are substantiated and that the material is appropriate for the target audience.[31]

69.    In light of the foregoing, it is foreseeable that Defendants could have, and should have, anticipated that young children would chew on certain toys, because as manufacturers of children's toys, Defendants should have known that "mouthing and

---

[29]    *Id.*

[30]    *See e.g.*, Fisher-Price Browse Toys by type, http://www.fisher-price.com/fp.aspx?st=30&e=toysbytype (last visited Mar. 30, 2008).

[31]    *See* Mattel 2007 GRI Report, note 56, at 37.

1  sucking activity among infants and young children is a very common and necessary

2  part of early childhood behavior."[32]

3      70.    Defendants, however, through their advertisements and marketing

4  materials made representations and gave Plaintiffs and members of the Class the false

5  impression that their toys were safe for children of certain ages and were safe for use,

6  when in fact, they were harmful.

7      **C.    The Retailer Defendants Represented that the Hazardous
         Toys Are Safe, Quality Products and Are Age-Appropriate**

8

9      71.    The Retailer Defendants further enabled Mattel and Fisher-Price to make

10  representations concerning the quality of its toys.    The retailers that sold the

11  Hazardous Toys adopted, and are responsible for, the representations Mattel made on

12  its packaging regarding the safety of the toys and the age-appropriateness of the toys,

13  when they decided to place such Toys on their store shelves and on retail websites,

14  and thereafter advertised and sold such Toys to Plaintiffs and other members of the

15  Class.

16      72.    Additionally, the Retailer Defendants have made specific representations

17  concerning the toys and products they offer for sale.

18      73.    Target has made representations to its customers that the toys it sells are

19  safe products.    Specifically, Target states on its website, in relevant part:

20      Product Safety

21      Guest safety has and continues to be a top priority for Target.    We are

22      working closely with our vendors, industry leaders and the Consumer

23      Product Safety Commission (CPSC) on product safety issues and we can

24

25  _____

26  [32]    Deland R. Juberg, Kathleen Alfano, Robert J. Coughlin, & Kimberly M.
       Thompson, *An Observational Study of object Mouthing Behavior by Young Children,*
27  107 PEDIATRICS, at 135-142 (Jan. 2001).

28

1    assure you that we are taking steps to ensure we have the best products –

2    in terms of safety and quality – on our store shelves.[33]

3        74.    Likewise, Toys "R" Us represents that its toys are safe for children.  On

4    its website, Toys "R" us lists the following question and answer:

5        **Are all the toys carried by Toys "R" Us tested for hazards and what**

6        **are they tested for?**  We have a very strict safety assurance program for

7        all the products we carry.  We require that any products we purchase

8        (including from outside the United States) comply with all applicable

9        government and industry laws, codes and requirements.   We have

10       mandated that our manufacturers test every toy shipment to Toys "R" Us

11       before it leaves the country of origin for a variety of potential safety

12       concerns including lead, small parts, sharp edges, flammability and other

13       mechanical hazards.

14       **How can you ensure the toys in your stores are safe for customers to**

15       **purchase?**  As the world's largest specialty toy retailer, we know that

16       nothing is more important than the safety of children.  Toys "R" Us

17       safety standards require that our products meet or exceed federally

18       mandated and industry-accepted standards."[34]

19       75.    Similarly, on its walmart.com website, Wal-Mart now states:

20       At Wal-Mart, we want you to feel comfortable giving the gifts that

21       children love to receive. To ensure that our products are both enjoyable

22       and safe, we have taken additional steps this year for toy safety.

23       Wal-Mart's Toy Safety Net Program

24    _____

25    [33]    Target – Product Recalls & Safety Information, http://www.target.com/Product-
      Recalls-Safety-Information-Shopping/b?ie=UTF8&node=10173841 (last visited Mar.

26    30, 2008).

27    [34]    Toys "R" Us – Safety FAQ's, http://www9.toysrus.com/safety/safetyFAQs.cfm
      (last visited Mar. 30, 2008).

28

1     Wal-Mart has heard parents' concerns over recent recalls and is

2     committed to playing an active role in improving toy industry standards.

3     As your advocate, we're working hard to get everyone in the toy industry

4     involved and doing their part to improve standards. Last August, we

5     launched our Toy Safety Net program to enhance ongoing safety efforts

6     and provide reassurance to our customers.

7     The program includes:

8     More checking: Wal-Mart has asked all toy suppliers to submit recent

9     testing documentation for toys currently on Wal-Mart shelves or on their

10     way to stores.

11     Increased product testing: Wal-Mart secured testing capacity at

12     independent labs to test for lead in product surface coating, magnets and

13     removable parts on toys that could end up in a child's mouth. More than

14     12,000 products have passed multiple tests, by both suppliers and Wal-

15     Mart, and testing will continue beyond this holiday season.

16     Greater industry involvement: Wal-Mart is participating in discussions

17     with toy industry organizations, Congress and the U.S. Consumer

18     Product Safety Commission (CPSC) regarding proposed legislation to

19     increase toy safety. We want to provide our knowledge and counsel,

20     share our findings, and work together in hopes new legislation will bring

21     about new safety standards and abilities to act quickly for children's

22     safety.

23     Larger selection: Wal-Mart has asked suppliers to look for additional

24     opportunities to buy products made in North America and has ordered

25     more North American-made toys for our customers.[35]

26     _____

27     [35] Information from Wal-Mart website *available at*
http://www.walmart.com/catalog/catalog.gsp?cat=651279 (visited May 15, 2008).

28

76.    KB Toys makes similar on-line representations:

eToys Direct, Inc., which owns and operates eToys.com and operates KBtoys.com, is committed to the safety of all children. The magnitude of the recent toy recalls concerns all of us, as parents and as members of the toy industry.

eToys works closely with manufacturers to ensure the swift and thorough retrieval of recalled products purchased through our web sites. We coordinate with both the manufacturer and the U.S. Consumer Product Safety Commission when any toy recall is issued.

Our immediate priority when a toy recall is issued is your child's safety. We use a three-step process of identification, containment and customer communication.

Identification

As soon as we are notified of a toy recall, our toy buyers identify all products carried by eToys that were affected by the recall. This includes products currently in stock and those that we carried at one time but no longer sell.

Containment

Our second step is to contain all affected products in our warehouse. Our team promptly begins to remove all recalled items from the shelves and storage locations. Those items are then quarantined and returned to the manufacturer.

Communication

We attempt to contact customers who have purchased recalled items. If available, we use the e-mail address you provided when you placed your order, and contact you about the recall. In the e-mail, we give you the specific name, item number and order number of the recalled item and offer specific instructions on returning the item to the manufacturer.

We also post recall notices on our web site to keep you informed about toy safety. We encourage you to check our recalls page regularly to stay informed.

We value your business and want to assure you that we take toy recalls seriously. We follow the same process for all toy recalls, large or small.[36]

### D. The Toy Industry Group Agreed to Ban the Use of Lead in Toys

77.    The trade association representing a number of toy manufacturers, including Mattel and Fisher-Price, have previously represented to the public that its members would cease using lead in all toys.

78.    Specifically, on September 17, 1997, the TMA issued the following policy statement, in relevant part:

More than 30 years ago, when lead in toys was first identified as toxic, it was the toy industry which took the lead to protect children.  Toy Manufactures of America (TMA), in cooperation with the American Academy of Pediatrics jointly developed the first toy safety standard limiting lead in paint and similar surface coatings.  Manufactures around the world have limited the use of lead in toys ever since.

The voluntary standard established in the United States under ASTM F-963 and the European standard under EN-71 for soluble lead in toys (lead which may migrate from the toy and be ingested by the child) is 90 parts-per-million.  At that level, any intentional use of lead in paints or other surface coatings containing lead would immediately put the toy over the permitted limit.

---

[36]    Recall    Statement    from    eToys    Direct,    *available    at* http://www.kbtoys.com/help/productRecallsStatement.html (visited May 15, 2008).

No one disputes the toxic effects of lead.  It is poison.  It is unthinkable that toy manufacturers, the very people whose mission in life is to provide safe playthings for children, would not be in the forefront of efforts to see that those children come to no harm.  Rest assured.  They are."[37]

79.    In 1998, the Toy Manufacturers of America ("TMA"), now known as the Toy Industry Association ("TIA"), again represented that its members would no longer use lead in any of it toys.  Mattel and Fisher-Price presently are, and have been during all times since 1997 when the foregoing statement were made, members of the TIA.

80.    Additionally, on August 20, 1998, the TMA, on behalf of its members issued the following press release which pledged to cease use of lead in all toys:

The Toy Manufacturers of America (TMA) has pledged that its members will help reduce children's exposure to hazardous lead levels.  They will go beyond what the law requires by eliminating lead from their products.  According to TMA President David Miller, "TMA members have always been vigilant in ensuring that children are not exposed to hazardous levels of lead from their products.  ***We are now going beyond what the law requires, and eliminating lead from our products altogether***. [38]

81.    Despite these representations that TMA members, including Mattel, would stop using lead from their products, Mattel continued to manufacture toys containing lead or lead paint.

_____

[37] Press Release, International Council of Toy Industries, Industry Policy on Lead in Toys (Sept 17, 1997), http://web.archive.org /web/19971017041448/www.toy-tma.com/news/policy.htm.

[38] Press Release, Toy Manufacturers of America, Toy Manufacturers Agree to Rid Products of Lead (Aug. 20, 1998), http://web.archive.org/web/19990915151440/www.toy-tma.org/NEWS/nolead.html.

### E. Defendants Represent that their Toys Comply with ASTM Standards

82.    As displayed on the packaging of Defendants' toys, including the Hazardous Toys, The Manufacturer Defendants represent that the toys meet the standards set forth by the ASTM (originally known as the American Society for Testing and Materials).  ASTM is one of the largest voluntary standards development organizations in the world and its standards are the work of over 30,000 ASTM members, including technical experts from various groups, including producers, users, consumers, government and academia.[39]  Additionally, the Retailer Defendants, by selling the Hazardous Toys with such representations, have adopted and likewise represent to consumers that the Hazardous Toys complied with such standards.

83.    Specifically, ASTM developed and published a standard concerning consumer safety specifications for toys – ASTM Standard F-963.  This standard is the current standard relating to possible hazards in toys, including those that relate to lead paint, or surface coatings containing lead paint.[40]

> Mattel represents on the boxes of its toys, including the Hazardous Toys
> at issue, that such toys conform to the safety requirements of ASTM F-
> 963.  Contrary to such representations, however, Mattel's toys did not in
> fact comply with ASTM F-963 because they contained lead paint.

### III. Defendants Knew that the Hazardous Lead Toys Were at Risk for Being Contaminated with Lead Paint

84.    Although lead paint has been banned on products marketed to children in the United States for thirty years, Defendants continue to manufacture, design, market, distribute and sell toy products with lead or lead paint.  Most, if not all of the toys, were manufactured in China.

---

[39]    *See* About ASTM International, http://www.astm.org/ (follow "About ASTM International" hyperlink) (last visited Mar. 30, 2008).

[40]    *Id*.

## A.    Numerous Recalls of Chinese Toys Put Defendants on Notice

85.    Defendants' practices have not ceased despite numerous recalls in recent years of toys made in China due to unlawful lead content.  From January 2005 until Mattel's first recall of toys containing lead on August 2, 2007, the CPSC worked with various manufacturers and retailers in the United States to initiate **more than fourteen** recalls of Chinese-made toys because they were contaminated with toxic lead paint. These recall announcements were made publicly and available to any member of the public on the CPSC's website.

86.    During the fiscal year of 2006, the CPSC announced a record number of recalls of defective products.  Over two-thirds of these recalls were of imported products, primarily from China.[41]

87.    Similarly, CPSC Commissioner Thomas H. Moore testified that the CPSC reached a new record number of recalls "of hazardous imported products from China including a wide variety of toys and children's jewelry" in 2007.[42]

88.    Defendants' own products were involved in several of these earlier recalls involving Chinese-made products.  On March 30, 2006, American Girl, Inc., a division of Mattel, recalled 180,000 units of American Girl jewelry made in China because they contained high levels of lead.  Target recalled Little Tikes Co. animal shaped flashlights because they contained lead paint on March 1, 2006.  In November of 2006, Target later recalled nearly 200,000 "Kool Toyz" because they contained toxic lead paint and/or presented laceration hazards.  This was followed by Target's

[41]    *See* Testimony on Enhancing the Safety of Our Toys; Lead Paint, the Consumer Product Safety Commission, and Toy Safety Standards: Hearing Before the Subcomm.  On Financial Servs. and General Government, 110th Cong. 1 (2007) (testimony of Nancy A. Nord, Acting Chairman, U.S. Consumer Product Safety Commission) ("Nord Testimony").

[42]    *Protecting Children from Lead-Tainted Imports: Hearing Before the Subcomm. on Commerce, Trade and Consumer Protection*, 110th Cong. 4 (2007) (statement of Thomas H. Moore, Commissioner, U.S. Consumer Product Safety Commission).

May 2007 recall of Anima Bamboo Collection Games and September 2007 recall of children's toy gardening tools and chairs, made in China because the toys contained lead paint.   In March 2007 Toys "R" Us recalled Elite Operations toy sets manufactured in China, due to lead and laceration hazards.   Then again in August 2007 and October 2007, Toys "R" Us issued two additional recalls of toys manufactured in China due to violations of lead paint standards.  In October 2007, KB Toys issued a recall of wooden toys due to violation of lead paint standards.   In February 2007, and again in June 2007, Kmart recalled children's jewelry and jewelry accessories that were manufactured in China and sold exclusively at Kmart stores due to lead poisoning hazards.   Finally, defendant Wal-Mart has issued various recalls due to hazardous lead in products manufactured in China.  In May 2007, October 2007 and most recently in April 2008, Wal-Mart issued three recalls of certain products manufactured in China because they contained hazardous levels of lead.  Defendants' previous recalls, along with the ongoing recalls of Chinese-made toys that contain toxic lead paint by other retailers and manufacturers, put Defendants on notice that children's products manufactured in China could contain lead or lead paint, and that their controls over production were not adequate.

89.    Approximately 50% of Mattel's production in China is from Mattel-owned plants.  Mattel's Chinese manufacturing operations have grown in recent years. In fact, in or about 2002, Mattel closed the last of its United States manufacturing plants in favor of moving more production to less expensive plants and subcontractors in China.[43]

---

[43]    *See* Alex Veiga, *Recalls Post Challenge for Mattel CEO*, THE ASSOCIATED PRESS, Sept. 7, 2007, http://www.usatoday.com/money/economy/2007-09-07-75084583_x.htm.

### B.   Mattel Failed to Timely Notify Government Agencies and Act to Recall Hazardous Toys

90.   Mattel failed to act in a timely manner to recall the Hazardous Toys even after they tested positive for lead content.  According to the September 5, 2007 Response of Mattel, Inc. to the August 22, 2007 Information Request from the United States Congress, Subcommittee on Commerce, Trade and Consumer Protection ("September 5 Response"), Mattel was put on notice by June 8, 2007 that certain of its Toys contained lead when a laboratory independently hired by Auchan, a French importer of toys, tested Toys positive for excessive amounts of lead.  The Toys were manufactured for Mattel by Lee Der Industrial Company, Ltd. ("Lee Der"), a supplier of toys, located in Foshan, China.

91.   As described in further detail below, some Mattel employees in China were notified of these test results on or about June 8, 2007.  On June 28, 2007, Mattel employees in China took additional samples of the toys and sent them to Mattel's laboratory for testing.  On July 3, 2007, another lead test performed by Intertek found noncompliant lead levels in paint on the same Fisher-Price toy manufactured by Lee Der.  On July 6, 2007, Mattel's laboratory in China reported the test results of the June 28, 2007 test and confirmed that nonconforming levels of lead were in the paint.  Additionally, on July 9, 2007, Mattel's laboratories found that 10 of 23 samples from Lee Der's production contained paint with excessive levels of lead.  Production was stopped on or about July 12, 2007.

92.   Despite its knowledge that the Toys were hazardous, Mattel did not notify the CPSC of its findings until July 20, 2007 – *over six weeks* after Mattel discovered the existence of toys contaminated with lead paint.  Indeed, it was not until August 2, 2007, *almost two months* after Mattel discovered the lead paint on the toys, that Mattel informed the public of the first recall.

93.   The CPSC is currently investigating the timeliness of Mattel's reports of lead paint.  In fact, the CPSC has already fined Mattel twice since 2001 for knowingly

1 withholding information regarding problems that created an unreasonable risk of

2 serious injury or death.[44]  Mattel has taken the position that it should be able to

3 evaluate hazards internally before alerting any outsiders.  However, according to a

4 former chairwoman of the CPSC, Mattel's position is "'fallacious and wrongheaded'

5 [and] [c]hildren can be injured while the company takes its time investigating

6 incidents under its own rules."[45]

7      94.    As a result, during the weeks when Defendants failed to disclose the

8 problem to the CPSC or to parents, children were needlessly exposed to lead-

9 contaminated toys, including in some cases, lead paint **exceeding the legal lead limit**

10 **by approximately 200 times** (*e.g.*, 11% lead as compared to the legal limit of 0.06%).

11 Defendants knew that the toys were being sold and distributed throughout retailers,

12 both in stores and on the Internet, yet failed to provide adequate and timely warnings

13 that the use of the toys could result in exposure to lead or hazardous magnets.

14 **C.    Mattel was Aware of the Dangers Posed by the Magnets in**
**its Polly-Pocket Play Sets Well Before the November 21,**
15 **2006 Recall**

16      95.    In an interview following the August 14, 2007 recalls, Mattel's Chairman

17 and CEO, Eckert and Mattel's Vice President, Walter, said that the danger inherent in

18 the tiny magnets that were used in the Mattel toys was an "emerging issue" that Mattel

19 has attacked as quickly as it thought prudent.[46]  As the facts indicate, however, Mattel

20 did not act quickly at all.

21      96.    Mattel was alerted to the potential danger of its magnet toys as early as

22 February 2006 when it was notified by an attorney whose client, a 7 year-old girl

23 named Paige Kostrzewski, had swallowed two magnets from a Polly Pocket toy,

24 ────────────────

25 [44]    *See* Nicholas Casey & Andy Pasztor, *Safety Agency, Mattel Clash Over Disclosure*, WALL ST. J., Sept. 4, 2007, at A1.

26 [45]    *Id*.

27 [46]    *Id*.

28

1  which caused an obstruction that required surgery.[47]  A scan test at the hospital

2  revealed that two magnets had lodged in the girl's bowel and required surgery to be

3  removed.  The magnets' connection punctured two holes in the girl's intestines – an

4  intestinal rupture – and caused a massive infection.  Mattel's attorneys interviewed

5  Paige, her mother and the surgeon in the spring of 2006, quietly settled for an

6  undisclosed amount, and **only issued a recall nine months after the incident**

7  **occurred.**

8      97.    Despite Mattel's knowledge dating back as early as February 2006, the

9  first recall of approximately 2.4 million Mattel Polly Pocket play sets was announced

10  only on November 21, 2006.  At the time of the recall, the CPSC had 170 reports of

11  small magnets coming out of the recalled toys, plus three reports of children that

12  swallowed the magnets and suffered intestinal perforations which required surgery.

13  Mattel was clearly on notice of the dangers posed by its Polly Pocket Toys, well

14  before the recall was announced.

15      98.    Mattel failed to timely act to expand the magnet-related recall.  In fact,

16  during the eight month period between Mattel's magnet-related recalls the company

17  collected an additional 400 reports of potentially lethal magnets coming loose.[48]

18      99.    According to a press release issued by Mattel on September 21, 2007,

19  Mattel produces 800 million toys a year.[49]  18.2 million of these toys were recalled in

20  2007 due to magnets that could become loose.[50]

21

22

23  _____

24  [47]   *Id.*

25  [48]   *Id.*

26  [49]   Mattel Sept. 21, 2007 Press Release, note 36.

27  [50]   *Id*.

28

**IV.    Defendants Exercised Inadequate Quality Control and Oversight Over Their Operations and Hazardous Toys**

100.    Notwithstanding the foregoing, and as illustrated below, Mattel's oversight and quality controls for its manufacturing facilities in China were inadequate and led to the use of toxic and nonconforming lead paint on products intended for children.  Despite the known problem of lead paint on Chinese-made toys, including Defendants' own products, Mattel failed to put into place proper controls to prevent the use of toxic lead and lead paint as it shifted its manufacturing operations to China.  Mattel subsequently failed to adequately screen products when delivered from China to ensure that Mattel's toy products were safe as children's playthings prior to placing them into the stream of commerce.

101.    Additionally, the Retailer Defendants independently failed to adequately inspect the safety of these products before selling them at their retail stores and/or through their websites, despite their own representations that the toys were safe playthings for children.  The Retailer Defendants knew or should have known of the dangers of toxic lead, lead paint and hazardous magnets, particularly for toys manufactured in China, due to the earlier recalls and other information relating to the lead contamination of Chinese toy products.  Additionally, the Retailer Defendants knew or should have known of federal and state bans on hazardous substances and the TIA's 1998 ban on lead in toy products, as aforementioned.  The Retailer Defendants had a duty to put into place adequate controls so as to monitor the quality and safety of the toys they sold to Plaintiffs and the Class.  Moreover, the Retailer Defendants had a duty to inquire of Mattel regarding the testing and quality assurance of their toys.

102.    During the relevant time period, Defendants were aware that the CPSC drastically reduced its staff that oversaw and inspected products manufactured abroad. Indeed, as of 2007, the CPSC had a staff of only 15 people assigned to the U.S. ports of entry to inspect more than 15,000 product types amounting to tens of millions of

products annually.  In fact, it is well known that the CPSC employed only one full-time toy tester.    Regardless of these numbers, Defendants had a duty and responsibility to ensure the safety of the products they sold and distributed. Defendants had a duty to implement much more stringent standards, quality control and testing procedures in China to prevent the manufacture, sale and/or marketing of toys contaminated with lead, lead paint, or loose magnets in the United States.

103.   In fact, the general manager and senior vice president of Fisher-Price's core operations admitted that ***"[w]e did not monitor the quality of production as closely as we should have."[51]***

## V.    DEFENDANTS RECALL SOME OF THE HAZARDOUS TOYS

### A.    The Lead Paint Recalls

104.   Since August 2, 2007, Mattel has recalled over 2 million toy products due to lead or lead paint, in a series of six recalls here in the United States.  Worldwide, this number spikes up to three million products in six separate recalls.  Despite these widespread recalls, Defendants continue to manufacture and sell children's toys containing hazardous levels of lead.

### 1.    August 2, 2007 Recall

105.   On August 2, 2007, in cooperation with the CPSC, Mattel announced the recall of 83 different types of Fisher-Price Toys, totaling approximately 967,000 Fisher-Price toys manufactured in China between April 19, 2007 and July 6, 2007, and subsequently shipped to the United States.[52]

---

[51]    Matt Glynn, *Fisher-Price redoubling its effort at toy safety*, THE BUFFALO NEWS, Feb. 10, 2008, http://www.tradingmarkets.com/.site/news/Stock%20News/1085168/.

[52]    A list of the toys recalled on August 2, 2007, is attached hereto as Exhibit A.

106.    According to the recall announcement, Mattel determined that the surface paints on the recalled products may contain excessive levels of lead, which is toxic if ingested by young children and can cause adverse health effects.

107.    The CPSC noted the seriousness of the recall by warning consumers that the recalled toys should be taken away from young children "immediately."[53]  In fact, the acting CPSC chairwoman, Nancy A. Nord, stated: "These recalled toys have accessible lead in the paint, and parents should not hesitate in taking them away from children."[54]

108.    According to August 2, 2007 and August 3, 2007 articles in the *Wall Street Journal*, Mattel had a 15-year relationship with the recalled toys' manufacturer in China, and because of its financial relationship with the manufacturer, Mattel looked the other way and allowed the manufacturer to perform its own tests, if any were even performed.[55]

109.    According to Mattel's senior vice president, Jim Walter, the manufacturer did not perform the testing they should have and "***the audit we performed didn't catch it.***"[56]

110.    As described in more detail above, Mattel discovered the lead contamination of the toys through an audit performed by one of Mattel's retailers on

---

[53]    Press Release, CPSC, Fisher-Price Recalls Licensed Character Toys Due to Lead-Poisoning Hazard (Aug. 2, 2007) http://www.cpsc.gov/cpscpub/prerel/prhtml07/07257.html.

[54]    Louise Story, *Lead Paint Prompts Mattel to Recall 967,000 Toys*, N.Y. TIMES, Aug. 2, 2007, http://www.nytimes.com/2007/08/02/business/02toy.html.

[55]    As noted above, the manufacture responsible for using lead paint was Lee Der. Lee Der's export license was revoked by the Chinese government following announcement of the August 2, 2007 recall.  In revoking the export license of Lee Der, Chinese regulators said they found the company had used a "fake lead-free" paint pigment that came from the company's paint supplier.

[56]    Jane Spencer & Nicholas Casey, *Toy Recall Shows Challenge China Poses to Partners*, WALL ST. J., Aug. 3, 2007, at 1.

1    June 8, 2007.  Mattel approached the CPSC with an initial verbal report on July 20,

2    2007.  A written full report was filed with the CPSC on July 26, 2007.

3                              **2.    August 14, 2007 Recall**

4           111.    A test conducted by Mattel on July 30, 2007, discovered lead paint on

5    "Sarge" die cast toy cars which were manufactured in China.  On August 14, 2007,

6    Mattel announced the recall of 253,000 "Sarge" die-cast toy cars in the United

7    States.[57]    According to Mattel's recall announcement, the "Sarge" toy cars were

8    manufactured by Early Light Industrial Co., Ltd. ("Early Light"), one of Mattel's

9    contract facilities in China which subcontracted the painting of parts to another vendor

10   in China, Hon Li Da.  Hon Li Da used paint supplied from a non-authorized third-

11   party supplier.[58]

12          112.    According to an August 14, 2007 article in *The New York Times*

13   regarding the August 14, 2007 recall of the "Sarge" toys, Walter stated that Mattel had

14   "quality checks" in place but acknowledged that "we do realize the need for increased

15   vigilance, increased surveillance."[59]

16          113.    Indeed, following the announcement of the August 14, 2007 recall of the

17   "Sarge" toy cars, Mattel announced the implementation of a strengthened three-point

18   check system to guard against lead-based paint: (1) only paint from certified suppliers

19   will be used and every single batch of paint at all vendors must be tested; (2) controls

20   of the production process at vendor facilities are being tightened and random

21   inspections will be increased; and (3) every production run of finished toys will be

22   _____

23   [57]    A list of the "Sarge" toys recalled on August 14, 2007 is attached hereto as
24   Exhibit B.

25   [58]    *See* Press Release, Mattel, Mattel Announces Expanded Recall of Toys (Aug.
     14, 2007), http://www.shareholder.com/mattel/news/20070814-259557.cfm.

26   [59]    *See* David Barboza & Louise Story, *Mattel Issues New Recall of Toys Made in*
27   *China*, N.Y. TIMES, Aug. 14, 2007, http://www.nytimes.com/2007/08/14/business/
     15toys-web.html.

28

tested to ensure compliance before the toys reach customers. *See* September 5 Response. However, these reforms have still been insufficient to ensure that Mattel's toys do not contain lead.

### 3.    September 4, 2007 Recalls

114.    Three separate recalls in the United States, totaling approximately 775,000 toys containing toxic lead, were announced on September 4, 2007. The recalls include approximately: (1) 675,000 Barbie® Accessory Toys ("Barbie Toys"); (2) 8,900 Fisher-Price 6-in-1 Bongo Band sets from It's a Big Big World™ ("Bongo Toys"); and (3) 90,000 GeoTrax™ Locomotive Toys ("GeoTrax").[60]

115.    According to testimony from Mattel Chairman and Chief Executive Officer, Robert Eckert, in front of the Subcommittee on Commerce, Trade and Consumer Protection on September 19, 2007 ("Eckert Testimony"), Mattel discovered lead paint on various Barbie Toys on or about August 9, 2007 and August 11, 2007. Mattel informed the CPSC of the lead paint on August 10, 2007 and August 17, 2007, and a full report was filed with the CPSC on August 27, 2007. Similarly, on or about August 16, 2007, Mattel discovered lead paint on Mattel's GeoTrax toys. Mattel notified the CPSC on August 20, 2007 and filed a full report with the CPSC on August 27, 2007. On or about August 20, 2007, Mattel discovered lead paint on the Bongo Toys. Mattel notified the CPSC of the lead paint in the Bongo Toys on August 27, 2007, and a full report was filed with the CPSC on August 28, 2007.

116.    According to a press release issued by Mattel regarding the recalls on September 4, 2007, the Barbie Toys were produced by Holder Plastic Company, a

---

[60]    A list of the toys recalled on September 4, 2007 is attached hereto as Exhibit C.

1    Mattel contract vendor which subcontracted the painting of the toys to two other

2    vendors who used uncertified paint.[61]

3        117.    According to this same press release, the GeoTrax toys were

4    manufactured by Apex Manufacturing Company Ltd. ("Apex"), one of Mattel's

5    contract vendors, which outsourced the painting of the toys to a subcontractor, Boyi

6    Plastic Products Factory, which used uncertified paint.

7        118.    Additionally, the Bongo Toys were produced by another one of Mattel's

8    contract vendors in China, Shun On Factory, which outsourced the molding and

9    painting of the toys to a subcontractor, Jingying Tampo Printing Processing Factory

10    which used uncertified paint.

### 4.    October 25, 2007 Recall

12        119.    On October 25, 2007, in cooperation with the CPSC, Mattel announced

13    yet another recall of toys containing excessive levels of lead paint.  This recall

14    involved approximately 38,000 "Go Diego Go!" Animal Rescue Boats which were

15    manufactured in China and sold in U.S. retail stores nationwide from June 2007

16    through October 15, 2007 for about $15.[62]  The toys were produced between May 17,

17    2007 and August 11, 2007 by a Chinese vendor, Man Shing, who subcontracted the

18    paint to another vendor, Hua Yi, which, according to Mattel, used "unauthorized

19    paint."

20

21

22

23

24

_____

25    [61]    Press Release, Mattel, Mattel Announces Recall of 11 Toys as a Result of
26    Extensive Ongoing Investigation and Product Testing (Sept. 4, 2007),
      http://www.shareholder.com/mattel/news/20070904-262639.cfm.

27    [62]    A list of the toys recalled on October 25, 2007 is attached hereto as Exhibit D.

28

B.     **The Magnet Recalls**

1.     **November 21, 2006 Recall**

120.   Since November 1, 2006, Mattel has recalled over 11.5 million toy products due to small magnet hazards, in a series of five recalls, here in the United States.  The magnet hazard recalls total over 20.5 million toys worldwide.

121.   On November 21, 2006, Mattel, in cooperation with the CPSC, announced a recall of approximately 2.4 million Polly Pocket play sets that contain plastic dolls and accessories with small magnets.[63]

122.   According to the recall announcement, the recalled Polly Pocket play sets were manufactured in China and were sold from May 2003 through September 2006.

123.   As indicated by the CPSC, the tiny magnets inside the dolls and accessories can fall out undetected by parents and caregivers and can be swallowed, aspirated by young children or placed by a child in their nose or ears.

124.   The CPSC was made aware of 170 reports of the small magnets coming out of these recalled toys and there were three reports of serious injuries to children who swallowed more than one magnet.  All three suffered intestinal perforations that required surgery.  A 2-year-old child was hospitalized for seven days and a 7-year-old child was hospitalized for 12 days.  An 8-year-old child was also hospitalized.

2.     **August 14, 2007 Recall**

125.   On August 14, 2007, Mattel, in cooperation with the CPSC, announced an expansion of the November 21, 2006 recall involving Polly Pocket play sets.  At this time, Mattel recalled approximately 7.3 million Polly Pocket play sets in the United States.  According to the CPSC announcement, the recalled Polly Pocket play

---

[63]     A list of the Polly Pocket play sets recalled on November 21, 2006 is attached hereto as Exhibit E.

1   sets were manufactured in China and sold at toys stores and other various retailers

2   from May 2003 through November 2006 for between $15 and $30.[64]

3        126.   Also, on August 14, 2007, Mattel announced several additional U.S.

4   recalls of various toys containing small magnets that can become loose.  One of these

5   recalls involved approximately one million Doggie Day Care™ play sets.[65]  Another

6   call was the Barbie® and Tanner™ recall which involved approximately 683,000

7   units due to a pellet "scooper" accessory with a magnetic end.[66]

8        127.   Additionally, on August 14, 2007, Mattel recalled approximately 345,000

9   Batman and One Piece magnetic action figure sets from U.S. retailers.[67]  As of the

10   date of the recall, Mattel had been made aware of 21 incidents where a magnet fell out

11   of the toy, including a case of a 3-year-old boy who was found with a magnet in his

12   mouth.

13        128.   In a press release issued by Mattel on September 21, 2007, Mattel

14   claimed the August 14, 2007 magnet recalls occurred "as a result of Mattel having

15   adopted a new design standard for securing magnets in toys" and because Mattel

16   "retroactively appli[ed] that higher standard."[68]

17        129.   In addressing the design flaw, Mattel announced it had redesigned its

18   toys with magnets by encasing the magnets in plastic.  According to Mattel's most

19   _____

20   [64]    A list of the Polly Pocket play sets recalled on August 14, 2007 is attached

21   hereto as Exhibit F.

22   [65]    A list of the Doggie Day Care™ play sets recalled on August 14, 2007 is
     attached hereto as Exhibit G.

23   [66]    A list of the Barbie® and Tanner™ recalled on August 14, 2007 is attached

24   hereto as Exhibit H.

25   [67]    A list of the Batman and One Piece magnetic action figure sets recalled on
     August 14, 2007 is attached hereto as Exhibit I.

26   [68]    Press Release, Mattel, Media Statement (Sept. 21, 2007),

27   http://www.shareholder.com/mattel/downloads/09-21-07%20China%20Meeting%
     Media%20Statement.pdf.

28

1  recent Quarterly Report, "[b]eginning in January 2007, all magnets must be 'locked'

2  into the toy with sturdy material holding in the edges around the exposed face of the

3  magnet or completely covering or 'encapsulating' the magnet."[69]  This decision was a

4  tacit acknowledgement that the previous solution – using stronger glue – did not fix

5  the flaw disclosed in November 2006 when Mattel originally recalled certain of the

6  Polly Pocket play sets.[70]  The Recalled Magnetic Toys but were the result of an

7  admitted design flaw, which dated back years.

8              **C.    Mattel Admits it Improperly Designed the Magnet Toys**

9              130.    On or about September 21, 2007, Mattel's executive vice president for

10  world-wide operations, Thomas A. Debrowski, apologized for the magnet toy recalls

11  and for previously placing blame on Chinese manufacturers for the defects, stating:

12  "Mattel takes full responsibility for these recalls and apologizes personally to you, the

13  Chinese people and all of our customers who received the toys."[71]

14              131.    Mattel, in order to save face with the Chinese government and Chinese

15  manufacturers, acknowledged that Mattel failed to properly implement appropriate

16  inspection, testing and other safeguards of the Hazardous Toys, admitting that: "the

17  vast majority of those products that we recalled were the result of a design flaw in

18  Mattel's design, not through a manufacturing flaw in Chinese manufacturers."[72]

19

20

21

22

23  [69]    Mattel, Inc., Quarterly Report, (Form 10-Q), at 21 (Oct. 26, 2007).

24  [70]    Michael Oneal et al., *Mattel Recalls 18 Million Toys; Tiny Magnets Called
     Dangerous*, CHI. TRIB., Aug. 15, 2007, http://www.chicagotribune.com/news/
25  nationworld/chi-toysaug15,1,4856796.story.

26  [71]    Nicholas Casey, Nicholas Zamiska & Andy Pasztor, *Mattel Seeks to Placate
     China with Apology*, WALL ST. J., Sept. 22, 2007, at A1.

27  [72]    *Id.*

28

## VI.    DEFENDANTS' FAILURE TO PREVENT FURTHER INJURY

### A.    Defendants Have Failed to Issue Recalls of Other Hazardous Toys

132.    Following the numerous Mattel recalls during the summer and the fall of 2007, a December 2007 Consumer Reports article reported that alarmingly high levels of lead (10,000 parts per million) were found in a Fisher-Price red toy blood pressure cuff that a child had played with for two years.

133.    In the wake of this report, tests of two other Mattel toy blood pressure cuffs, performed at the direction of the Attorney General of Illinois, revealed lead levels of 5,900 parts per million and 4,500 parts per million, more than seven to nine times higher than the limit of 600 parts per million allowed by Illinois state law.

134.    In response to these tests, on December 3, 2007, the Illinois Attorney General warned consumers that the Fisher-Price cuffs contain high levels of lead and urged parents to take away the cuffs from their children immediately.[73]    Additionally, at the request of the Illinois Attorney General, Fisher-Price agreed to remove the toy cuffs from store shelves and to offer a replacement part for families who already possessed the toy, but in the state of Illinois only.

135.    On December 14, 2007, the Illinois Attorney General warned consumers of a similar toy that presented a potential lead poisoning hazard – the green blood pressure cuff found in Sesame Street Giggle Fisher-Price toy medical kits and urged parents to take the toy cuff from the children immediately.[74]

---

[73]    *See* Press Release, Illinois Attorney General Lisa Madigan, Attorney General Warns Consumers of Potential Lead Poisoning Hazard in Fisher Price Toy Kits (Dec. 3, 2007), http://www.illinoisattorneygeneral.gov/pressroom/2007_12/20071203.html.

[74]    *See* Press Release, Illinois Attorney General Lisa Madigan, Attorney General Warns Consumers of New Potential Lead Poisoning Hazard in Fisher Price Toy Kits (Dec. 14, 2007), http://www.illinoisattorneygeneral.gov/pressroom/2007_12/20071214.html.

136.   Fisher-Price notified retailers to pull the product from stores only in Illinois, even though the toy cuffs are sold at retail stores nationwide.

137.   On January 30, 2008, dozens of members of Congress sent a letter to Mattel's chief executive, accusing the company of not living up to its promise to keep lead-tainted toys out of children's hands.   The letter was prompted by Mattel's decision ***not*** to issue a nationwide recall of the blood pressure cuffs.[75]

138.   The 56 members of Congress who signed the letter were "disturbed by [Mattel's] lack of action" upon discovering the high level of lead in the blood pressure cuffs.[76]  The letter indicated that the members of Congress found Mattel's response to be "deficient" and encouraged Mattel to immediately stop selling the red blood pressure cuff in all states and that if the toy is dangerous for the children of Illinois, it is dangerous for children throughout the United States.[77]

139.   To this day, Mattel has only recalled the blood pressure cuffs in a single state: Illinois. These toys are still in the stream of commerce, posing a dangerous health risk to putative Class members and their children in the remaining 49 states and the District of Columbia.

140.   As a result of the public outrage surrounding Mattel's failure to initiate a nationwide recall of the blood pressure cuff, Mattel instituted a poorly publicized "replacement program" of the blood pressure cuffs in December, 2007.

141.   Mattel's replacement program is misleading and inadequate.  For the few consumers who happened to visit Mattel's website for information about their un-recalled blood pressure cuff, they find information about a "Replacement Program,"

---

[75]     *See* Louise Story, *Lawmakers Say Mattel Broke Word on Lead*, N.Y. TIMES, Jan. 30, 2008, http://www.nytimes.com/2008/01/30/business/30toys.html.

[76]     *See* Press Release, Congressman Elijah E. Cummings, Cummings, DeLauro to Mattel: 'Stop Selling Toxic Toys' (Jan. 30, 2008), http://www.house.gov/list/press/md07_cummings/20080130mattel2.shtml.

[77]     *Id*.

not a *recall* program.[78] However, when consumers click on the hyperlink, "help me determine if my Fisher-Price Medical Kit is at issue" which directs them to the next site,[79] it says "Recall" at the top of the page, implying that Mattel has in fact recalled the toys, when they have done no such thing.

142.    Furthermore, in the case of the Fisher-Price kit, only red cuffs contain lead; for the Sesame Street medical kit, only green cuffs contain lead. Rather than "replace" the entire toy, or even all of the blood pressure cuffs, Mattel has established a complicated procedure whereby the customer must identify which kit they have purchased and whether the cuff is red (in the case of the Fisher Price kit) or green (in the case of the Sesame Street kit).

143.    To this day, blood pressure cuffs from one or both of these kits are still available for purchase on the Toys "R" Us website, as well as the Fisher-Price Shop Online Catalog, and Amazon.com.

### B. Discrepancies Appear in the Recall Between Mattel and Its Retailers

144.    Certain retailers have recalled toys manufactured by Mattel and Fisher-Price even though the toys have not been recalled by the Manufacturer Defendants.

145.    For example, the Toys "R" Us product recall website for "Various Fisher-Price Character Branded Toys Lead Hazard" includes the following toys that are not listed by Mattel as recalled[80]:

- Dora Castle Ultimate Bundle (Product no. K6996)
- Dora Ultimate Dollhouse, (Product no. G9944)

---

[78]    *See* Fisher-Price and Sesame Street Medical Kit Replacement Program, http://service.mattel.com/us/recall/cuff.asp (last visited Mar. 30, 2008).

[79]    Recall Information – Fisher-Price Medical Kit Replacement Program, http://service.mattel.com/us/recall/J2526_IVR.asp (last visited Mar. 30, 2008).

[80]    *See* Toys "R" Us – Safety Recall; Various Fisher-Price Character Branded Toys Lead Hazard, http://www1.toysrus.com/safety/prodRecalls/513072.cfm?source=0 (last visited Mar. 30, 2008).

- Dora House Ultimate Bundle, (Product no. H9766)
- Dora Figures Bundle 2005, (Product no. H9768)
- Dora Figures Dollhouse, (Product no. G9950)
- DE Castle Figure Bundle, (Product no. K6997)
- Dora's House Figures, (Product no. B9617)
- Dora Castle Figures, (Product no. K3002)

146.   These so-called "bundled" toys, which were sold in groups (usually for reasons of economy), and which were identified as recalled by retailers, were not recalled by Mattel.  Meanwhile, the items recalled by Mattel were sold as individual pieces, but with different product numbers than the larger sets or "bundles."  For example, the recalled toys "Queen Mami" (J6762), "Royal Boots and Tico" (J6763), "Prince Diego" (J6765), and "Fairytale Adventure Dora" (K3580) are figurines sold separately but made to accompany "Dora's Magical Castle" or "Fairytale Castle." The "Dora Castle Figures" toy (K3002) listed as recalled by Toys "R" Us is a set that includes these individual recalled figures.  Although the sets have not been recalled by Mattel, Toys "R" Us obviously has reason to believe that the bundles or sets contain contaminated toy components.

147.   In addition, Toys "R" Us recalled the toy "Dora Figures Bundle 2005" with an earlier manufacturing date than the Mattel recalled products.  This discrepancy obviously calls into question the accuracy of the date codes listed by Mattel for their recalled toys.

**VII.   Children Must Be Screened for Lead Exposure**

148.   A terrifying fact for parents who bought a Hazardous Toy contaminated by lead paint is that lead poisoning can go undetected because often there are no obvious signs or symptoms.  As the Center for Disease Controls and Prevention

1  ("CDC") has found: "Most children with elevated blood lead levels have no
2  symptoms."[81]

3      149.    However, parents can determine whether their children are suffering lead
4  poisoning through simple screening measure known as a Blood-lead level test or BLL.
5  Blood lead-level tests are frequently administered to screen for lead exposure
6  indicated by elevated levels of lead in blood.  Blood-lead level testing is also
7  important in determining whether further medical examinations are necessary.  The
8  CDC recommends that children exposed to lead paint be tested at six-months old and
9  annually thereafter.

10     150.    Early detection and treatment is critical for preventing and minimizing
11  the harmful effects of lead poisoning.  If a child screens positive, she will need to be
12  retested periodically until the lead levels in the blood stream taper off.  The higher the
13  blood-lead level test result, the more lead is in the child's blood.  However, the
14  amount of lead in the blood does not necessarily reflect the total amount of lead in the
15  body.  This is because lead travels from the lungs and intestinal tract to the blood and
16  organs, and then is gradually removed from the blood and organs and stored in tissues
17  such as bones and teeth.

18     151.    Because the neurological damage which can result from lead exposure is
19  permanent, early detection through blood-level screening is urgently needed to
20  identify children who have been exposed, so that appropriate interventional measures
21  can be taken to help reduce the extent of potential neurological damage to children.
22  As set forth in a 2002 report on the management of blood-lead levels among young
23  children prepared by an Advisory Committee of the CDC, elevated blood lead levels
24  require appropriate follow-up, including chelation therapy, use of dietary iron
25  supplements, repeated blood lead level monitoring and, dependent upon the

26  _____

27  [81]    Centers for Disease, Control and Prevention, Toys and Childhood Lead Exposure, http://www.cdc.gov/nceh/lead/faq/toys.htm (last visited Mar. 30, 2008).

28

1    circumstances, other diagnostic measures. The CDC Advisory Committee report also

2    details recommended nutritional, educational and neurobehavioral follow-up.

3        152.    More recent recommendations issued by the American Academy of

4    Pediatrics support interventional measures for blood lead levels even when detected at

5    concentrations of less than 10mcg/dL, underscoring the fact that even relatively low

6    blood levels of lead can be *extremely* harmful, and clearly supporting the urgent need

7    for blood lead screening at the very earliest possible time. Early and adequate

8    screening is also necessary so that parents can be prepared to take any necessary

9    action to protect affected children from further harm, since the lack of early

10    intervention can lead to severe and irreparable harm.

11        153.    However, some putative Class members cannot afford such a screening.

12    Even though they may be distressed about their children's exposure to the lead in the

13    Hazardous Toys, they simply do not have the financial resources to pay for the one-

14    time screening.

15    **VIII.  Recent Attempts to Regulate Hazardous Toys**

16        154.    Sparked by the massive number of recalls, on December 17, 2007, the

17    United States House of Representatives voted 407-0 to approve the Consumer Product

18    Safety Modernization Act of 2007, H.R. 4040. The bill doubles the CPSC's funds,

19    lowers lead standards from 600 ppm to 100 ppm, mandates third-party testing for

20    many children's products, and requires tracking labels to be placed on children's

21    products identifying manufacturers and facilitating recalls.

22        155.    On March 3, 2008, the Senate began consideration of its version of the

23    CPSC Reform Act of 2008, also known as the Pryor-Stevens bill. Senator Mark Pryor

24    called it a "historic day" and Senator Amy Klobuchar stated that "[t]his bill is not just

25    a matter of implementing consumer safety laws and regulations, it is a matter of

26    protecting consumers from harmful products. This bill is a matter of saving the lives

27    of children . . . children who have died from lead paint or choking on toys." Senator

28    Bill Nelson highlighted the desperate need for the passage of the bill by pointing to

1  magnet dangers in Mattel's Laugh & Learn Bunny and the lead hazards presented by

2  Mattel's Barbie accessories.

3      156.   Despite the perception that it is a much more demanding bill than its

4  House counterpart, on March 6, 2008, the Senate passed the Pryor-Stevens bill by an

5  overwhelming margin of 79-13.  Described by the Chicago Tribune as the "most

6  sweeping reform of the nation's consumer safety system in a generation," the Pryor-

7  Stevens bill toughens the House bill by: imposing stricter fines (the Senate bill

8  increases the current $1.8 million cap to $20 million versus the House's proposal of

9  $10 million for companies that fail to immediately report product hazards); permitting

10 state attorney generals to enforce regulations before CPSC action; increasing the

11 CPSC budget to $106 million by 2011 (compared to its current $63 million fiscal

12 budget); providing whistle-blower protection to corporate employees; establishing a

13 public database to include any reports of illness, death or risks related to consumer

14 products; and including an amendment proposed by Senator Barack Obama requiring

15 recall notices to include the names and locations of factories where the flawed

16 products were produced.

17     157.   Additionally, while Mattel pays lip service to making safety a top

18 priority, its actions tell a different story.  Mattel has invested intensive efforts to lobby

19 Washington State Governor Chris Gregoire against signing into law that state's

20 groundbreaking new toy safety legislation, which was overwhelmingly supported by

21 the legislature.  On March 25, 2008, the *Wall Street Journal* reported:

22          In a last-ditch effort to stop the [passage of the toy safety law],

23          representatives of Mattel Inc. and Hasbro Inc., the country's two biggest

24          toy makers, met with Gov. Gregoire March 17, according to people

25          familiar with the matter. At that meeting, and elsewhere, these people

26          say, Mattel has told Washington officials that half of the products made

27          by its Fisher-Price unit, which specializes in products for preschoolers,

28

1    would be barred from the state if the law is adopted. The new restrictions

2    would take effect in July 2009.[82]

3    158.    This attempt by Mattel to undermine state legislature support for toy

4    safety provides proof that Mattel touts its safety record when it serves the company's

5    bottom line, but that Mattel secretly attempts to block toy safety legislation when such

6    legislation might actually protect children from lead and other toxic chemicals.

7    **IX.    The Conduct at Issue is Centered in California**

8    159.    Much of the conduct at issue arises and emanates from California.

9    Specifically, Defendant Mattel is headquartered in El Segundo, California, and

10    executives are located in California.

11    160.    Mattel and Fisher-Price's activities related to the recalls and Hazardous

12    Toys have been coordinated through Mattel's offices in California. Additionally,

13    Mattel's "control procedures," audits, recalls and recall procedures originated at its

14    California headquarters.

15    161.    Although Fisher-Price's offices are located in New York, many of its

16    executives including its Vice President of Consumer Products is located in California.

17    162.    Additionally, Mattel's SEC Form 10-Q (dated August 3, 2007) states that

18    the Hazardous Toys were manufactured and shipped from China to ports in the United

19    States, including ports in California.  As stated below,  China sends more of its

20    products through the ports in Los Angeles and Long Beach, California than any other

21    port in the United States.[83]

22

23

24    [82]    *See* Joseph Pereira, *States Alter Rules of Game on Safety for Toy Makers*, WALL
ST. J., Mar. 25, 2008, http://online.wsj.com/article/SB120640378503760985.html (last
25    visited Mar. 30, 2008).

26    [83]    *See, e.g.,* U.S. Department of Transportation Research and Innovative
Technology Administration Bureau of Transportation Statistics, *America's Container
27    Ports: Delivering the Goods*, March 2007, http://www.bts.gov/publications/
americas_container_ports/pdf/entire.pdf.

28

163.    Specifically, an article from the Long Beach Press Telegram states that the ports in Los Angeles, California, and Long Beach, California, are the top two busiest United States maritime ports.  More than 80% of United States imports from China are shipped through the Los Angeles and Long Beach ports.[84]

164.    Furthermore, as reported in a *New York Times* article discussing toys containing lead that were manufactured in China, a single inspector from the CPSC, located at the port in Los Angeles, California, is responsible for spot-checking incoming shipments of toy products from China.[85]

165.    Additionally, Retailer Defendants' KB Toys, Kmart, Target, Toys "R" Us and Wal-Mart have a substantial presence in California.  KB Toys has approximately 42 stores in California; Kmart has approximately 101 stores in California; Target has approximately 226 stores in California; Toys "R" Us has approximately 102 stores in California; and Wal-Mart has approximately 209 stores in California.

## CLASS ACTION ALLEGATIONS

166.    Plaintiffs bring this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs bring this action on behalf of themselves and all members of a Class comprised of all persons who, during the period May 2003 through the present purchased and/or acquired the Hazardous Toys.

167.    The Class is so numerous that joinder of all members is impracticable.  Defendants have estimated that approximately 11.2 million toys have been recalled in the United States.  Based on this figure, it appears that the total membership of the Class numbers in at least the hundreds of thousands, if not millions.

---

[84]    *See* Susan Abram, *Recalls Soar Amid Safety Fears*, Long Beach Press Telegram, Sept, 5, 2007.

[85]    *See* Eric Lipton, *The TestingLab: Safety Agency Faces Scrutiny Amid Changes*, N.Y TIMES, Sept. 2, 2007, http://www.nytimes.com/2007/09/02/business/02consumer.html.

168.    There are many common questions of law and fact involving and affecting the parties to be represented.  These common questions of law or fact predominate over any questions affecting only individual members of the Class.  Common questions include, but are not limited to, the following:

(a)    Whether the Hazardous Toys are defective;

(b)    Whether Defendants negligently designed, manufactured, distributed, marketed, tested and/or sold the Hazardous Toys;

(c)    Whether there is an increased risk of serious health problems in young children as a result of the lead contamination and/or detachable magnets in the Hazardous Toys;

(d)    Whether Defendants conducted adequate studies and quality tests of their Hazardous Toys to determine whether and to what extent the Hazardous Toys were contaminated with lead or contained small magnets and are therefore unsafe;

(e)    Whether Defendants engaged in deceptive and unfair business and trade practices;

(f)    Whether Defendants knowingly or negligently concealed or omitted material information concerning the safety of the Hazardous Toys;

(g)    Whether the Class has been injured by virtue of Defendants' negligence and conduct;

(h)    Whether the Class is entitled to injunctive relief; and

(i)    Whether Defendants falsely and fraudulently misrepresented in their advertisements and promotional materials, and other materials the safety of the Hazardous Toys.

169.    Plaintiffs' claims are typical of the claims of the respective Class they seek to represent, in that the named Plaintiffs and all members of the proposed Class have purchased Hazardous Toys and/or are at risk of serious health problems.

170.   Plaintiffs will fairly and adequately protect the interests of the Class, and have retained attorneys experienced in class actions and complex litigation as their counsel.

171.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief.

172.   Plaintiffs aver that the prerequisites for class action treatment apply to this action and that questions of law or fact common to the Class predominate over any questions affecting only individual members and that class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy which is the subject of this action. Plaintiffs further state that the interests of judicial economy will be served by concentrating litigation concerning these claims in this Court, and that the management of this Class will not be difficult.

## COUNT ONE

### Breach of Express Warranty
### (Against All Defendants)

173.   Plaintiffs repeat and allege each and every allegation contained above as if fully set forth herein.

174.   The Uniform Commercial Code §2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the good and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise.

175.   As detailed above, Defendants manufactured, marketed and sold the Hazardous Toys and specifically represented on the packaging of the Hazardous Toys that they were safe and fit for use by children; that the Hazardous Toys were appropriate for certain age groups; and that the Hazardous Toys complied with ASTM-963 and were free from hazardous substances including lead, lead paint. Further, certain of the Hazardous Toys contain pictures of children playing with the Toys.

176. Defendants expressly warranted that the Hazardous Toys were manufactured to conform with all safety requirements under U.S. federal and other applicable laws and regulations, including the Consumer Product Safety Act, the Hazardous Substances Act and industry developed standards, including the ASTM Standards, and product specific standards, and that they were periodically reviewed and approved by independent safety testing laboratories.

177. The Hazardous Toys did not conform to these express representations because the Hazardous Toys were not safe for children; were not age-appropriate; and were defective as they contained lead, lead paint or magnets.

178. At all times, California and the following 48 states listed below, including the District of Columbia have codified and adopted the provisions of the Uniform Commercial Code governing the express warranty of merchantability: Ala. Code 1975 §7-2-313; Alaska Stat. §45.02.313; Ariz. Rev. Stat. §47-2313; Ark. Stat. §4-2-313; Cal. Com. Code §2313; Colo. Rev. Stat. Ann. §4-2-313; Conn. Gen. Stat. Ann. §42a-2-313; 6 Del. C. §2-313; D.C. Stat. §28:2-313; Fla. Stat. Ann. §672.313; Ga. Code Ann. §11-2-313; Haw. Rev. Stat. §490:2-313; Idaho Code §28-2-313; 810 Ill. Comp. Stat. Ann. 5/2-313; Ind. Code Ann. §26-1-2-313; Iowa Code Ann. §554.2313; Kan. Stat. Ann. §84-2-313; Ky. Rev. Stat. Ann. §355.2-313; 11 Me. Rev. Stat. Ann. §2-313; Md. Code Ann. §2-313; Mass. Gen. Laws. Ch. 106 §2-313; Mich. Comp. Laws Ann. §440.2.313; Minn. Stat. Ann. §336.2-313; Miss. Code Ann. §75-2-313; Mo. Rev. Stat. §400.2-313; Mont. Code Ann. §30-2-313; Nev. Rev. Stat. U.C.C §104.2313; N.H. Rev. Ann. §382-A:2-313; N.J. Stat. Ann. §12A:2-313; N.M. Stat. Ann. §55-2-313; N.Y. U.C.C. Law 2-313; N.C. Gen. Stat. Ann. §25-2-313; N.D. Stat. §41-02-313; Ohio Rev. Code Ann. §1302.26; Okla. Stat. tit. 12A §2-313; Or. Rev. Stat. §72.3130; 13 Pa. Stat. Ann. §2313; R.I. Gen. Laws §6A-2-313; S.C. Code Ann. §36-2-313; S.D. Stat. §57A-2-313; Tenn. Code Ann. §47-2-313; Tex. Bus. & Com. Code Ann. §2-313; Utah Code Ann. §70A-2-313; Va. Code §8.2-313; Vt. Stat. Ann.

1    9A §2-313; Rev. Code Wash. Ann. §62A.2-313; W. Va. Code §46-2-313; Wis. Stat.

2    Ann §402.313; and Wyo. Stat. §34.1-2-313.

3         179.    At the time that Defendants designed, manufactured, sold and/or

4    distributed the Hazardous Toys, Defendants knew the purpose for which the

5    Hazardous Toys were intended and expressly warranted that the Hazardous Toys were

6    safe and fit for use as playthings by young children.

7         180.    Plaintiffs and other members of the Class relied upon the skill, superior

8    knowledge and judgment of the Defendants to sell toys that were reasonably safe for

9    use by young children.  Plaintiffs could not have known about the risks associated

10   with the Hazardous Toys until after Defendants issued a public notice recalling the

11   Hazardous Toys announcing that the toys were not safe or fit for their ordinary

12   purpose and intended use and were not free of manufacturing defects, but instead were

13   potentially laden with lead paint, which is a banned hazardous substance because of its

14   extreme danger to young children, and/or were designed in such a defective manner as

15   to contain loose magnets.  Additionally, Plaintiffs still remain unable to ascertain

16   which other Toys are hazardous if they have not yet been recalled.

17        181.    Defendants breached their express warranties in connection with the sale

18   of the Hazardous Toys to Plaintiffs and other members of the Class.

19        182.    Because Defendants announced the recalls of the Hazardous Toys, they

20   had actual knowledge that the Hazardous Toys were not free from hazardous

21   substances or manufacturing defects; the Hazardous Toys were not fit for their

22   ordinary purpose; and thus Plaintiffs were not required to notify Defendants of their

23   breach.  If notice is required, Plaintiffs and the Class have adequately provided

24   Defendants such notice through the filing of this lawsuit and through their notices sent

25   pursuant to California Consumer Legal Remedies Act.

26        183.    As a direct and proximate result of Defendants' breach of express

27   warranties, Plaintiffs and other members of the Class have sustained injuries,

28   including, but not limited to, the purchase price of the Hazardous Toys, exposure to

lead and dangerous magnets, increased risk of serious health problems, and the costs of diagnostic screening.

**COUNT TWO**

**Breach of Implied Warranty**
**(Against All Defendants)**

184.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185.    The Uniform Commercial Code §2-314 provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

186.    Defendants manufactured, marketed and sold the Hazardous Toys and represented that the Hazardous Toys were fit for use by children.  Contrary to such representations, Defendants failed to disclose that the Hazardous Toys were defective as they contained lead, lead paint and/or magnets that could become loose.

187.    At all times, California and the following 48 states listed below, including the District of Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability: Ala. Code §7-2-314; Alaska Stat. §45.02.314; Ariz. Rev. Stat. Ann. §47-2314; Ark. Code Ann. §4-2-314; Cal. Com. Code §2314; Colo. Rev. St §4-2-314; Conn. Gen. Stat. Ann. §42a-2-314; 6 Del. C. §2-314; D.C. Code §28:2-314; Fla. Stat. Ann. §672.314; Ga. Code Ann. §11-2-314; Haw. Rev. Stat. §490:2-314; Idaho Code §28-2-314; 810 Ill. Comp. Stat. Ann. 5/2-314; Ind. Code Ann. §26-1-2-314; Iowa Code Ann. §554.2314; Kan. Stat. Ann. §84-2-314; Ky. Rev. Stat. Ann. §355.2-314; La. Civ. Code Ann. art. §2520; 11 Me. Rev. Stat. Ann. §2-314; Md. Code Ann. §2-314; Mass. Gen. Laws Ch. 106 §2-314; Mich. Comp. Laws Ann. §440.2314; Minn. Stat. Ann. §336.2-314; Miss. Code Ann. §75-2-314; Mo. Rev. Stat. §400.2-314; Mont. Code Ann. §30-2-314; Nev. Rev. Stat. U.C.C §104.2314; N.H. Rev. Ann. §382-A:2-314; N.J. Stat. Ann. §12A:2-314; N.M. Stat. Ann. §55-2-314; N.Y. U.C.C. Law §2-314;

N.C. Gen. Stat. Ann. §25-2-314; N.D. Stat §41-02-314; Ohio Rev. Code Ann. §1302.27; Okla. Stat. tit. 12A §2-314; Or. Rev. Stat. §72.3140; 13 Pa. Stat. Ann. §2314; R.I. Gen. Laws §6A-2-314; S.C. Code Ann. §36-2-314; S.D. Stat. §57A-2-314; Tenn. Code Ann. §47-2-314; Tex. Bus. & Com. Code Ann. §2-314; Utah Code Ann. §70A-2-314; Va. Code §8.2-314; Vt. Stat. Ann. 9A §2-314; W. Va. Code §46-2-314; Wash. Rev. Code §62A 2-314; Wis. Stat. Ann. §402.314; and Wyo. Stat. §34.1-2-314.

188.   As designers, manufacturers, producers, marketers and sellers of toys, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

189.   Further, Defendants were merchants with respect to toy products.  The Manufacturer Defendants designed, manufactured, distributed, marketed and/or sold the Hazardous Toys and represented to Plaintiffs and the Class that they manufacturer high quality toys that comply with all applicable state and federal regulations. Further, the Retailer Defendants, by selling the Hazardous Toys to Plaintiffs and the Class have held themselves out as retailers of high quality toy products that comply with all applicable state and federal regulations and, in fact, derive a substantial amount of revenues from the sale of toys.

190.   The Mattel toys are "goods," as defined in the various states' commercial codes governing the implied warranty of merchantability.

191.   As merchants of the Hazardous Toys, Defendants knew that purchasers relied upon them to design, manufacture and sell toy products that were reasonably safe and would not endanger their children's health.

192.   Defendants designed, manufactured and sold Hazardous Toys to parents of young children, and they knew that such toys would be used by young children.

193.   The Manufacturer Defendants specifically represented in its marketing and advertising that its toys were of high quality, safe and complied with state and federal regulations.  Moreover, the Manufacturer Defendants specifically marketed

1   and sold the Hazardous Toys as age-appropriate and in compliance with ASTM-963.

2   Pictures on certain of the toys of children playing with the products further support the

3   representations that the toys were safe and age appropriate.

4       194.    At the time that Defendants designed, manufactured, sold and/or

5   distributed the Toys, Defendants knew the purpose for which the Toys were intended

6   and impliedly warranted that the Toys were of merchantable quality; were free of

7   hazardous substances; were free of manufacturing defects such as lead contamination;

8   were free of design defects; and were safe and fit for their ordinary purpose – as play

9   toys for young children.

10      195.    Defendants breached their implied warranties in connection with their

11  sale of Hazardous Toys to Plaintiffs and members of the Class.  The Hazardous Toys

12  were not safe and fit for their ordinary purposes and intended uses as children's

13  playthings, and were not free of defects, such as lead contamination or loose magnets

14  that can cause intestinal perforation or blockage and which can cause permanent

15  health damage or fatal injury.

16      196.    Because Defendants announced the recalls of the Hazardous Toys, they

17  had actual knowledge that the Hazardous Toys were not free from hazardous

18  substances or manufacturing defects; the Hazardous Toys were not fit for their

19  ordinary purpose; and thus Plaintiffs were not required to notify Defendants of their

20  breach.  If notice is required, Plaintiffs and the Class have adequately provided

21  Defendants of such notice through the filing of this lawsuit and through their notices

22  sent pursuant to the California Consumer Legal Remedies Act.

23      197.    As a direct and proximate result of Defendants' breach of implied

24  warranties, Plaintiffs and other members of the Class's injuries include, but are not

25  limited to the purchase price of the Hazardous Toys, exposure to lead and/or

26  dangerous magnets in the Hazardous Toys, serious health problems associated with

27  the exposure, and the costs of diagnostic screening.

28

## COUNT THREE

### Negligence – Design, Manufacturing Defect and Failure to Warn
#### (Against All Defendants)

198.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

199.   Defendants designed, manufactured, sold, and/or distributed Hazardous Toys to parents of young children.

200.   The Hazardous Toys contained lead, lead paint, and/or loose magnets when they left the hands of Defendants.

201.   Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Hazardous Toys, including a duty to ensure that the Hazardous Toys did not contain excessive levels of lead, lead paint and/or loose magnets and a duty to warn that the Hazardous Toys contained excessive levels of lead, lead paint and/or loose magnets.

202.   Defendants failed to exercise reasonable care in the design, manufacture, sale, and/or distribution, of the Hazardous Toys.

203.   Specifically, Defendants were negligent in their design, manufacture, testing, inspection, sale and/or distribution of the Hazardous Toys in that they:

(a)   Failed to use reasonable care in designing and manufacturing the Hazardous Toys so as to avoid the harmful risks of possibly exposing children to lead, lead paint and/or loose magnets discussed above;

(b)   Failed to conduct adequate quality testing of the Hazardous Toys in China and upon the Hazardous Toys' arrival in the United States to determine the safety of the Hazardous Toys prior to sale;

(c)   Failed to inquire about the safety of the Hazardous Toys as to the Retailer Defendants; and

(d)     Failed to accompany the Hazardous Toys with proper warnings regarding the possible adverse effects associated with children's exposure to lead, lead paint and/or loose magnets.

204.   Despite the fact that Defendants knew or should have known that the Hazardous Toys could cause adverse health effects to children, Defendants continued to market and sell the Hazardous Toys to consumers, including Plaintiffs and members of the Class, despite the reasonable possibility that the Hazardous Toys contained lead or loose magnets.

205.   Defendants knew or should have known that Plaintiffs and members of the Class would foreseeably be put at risk to hazardous substances, and to suffer adverse health effects and injury exercise reasonable care in the design, manufacture, sale and/or distribution of the Hazardous Toys and as a result of Defendants' failure to give warning of the adverse effects associated with children's exposure to lead, lead paint or loose magnets.

206.   Defendants' negligence proximately caused Plaintiffs and the Class to be injured, including exposure to hazardous substances such as lead and loose magnets, increased risk of serious health problems, and the associated costs of diagnostic screening.

207.   Plaintiffs do not allege negligence claims based on an injury to the Hazardous Toys and hazardous magnets themselves; Plaintiffs' negligence claims relate to injuries that they and Class members sustained as a result of the Hazardous Toys.

### COUNT FOUR

**Strict Liability- Design Defect/Manufacturing Defect and Failure to Warn**
**(Against All Defendants)**

208.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

209.   Defendants designed, manufactured, sold and/or distributed Hazardous Toys to parents of young children.

210.   The Hazardous Toys that Defendants designed, manufactured, sold and/or distributed were defective in design and/or manufacturing.  Further, the Hazardous Toys were defective when they left the control of the Defendants such that: (1) the foreseeable risks of lead poisoning and/or hazardous magnets exceeded the benefits associated with the design or manufacturing with same, or (2) they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other toys.

211.   Defendants knew or should have known that the Hazardous Toys contained a non-obvious danger in their material, surface paint, or detachable magnets.  Moreover, the presence of lead and hazardous magnets was a knowable danger.

212.   Defendants knew that Plaintiffs and the Class would use the products without first inspecting them for lead, lead paint and/or loose magnets.  However, Defendants failed to inform Plaintiffs and members of the Class as to the adverse health effects that the Hazardous Toys could have on young children.

213.   The Hazardous Toys were expected to and did reach Plaintiffs and other members of the Class without substantial change in condition.

214.   The Hazardous Toys Defendants designed, manufactured, sold and/or distributed were defective due to inadequate warning and inadequate inspection and testing, and inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

215.   Had Plaintiffs and members of the Class been warned about the presence of lead in the Hazardous Toys or the danger that it posed to their children, or were warned that the Toys contained magnets that could become loose and cause intestinal perforation or blockage, they would not have purchased, acquired, or otherwise used the Hazardous Toys.

216.   As a direct and proximate result of the defective condition of the Hazardous Toys as designed, manufactured, sold and/or distributed by Defendants, Plaintiffs and other members of the Class have been injured, including exposure to hazardous substances such as lead and hazardous magnets in the Toys, increased risk of serious health problems, and the associated costs of diagnostic screening.

217.   Plaintiffs do not allege negligence claims based on an injury to the Hazardous Toys and hazardous magnets themselves; Plaintiffs' negligence claims relate to injuries that they and Class members sustained as a result of the Hazardous Toys.

## COUNT FIVE

**Violation of the Consumer Product Safety Act (15 U.S.C. §2072) & Consumer Product Safety Rules (15 U.S.C. §1261, 16 C.F.R. §1303, 16 C.F.R. §1117.1 *et seq*., 16 C.F.R. §1500.18 (a)(2))**
**(Against All Defendants)**

218.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

219.   Section 2072 of the Consumer Product Safety Act provides as follows:

(a) Persons injured; costs; amount in controversy.

Any person who shall sustain injury ***by reason of any knowing (including willful) violation of a consumer product safety rule***, or any other rule or order issued by the Commission may sue any person who knowingly (including willfully) violated any such rule or order in any district court of the United States in the district in which the defendant resides or is found or has an agent, shall recover damages sustained, and may, if the court determines it to be in the interest of justice, recover the costs of suit, including reasonable attorneys' fees (determined in accordance with section 11(f) [15 U.S.C.A. §2060(f)]) and reasonable expert witnesses' fees; Provided, That the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, unless such

1    action is brought against the United States, any agency thereof, or any
2    officer or employee thereof in his official capacity.

3                              *        *        *

4    (c) Remedies available.

5    The remedies provided for in this section shall be in addition to and not
6    in lieu of any other remedies provided by common law or under Federal
7    or State law.

8    (emphasis added).

9        220.   Through Consumer Product Safety rules, the CPSC has banned, as
10   hazardous, the manufacture, sale and distribution of lead-containing paint and toys
11   that contain certain levels of lead paint (15 U.S.C. §1261 and 16 C.F.R. §1303).

12       221.   Also, through Consumer Product Safety rules, the CPSC has banned, as
13   hazardous toys, any toys that contain "attachments capable of being dislodged by the
14   operating features of the toy or capable of being deliberately removed by a child,
15   which toy has the potential for causing laceration, puncture wound injury, aspiration,
16   ingestion, or other injury."  16 C.F.R. §1500.18(a)(2).

17       222.   The Hazardous Toys contained banned hazardous substances and
18   unlawfully exposed children to lead and/or loose magnets capable of being dislodged,
19   which can result in ingestion and injury, in violation of Consumer Product Safety
20   rules.

21       223.   Defendants knowingly violated Consumer Product Safety rules,
22   including, but not limited to, 15 U.S.C. §1261, 16 C.F.R. §1303, 16 C.F.R. §1117.1 *et*
23   *seq*., 16 C.F.R. §1500.18 (a)(2), and thus violated §2072(a) of the Consumer Product
24   Safety Act.  Defendants failed to exercise due care to ascertain the safety and quality
25   in the manufacturing of the Hazardous Toys before they marketed, sold and
26   distributed them as safe and quality play toys for young children, and failed to
27   institute quality-control measures and to inspect with due care the Hazardous Toys
28   and their surface paint.

224.   Plaintiffs and other members of the Class were reasonably relied upon Defendants' representations that the Hazardous Toys were safe for play toys used by young children.

225.   Plaintiffs and other members of the Class were reasonably deceived by Defendants' representations that the Hazardous Toys were safe and quality toys, when in fact the Hazardous Toys were hazardous, as they exposed children who played with them to lead or loose magnets.  Plaintiffs and other Class members would not have purchased the Hazardous Toys had they known of the risk of lead or loose magnets.

226.   As a direct and proximate result of Defendants' unlawful conduct and practices, Plaintiffs and members of the Class have suffered damages and have been injured, including exposure to lead and loose magnets, increased risk of serious health problems, the value of the Hazardous Toys had they been safe and fit for their ordinary purposes, and the cost of diagnostic screening.

## COUNT SIX

### Unlawful, Unfair or Fraudulent Business Acts and Practices in Violation of Cal. Bus. & Prof. Code §17200, *et seq*.
### (Against the Manufacturer Defendants)

227.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

228.   California Business and Professions Code §17200 prohibits any "unfair, deceptive, untrue or misleading advertising."  For the reasons set forth above, Defendants engaged in unfair, deceptive, untrue and misleading advertising in violation of California Business and Professions Code §17200, in that Defendants' representations and advertising were likely to deceive the public as to the safety, quality, and age-appropriateness of the Hazardous Toys.

229.   California Business and Professions Code §17200 also prohibits any "unlawful business act or practice."  The Manufacturer Defendants have engaged in "unlawful" business acts and practices by selling, marketing and distributing the Hazardous Toys as safe, quality and age-appropriate products when in fact the

1    Hazardous Toys were laden with lead, lead paint, or contained certain small magnets

2    that could come loose and cause intestinal perforation or blockage, which can be fatal.

3        230.    These business acts and practices violated numerous provisions of federal

4    law, including, *inter alia*; the Consumer Product Safety Commission statutes and

5    regulations, 15 U.S.C. §2051 *et seq.* (Consumer Product Safety Act); 16 C.F.R.

6    §1303.1 *et seq.* (Ban of Lead-Containing Paint and Certain Consumer Products

7    Bearing Lead-Containing Paint); 16 C.F.R. §1117.1 *et seq.* (Reporting of Choking

8    Incidents Involving Marbles, Small Balls, Latex Balloons and Other Small Parts); 15

9    U.S.C. §1261 *et seq.* (Federal Hazardous Substances Act); 16 C.F.R. §1500.18(a)(2)

10   (Banned toys and other banned articles intended for use by children); Proposition 65,

11   Cal. Health & Safety Code §§25249.6, *et seq.* (Required warning before exposure to

12   chemicals known to cause cancer or respiratory toxicity); California Consumer Legal

13   Remedies Act, Cal. Civ. Code §§1750 *et seq.*; and California Song-Beverly Consumer

14   Warranty Act, Cal. Civ. Code §§1791.1(a), 1792, 1792.1, and 1791.1(b); as well as

15   other violations of state law and common law.  Plaintiffs reserve the right to identify

16   additional provisions of the law violated by Defendants as further investigation and

17   discovery warrants.

18       231.    The Manufacturer Defendants' failure to comply with the above statutes,

19   regulations, and common law constitutes an unlawful business act or practice.

20       232.    The Manufacturer Defendants' wrongful conduct emanated, and

21   continues to emanate, from California.  Specifically, Mattel is headquartered in

22   California and its executives are located in California.  Although Fisher-Price has

23   offices located in New York, many of its executives, including its Vice President of

24   Consumer Products, are located in California.  Moreover, the investigation and

25   determination to establish a recall of the Hazardous Toys were conducted from

26   California.  Additionally, many of the Hazardous Toys were imported from China into

27   California and entered the stream of commerce from California.  Finally, many of the

28   toys were purchased in stores and on websites located in California.

233.   Plaintiffs and members of the Class have reasonably acted and relied on the misrepresentations made by Defendants regarding Defendants' assurances that the Hazardous Toys are safe, quality, and age-appropriate products, and Plaintiffs have suffered injury as a direct result of the unlawful business practices of the Manufacturer Defendants.

234.   California Business and Professions Code §17200 also prohibits any "unfair business act or practice."   Through the above-described conduct, the Manufacturer Defendants engaged in "unfair" business acts or practices and Defendants' conduct outweighs any business justification, motive or reason, particularly considering the available legal alternatives that exist in the marketplace. Further, the Manufacturer Defendants' conduct is immoral, unethical, unscrupulous, offends established public policy and has injured Plaintiffs and other members of the Class.

235.   California Business and Professions Code §17200 also prohibits any "fraudulent business act or practice."   By engaging in the above-described conduct, the Manufacturer Defendants engaged in "fraudulent" business acts or practices in that the business acts and practices described above had a tendency and likelihood to deceive persons to whom such conduct was and is targeted by selling, marketing and distributing the Hazardous Toys as safe, quality and age-appropriate products, when in fact the Hazardous Toys contained hazardous lead, lead paint or loose magnets.

236.   Plaintiffs and members of the Class relied on Defendants' representations that the Hazardous Toys were safe for use.

237.   Plaintiffs and members of the Class were reasonably deceived by Defendants' representations that the products were safe and suitable for use, when in fact they were contaminated with lead, lead paint or contained small magnets that could become loose and cause intestinal perforation or blockage, which can be fatal. Plaintiffs and members of the Class would not have purchased the Hazardous Toys had they known of the risk of lead contamination or hazards due to the magnets.

238.   As a direct and proximate result of Defendants' misrepresentations regarding the safety of the Hazardous Toys, Plaintiffs and members of the Class have suffered damages.  Specifically, as a result of the defects and recalls, Plaintiffs and members of the Class, among other things, have purchased products that are defective and not fit for their ordinary use as children's playthings, have suffered an increase risk of serious health problems, and incurred the cost of diagnostic screening.

239.   The Manufacturer Defendants have thus engaged in unlawful, unfair and fraudulent business acts and practices and false advertising, entitling Plaintiffs to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

240.   Additionally, pursuant to California Business & Professions Code §17203, Plaintiffs seek an order requiring Manufacturer Defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices.

### COUNT SEVEN

**Unlawful, Unfair or Fraudulent Business Acts and Practices**
**in Violation of Cal. Bus. & Prof. Code §17200, *et seq*.**
**(On Behalf of California Resident Plaintiffs**
**Against the Retailer Defendants)**

241.   Plaintiffs Harrington, Underhill, Dunsmore, Jimenez, Perez, Rusterhotz, and Probst repeat and reallege each and every allegation contained above as if fully set forth herein.

242.   California Business and Professions Code §17200 prohibits any "unfair, deceptive, untrue or misleading advertising."  For the reasons set forth above, Defendants engaged in unfair, deceptive, untrue and misleading advertising in violation of California Business and Professions Code §17200, in that Defendants' representations and advertising were likely to deceive the public as to the safety, quality, and age-appropriateness of the Hazardous Toys.

243.   California Business and Professions Code §17200 also prohibits any "unlawful business act or practice."  The Retailer Defendants have engaged in "unlawful" business acts and practices by selling, marketing and distributing the

1   Hazardous Toys as safe, quality and age-appropriate products when in fact the
2   Hazardous Toys were laden with lead paint or contained certain small magnets that
3   could come loose and cause intestinal perforation or blockage, which can be fatal.

4        244.   These business acts and practices violated numerous provisions of federal
5   law, including, *inter alia*; the Consumer Product Safety Commission statutes and
6   regulations, 15 U.S.C. §2051 *et seq.* (Consumer Product Safety Act); 16 C.F.R.
7   §1303.1 *et seq.* (Ban of Lead-Containing Paint and Certain Consumer Products
8   Bearing Lead-Containing Paint); 16 C.F.R. §1117.1 *et seq.* (Reporting of Choking
9   Incidents Involving Marbles, Small Balls, Latex Balloons and Other Small Parts); 15
10  U.S.C. §1261 *et seq.* (Federal Hazardous Substances Act); 16 C.F.R. §1500.18(a)(2)
11  (Banned toys and othe rbanned articles intended for use by children); Proposition 65,
12  Cal. Health & Safety Code §§25249.6, *et seq.* (Required warning before exposure to
13  chemicals known to cause cancer or respiratory toxicity); California Consumer Legal
14  Remedies Act, Cal. Civ. Code §§1750 *et seq.*; and California Song-Beverly Consumer
15  Warranty Act, Cal. Civ. Code §§1791.1(a), 1792, 1792.1, and 1791.1(b); as well as
16  other violations of state law and common law.  Plaintiffs reserve the right to identify
17  additional provisions of the law violated by Defendants as further investigation and
18  discovery warrants.

19       245.   The Retailer Defendants' failure to comply with the above statutes,
20  regulations and state law constitutes an unlawful business act or practice.

21       246.   Plaintiffs and members of the Class have reasonably acted and relied on
22  the misrepresentations made by the Defendants regarding the Defendants' assurances
23  that the Hazardous Toys are safe, age-appropriate, quality products, and Plaintiffs
24  have suffered injury as a direct result of the unlawful business practices of the Retailer
25  Defendants.

26       247.   California Business and Professions Code §17200 also prohibits any
27  "unfair business act or practice."  Through the above-described conduct, the Retailer
28  Defendants engaged in "unfair" business acts or practices and the Retailer

1    Defendants' conduct outweighs any business justification, motive or reason,

2    particularly considering the available legal alternatives that exist in the marketplace.

3    Further, the Retailer Defendants' conduct is immoral, unethical, unscrupulous, offends

4    established public policy and has injured Plaintiffs and other members of the Class.

5        248.   California Business and Professions Code §17200 also prohibits any

6    "fraudulent business act or practice."  By engaging in the above-described conduct,

7    the Retailer Defendants engaged in "fraudulent" business acts or practices in that the

8    business acts and practices described above had a tendency and likelihood to deceive

9    persons to whom such conduct was and is targeted by selling, marketing and

10   distributing the Hazardous Toys as safe, quality and age-appropriate products, when in

11   fact the Hazardous Toys contained lead, lead paint or loose magnets.

12       249.   In addition, when the Retailer Defendants sold the Hazardous Toys on

13   their shelves, they adopted, and are responsible for, the representations Mattel made

14   on its packaging regarding the safety of the toys and regarding the age-appropriateness

15   of the toys by placing the Toys on their store shelves and retail websites, and by

16   selling the Hazardous Toys to Plaintiffs and the Class.

17       250.  Plaintiffs and members of the Class relied on the Defendants'

18   representations that the Hazardous Toys were safe for use and were age-appropriate.

19       251.   Plaintiffs and members of the Class were reasonably deceived by the

20   Defendants' representations that the products were safe and suitable for young

21   children's use, when in fact they were defective as they were contaminated with lead,

22   lead paint or contained small magnets that could become loose and cause intestinal

23   perforation or blockage, which can be fatal.  Defendants' practices were likely to

24   deceive the public.  Plaintiffs and other members of the Class would not have

25   purchased the Hazardous Toys had they known of the defects.

26       252.   As a direct and proximate result of the Defendants' misrepresentations

27   regarding the safety of the Hazardous Toys, Plaintiffs and members of the Class have

28   suffered damages.  Specifically, as a result of the defects and recalls, Plaintiffs and

1  members of the Class have purchased products that are not fit for their ordinary use as
2  playthings, exposure to a hazardous substance and/or dangerous magnets, have
3  suffered an increased risk of serious health problems, and incurred the cost of
4  diagnostic screening.

5      253.  The Retailer Defendants have thus engaged in unlawful, unfair and
6  fraudulent business acts and practices and false advertising, entitling Plaintiffs to
7  judgment and equitable relief against the Retailer Defendants, as set forth in the
8  Prayer for Relief.

9      254.  Additionally, pursuant to California Business & Professions Code
10  §17203, Plaintiffs seek an order requiring the Retailer Defendants to immediately
11  cease such acts of unlawful, unfair and fraudulent business practices.

12                        **COUNT EIGHT**

13  **Violation of the California Consumers Legal Remedies Act**
    **Cal. Civ. Code §1750,** *et seq.*
14  **(Against the Manufacturer Defendants)**

15      255.  Plaintiffs repeat and reallege each and every allegation contained above
16  as if fully set forth herein.

17      256.  The California Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et*
18  *seq.*, protects consumers against fraud, unlawful practices, and unconscionable
19  commercial practices in connection with the sale of any merchandise. Plaintiffs are
20  consumers as defined by California Civil Code §1761(d). The Hazardous Toys are
21  goods within the meaning of the California Consumers Legal Remedies Act.

22      257.  Defendants sold and falsely marketed the Hazardous Toys as safe. age-
23  appropriate, and quality products, when in fact the Hazardous Toys were laden with
24  lead, lead paint, which is a banned hazardous substance, or dangerous magnets and
25  thus violates the California Consumers Legal Remedies Act. Defendants'
26  representations were likely to deceive consumers.

27      258.  The Manufacturer Defendants violated and continue to violate, the
28  Consumer Legal Remedies Act by engaging in the following practices proscribed by

- 74 -

California Civil Code §1770(a) in transactions with Plaintiffs and the Class which were intended to result in, and did result in, the sale of the Hazardous Products:

(5)    Representing    that    [the    Hazardous    Products have] . . . characteristics . . . uses [or] benefits . . . which they do not have . . . .

(7) Representing that [the Hazardous Products] are of a particular standard, quality or grade…if they are of another.

(9) Advertising goods…with intent not to sell them as advertised.

(16) Representing that [the Hazardous Products have] been supplied in accordance with a previous representation when [they have] not.

259.    Plaintiffs and other members of the Class reasonably relied upon Defendants' representations that the Hazardous Toys were safe for play toys to be used by young children.

260.    Plaintiffs and other members of the Class were reasonably deceived by Defendants' representations that the Hazardous Toys were safe, and age-appropriate toys, when instead they were defective and exposed children to hazardous lead or that they contained magnets that could cause intestinal perforation or blockage, which can be fatal.  Plaintiffs and other Class members would not have purchased the Hazardous Toys had they known of these defects.

261.    As a direct and proximate result of Defendants' misrepresentations and unlawful and unconscionable commercial practices, Plaintiffs and members of the Class have paid for products that are unsuitable for their ordinary use as playthings for children, have suffered an increased risk of serious health problems and incurred the cost of diagnostic screening.

262.    Pursuant to §1782 of the Consumers Legal Remedies Act, Plaintiffs notified Defendants in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

263.   As 30 days have elapsed since Plaintiffs provided such notice, Plaintiffs and the Class are entitled to damages under the Consumer Legal Remedies Act, California Civil Code §1784.

264.   Pursuant to California Civil Code §1782(d), Plaintiffs and the Class seek a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

### COUNT NINE

**Violation of the California Consumers Legal Remedies Act**
**Cal. Civ. Code §1750, *et seq.***
**(On Behalf of California Resident Plaintiffs**
**Against the Retailer Defendants)**

265.   Plaintiffs Harrington, Underhill, Dunsmore, Jimenez, Perez, Rusterhotz, and Probst repeat and reallege each and every allegation contained above as if fully set forth herein.

266.   The California Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*, protects consumers against fraud, unlawful practices, and unconscionable commercial practices in connection with the sale of any merchandise.  Plaintiffs are consumers as defined by California Civil Code §1761(d).  The Hazardous Toys are goods within the meaning of the California Consumers Legal Remedies Act.

267.   The Defendants sold and falsely marketed the Hazardous Toys as safe, quality, and age-appropriate products, when in fact the Hazardous Toys were laden with lead, lead paint, which is a banned hazardous substance, and constitutes a violation of the California Consumers Legal Remedies Act.

268.   The Retailer Defendants violated and continue to violate the Consumer Legal Remedies Act by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with Plaintiffs and the Class which were intended to result in, and did result in, the sale of the Hazardous Products:

(5)    Representing    that    [the    Hazardous    Products have] . . . .characteristics . . . uses [or] benefits . . . which they do not have . . . .

(7) Representing that [the Hazardous Products] are of a particular standard, quality or grade . . .if they are of another.

(9) Advertising goods . . . with intent not to sell them as advertised.

(16) Representing that [the Hazardous Products have] been supplied in accordance with a previous representation when [they have] not.

269.    Plaintiffs and other members of the Class reasonably relied upon the Defendants' representations that the Hazardous Toys were safe for play toys to be used by young children.

270.    In addition, the Retailer Defendants adopted, and are responsible for, the representations Mattel made on its packaging regarding the safety of the toys and regarding the age-appropriateness of the toys, when they decided to place and sell such toys on their store shelves, and retail websites, and when they advertised and sold the Toys to Plaintiffs and other members of the Class.

271.    Plaintiffs and other members of the Class were reasonably deceived by the Defendants' representations that the Hazardous Toys were safe, quality and age-appropriate toys, when in fact they were hazardous and exposed children who played with them to hazardous lead or magnets that could cause intestinal perforation or blockage, which can be fatal.  Plaintiffs and other Class members would not have purchased the Hazardous Toys had they known of the defects.

272.    As a direct and proximate result of Defendants' misrepresentations and unlawful and unconscionable commercial practices, Plaintiffs and members of the Class have paid for products that are unsuitable for their ordinary use as playthings for children, have suffered an increased risk of serious health problems and incurred the cost of diagnostic screening.

273.    Pursuant to §1782 of the Consumers Legal Remedies Act, Plaintiffs notified the Retailer Defendants in writing by certified mail of the particular violations of §1770 of the Act and demanded that Defendants Target, Toys 'R' Us, Wal-Mart, KB Toys and Kmart rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

274.    As 30 days have elapsed since Plaintiffs provided such notice, Plaintiffs and the Class are entitled to damages under the Consumer Legal Remedies Act, California Civil Code §1784.

275.    Pursuant to California Civil Code §1782(d), Plaintiffs and the Class seek a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

**COUNT TEN**

**Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability, Cal. Civ. Code §§1792 & 1791.1(a)**
**(On Behalf of California Purchasers**
**Against All Defendants)**

276.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

277.    Plaintiffs and other Class members who purchased the Hazardous Toys in California are "buyers" within the meaning of Cal. Civ. Code §1791.

278.    The Toys are "consumer goods" within the meaning of Civ. Code §1791.

279.    The Manufacturer Defendants are "manufacturers" of the Hazardous Toys within the meaning of Cal. Civ. Code §1791(j).

280.    The Retailer Defendants are "retailers" of the Hazardous Toys within the meaning of Cal. Civ. Code §1791(l).

281.    Defendants impliedly warranted to Plaintiffs and the Class that the Hazardous Toys were "merchantable" within the meaning of Cal. Civ. Code §§1791.1(a) & 1792.

282.   Defendants have breached the implied warranty of merchantability to Plaintiffs and the Class because the Hazardous Toys:  (i) would not pass without objection in the trade; (ii) were not fit for their ordinary purposes for which such goods are used; (iii) were not adequately contained, packaged and labeled; and (iv) did not conform to the promises or affirmations of fact made on the container or label.

283.   As a proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and other members of the Class sustained damages including, but not limited to, the purchase price of the Hazardous Toys, exposure to hazardous lead and loose magnets, an increased risk of serious health effects, and the cost of diagnostic screening.

284.   Pursuant to Cal. Civ. Code §§1791.1(d) & 1794(a),(b)(2), Plaintiffs and other members of the Class are entitled to damages and other legal and equitable relief including, at their election, the right of reimbursement.

**COUNT ELEVEN**

**Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Fitness, Civ. Code §§1792.1 & 1791.1(b)**
**(On Behalf of California Purchasers**
**Against the Manufacturer Defendants)**

285.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

286.   The Manufacturer Defendants impliedly warranted to Plaintiffs and members of the Class who purchased the Hazardous Toys in California that they were fit for the particular purpose of being played with by children within the meaning of Cal. Civ. Code §§1791.1(b) & 1792.1.

287.   The Manufacturer Defendants knew or had reason to know that the Hazardous Toys were being purchased by Plaintiffs and the Class for use as playthings for children, and that the buyers of the Hazardous Toys were relying on the Manufacturer Defendants' skill and judgment to furnish goods suitable for that purpose.

288.   The Manufacturer Defendants have breached the implied warranty of fitness.

289.   As a proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and other members of the Class sustained damages including, but not limited to, the purchase price of the Hazardous Toys, exposure to hazardous lead and loose magnets, an increased risk of serious health effects, and the cost of diagnostic screening.

290.   Pursuant to Cal. Civ. Code §§1791.1(d) & 1794(a), (b)(2), Plaintiffs and the Class are entitled to damages and other legal and equitable relief including, at their election, the right of reimbursement.

**COUNT TWELVE**

**Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied (Warranty of Fitness, Cal. Civ. Code §§1792.2 & 1791.1(b) On Behalf of California Purchasers Against The Retailer Defendants)**

291.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

292.   The Retailer Defendants impliedly warranted to Plaintiffs and other members of the Class who purchased the Hazardous Toys in California that they were fit for the particular purpose of being played with by children within the meaning of Cal. Civ. Code §§1791.1(b) & 1792.2.

293.   The Retailer Defendants knew or had reason to know that the Hazardous Toys were being purchased by Plaintiffs and the Class for the particular use as children's playthings, and that the buyers of the Hazardous Toys were relying on their skill and judgment to furnish goods suitable for that purpose.

294.   The Retailer Defendants have breached the implied warranty of fitness.

295.   As a proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and other members of the Class sustained damages including, but not limited to, the purchase price of the Hazardous Toys, exposure to

1    hazardous lead and loose magnets, an increased risk of serious health effects, and the

2    cost of diagnostic screening.

3        296.   Pursuant to Cal. Civ. Code §§1791.1(d) & 1794(a), (b)(2), Plaintiffs and

4    the Class are entitled to damages and other legal and equitable relief including, at their

5    election, the right of reimbursement.

6                              **COUNT THIRTEEN**

7                              **Unjust Enrichment**

8        297.   Plaintiffs repeat and reallege each and every allegation contained above

9    as if fully set forth herein.

10       298.   At all times relevant hereto, Defendants designed, manufactured,

11   produced, marketed and/or sold Hazardous Toys that contained lead, lead-based

12   surface paint, or small magnets that become loose and cause intestinal perforation or

13   blockage, which can be fatal.

14       299.   Plaintiffs and members of the Class conferred upon Defendants, without

15   knowledge of the Hazardous Toys' defects and eventual recalls, payment for such

16   toys, benefits that were non-gratuitous. Defendants accepted or retained the non-

17   gratuitous benefits conferred by Plaintiffs and members of the Class, with full

18   knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing,

19   Plaintiffs and members of the Class were not receiving products of the high quality,

20   nature, fitness or value that had been represented by Defendants and reasonable

21   consumers would have expected.  Retaining the non-gratuitous benefits conferred

22   upon Defendants by Plaintiffs and members of the Class under these circumstances

23   made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

24   Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs

25   and members of the Class is unjust and inequitable, Plaintiffs and members of the

26   Class are entitled to, and hereby seek disgorgement and restitution of Defendants'

27   wrongful profits, revenue, and benefits in a manner established by the Court.

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment against Defendants as follows:

(a)    Certifying this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed class described herein and designating Plaintiff's Interim Co-Lead Counsel, Coughlin Stoia Geller Rudman & Robbins and Whatley Drake & Kallas, LLC, as Co-Lead Counsel for the Class;

(b)    Awarding declaratory and injunctive relief as permitted by law or equity pursuant to Rules 64 and 65 to assure that the Class has an effective remedy, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

(c)    Awarding a declaratory judgment with damages awarded as supplemental relief;

(d)    Awarding costs of initial diagnostic screening for Plaintiffs and members of the Class;

(e)    Awarding the cost of appropriate treatment for those who screen positive for blood-lead levels;

(f)    Awarding reimbursement to Class members for the amounts they paid for the Hazardous Toys;

(g)    Awarding all costs, including experts' fees and attorneys' fees and expenses, and the costs of prosecuting this action; and

(h)    Awarding such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: May 16, 2008

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
THOMAS J. O'REARDON II

JOHN J. STOIA, JR.

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

WHATLEY, DRAKE & KALLAS, LLC
JOE R. WHATLEY, JR.
EDITH M. KALLAS
JOSEPH P. GUGLIELMO

JOE R. WHATLEY, JR.

1540 Broadway, 37th Floor
New York, NY 10036
Telephone: 212/447-7070
212/447-7077 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
PAUL J. GELLER
JACK REISE
ELIZABETH A. SHONSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

***Co-Lead Counsel for Plaintiffs***

KELLER ROHRBACK LLP
LYNN LINCOLN SARKO
JULI E. FARRIS
GRETCHEN FREEMAN CAPPIO
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: 206/623-1900
206/623-3384 (fax)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Chair of Plaintiffs' Executive Committee*

BALKAN & PATTERSON, LLP
ADAM BALKAN
JOHN PATTERSON
601 S. Federal Highway, Suite 302
Boca Raton, FL  33432
Telephone:  561/750-9191
561/750-1574 (fax)

ENGSTROM LIPSCOMB & LACK, P.C.
WALTER J. LACK
PAUL A. TRAINA
GREGORY P. WATERS
10100 Santa Monica Blvd., 16th Floor
Los Angeles, CA  90067-4107
Telephone:  310/552-3800
310/552-9434 (fax)

EYSTER KEY TUBB ROTH
   MIDDLETON AND ADAMS LLP
NICHOLAS B. ROTH
HEATHER NECKLAUS HUDSON
402 East Moulton Street
P.O. Box 1607
Decatur, AL  35602
Telephone:  256/353-6761
256/353-6767 (fax)

FINKELSTEIN THOMPSON LLP
BURTON H. FINKELSTEIN
MILA F. BARTOS
Duvall Foundry
1050 30th Street, N.W.
Washington, DC  20007
Telephone:  202/337-8000
202/337-8090 (fax)

FINKELSTEIN THOMPSON LLP
ROSEMARY M. RIVAS
MARK PUNZALAN
100 Bush Street, Suite 1450
San Francisco, CA  94104
Telephone:  415/398-8700
415/398-8704 (fax)

GOLOMB & HONIK, P.C.
RICHARD M. GOLOMB
RUBEN HONIK
MICHAEL S. LEVIN
STEPHAN MATANOVIC
1515 Market Street, Suite 1100
Philadelphia, PA  19102
Telephone:  215/985-9177

- 84 -

215-985-4169 (fax)

HARKE & CLASBY LLP
LANCE A. HARKE
155 South Miami Avenue, Suite 600
Miami, FL 33130
Telephone: 305/536-8220
305/536-8229 (fax)

MCGOWAN HOOD & FELDER LLC
JOHN GRESSETTE FELDER, JR
1405 Calhoun Street
Columbia, SC 29201
Telephone: 803/779-0100
803/787-0750 (fax)

MCGOWAN HOOD & FELDER LLC
CHAD A. MCGOWAN
S. RANDALL HOOD
WILLIAM A. MCKINNON
1539 Healthcare Drive
Rock Hill, SC 29732
Telephone: 803/327-7800
803-328-5656 (fax)

*Executive Committee Members*

GULAS & STUCKEY, P.C.
JASON A. STUCKEY
LAUREN WAGNER PEDERSON
  (*Of Counsel*)
2031 2nd Avenue North
Birmingham, AL 35203
Telephone: 205/879-1234
205/879-1247 (fax)

GILBERT AND SACKMAN, A LAW
  CORPORATION
JOSEPH L. PALLER, JR
JAY EDWARD SMITH
3699 Wilshire Blvd., Suite 1200
Los Angeles, CA 90048-5114
Telephone: 323/938-3000
323/937-9139 (fax)

PRICE WAICUKAUSKI & RILEY, LLC
WILLIAM N. RILEY
JAMIE R. KENDALL
JOSEPH N. WILLIAMS
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: 317/633-8787
317-633-8797 (fax)

BAGNELL AND EASON

- 85 -

GILBERT S. BAGNELL
1201 Main Street, Suite 1980
Columbia, SC 29211
Telephone: 803/748-1333
803-748-1300 (fax)

KAPLAN FOX & KILSHEIMER LLP
LORI S. BRODY
1801 Century Park East, Suite 1460
Los Angeles, CA 90067
Telephone: 310/785-0800
310/785-0897 (fax)

KAPLAN FOX & KILSHEIMER LLP
LINDA M. FONG
LAURENCE D. KING
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415/772-4700
415/772-4707 (fax)

KAPLAN FOX & KILSHEIMER LLP
FREDERIC S. FOX
DONALD R. HALL
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: 212/687-1980
212/687-7714 (fax)

BRAUN LAW GROUP, P.C.
MICHAEL D. BRAUN
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Telephone: 310/442-7755
310/442-7756 (fax)

HANLY CONROY BIERSTEIN
   SHERIDAN FISHER & HAYES LLP
JAYNE CONROY
STEVEN M. HAYES
112 Madison Avenue, 7th Floor
New York, NY 10016
Telephone: 212/784-6400
212/213-5349 (fax)

THE LAW OFFICE OF ARON D.
   ROBINSON
ARON D. ROBINSON
19 South LaSalle Street, Suite 1300
Chicago, IL 60603

BARNOW AND ASSOCIATES PC
BEN BARNOW
One North LaSalle Street, Suite 4600
Chicago, IL 60602

Telephone: 312/621-2000
312/641-5504 (fax)

SIMMONS COOPER LLC
KENNETH J. BRENNAN
707 Berkshire Blvd.
East Alton, IL 62024
Telephone: 618/259-2222
618-259-2251 (fax)

CHIMICLES & TIKELLIS LLP
KIMBERLY M. DONALDSON
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041-0100
Telephone: 610/642-8500
610/649-3633 (fax)

HAGENS BERMAN SOBOL
  SHAPIRO LLP
STEVE W. BERMAN
IVY D. ARAI
1301 5th Avenue, Suite 2900
Seattle, WA 98101
Telephone: 206/623-7292
206/623-2594 (fax)

HAGENS BERMAN SOBOL
  SHAPIRO LLP
ELAINE T. BYSZEWSKI
LEE M. GORDON
700 South Flower Street, Suite 2940
Los Angeles, CA 90017-4101
Telephone: 213/330-7150
213/330-7152 (fax)

HAGENS BERMAN SOBOL
  SHAPIRO LLP
ELIZABETH A. FEGAN
DANIEL J. KUROWSKI
TIMOTHY MAHONEY
820 North Blvd., Suite B
Oak Park, IL 60301
Telephone: 708/776-5600
708/776-5601 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
  & BALIANT, P.C.
ANDREW S. FRIEDMAN
WENDY J. HARRISON
MICHAEL C. McKAY
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)

- 87 -

WOLOSHIN AND KILLINO
DAVID L. WOLOSHIN
JEFFREY B. KILLINO
1800 John F Kennedy Blvd., 11th Floor
Philadelphia, PA  19103-2925
Telephone:  215/840-2020
215/569-2741 (fax)

JULIO RAMOS ATTORNEY AT LAW
JULIO RAMOS
35 Grove Street, Suite 103
San Francisco, CA  94102
Telephone:  415/948-3015
415/469-9787 (fax)

LAW OFFICES OF STEVEN M.
   NUNEZ
STEVEN M. NUNEZ
3333 Camino Del Rio South, Suite 215
San Diego, CA  92108
Telephone:  619/296-8400
619/296-3700 (fax)

KALCHEIM LAW GROUP
MITCH KALCHEIM
AMBER S. HEALY
2049 Century Park East, Suite 2150
Los Angeles, CA  90067
Telephone:  310/461-1200
310/461-1201 (fax)

KIRTLAND & PACKARD LLP
MICHAEL L. KELLY
BEHRAM V. PAREKH
2361 Rosecrans Avenue, Fourth Floor
El Segundo, CA  90245
Telephone:  310/536-1000
310/536-1001 (fax)

CUNEO GILBERT AND LADUCA, LLP
PAMELA GILBERT
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

THE STARK LAW OFFICES, P.C.
AMIR STARK
2766 Fischer Road
Hatfield, PA  19440
Telephone:  215/275-2919
245/855-6029 (fax)

SARRAF GENTILE LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RONEN SARRAF
JOSEPH GENTILE
11 Hanover Square, 2nd Floor
New York, NY 10005
Telephone: 212/868-3610
212/918-7967 (fax)

THE CROW LAW FIRM
MICHAEL G. CROW
1100 Poydras Street, Suite 1175
New Orleans, LA 70163
Telephone: 504/599-5770
504/566-1141 (fax)

*Additional Plaintiffs' Counsel*

S:\CasesSD\Mattel Consumer\CPT 00051278 2nd Amded.doc

# EXHIBIT A

**August 2, 2007 Recall of 967,000 Sesame Street, Dora the Explorer, and other children's toys due to lead paint:**

| Product Name | Product Number |
|---|---|
| Elmo Light Up Musical Pal | 33662 |
| Ernie Light Up Musical Pal | 33663 |
| Big Bird Light Up Musical Pal | 33664 |
| Elmo Stacking Rings | 34658 |
| Elmo Tub Sub | 39038 |
| Sesame Street Shape Sorter | 39054 |
| Elmo Keyboard | 87946 |
| Ernie Splashin' Fun Trike | 90267 |
| Elmo Collectible | 90609 |
| Cookie Collectible | 90611 |
| Zoe Collectible | 90612 |
| Ernie Collectible | 90613 |
| Big Bird Collectible | 90614 |
| Construction Playset | 90745 |
| Elmo Boom Box | 93068 |
| Action Fire Engine | 93107 |
| Press 'n Go Elmo | 93307 |
| Press 'n Go Cookie Monster | 93308 |
| Cookie Saxophone | 93492 |
| Elmo's Guitar | 93493 |
| Splash Tub Puzzle | 93615 |
| Music and Lights Phone | 93780 |
| Count to Beat Elmo | B7554 |
| Shake, Giggle & Roll | B7888 |
| Elmo in The Giggle Box | B7987 |
| Silly Parts Talking Elmo | B7989 |
| Dora's Talking House | B9620 |
| Dora, Backpack, Perrito Figure Pack | C6908 |

| Product Name | Product Number |
|---|---|
| Diego Figure Pack | C6909 |
| Swiper Figure Pack | C6910 |
| Boots, Tico Figure Pack | C6911 |
| Dora Talking Vamonos Van | G3825 |
| Sing With Elmo's Greatest Hits | G5112 |
| Giggle Doodler | G9717 |
| Grow with Me Elmo Sprinkler | H2943 |
| Cousin Daisy | H3343 |
| Birthday Dora | H3344 |
| Elmo & Pals (Elmo, Cookie, Ernie) | H5569 |
| Elmo & Pals (Elmo, Zoe, Bigbird) | H5570 |
| Dora Figures in Tube | H4187 |
| Water Fun Tote | H4628 |
| Dora 3 Pack Figures In Tube | H8236 |
| Blue 3 Pack Figures in Tube | H8237 |
| Sponge Bob 3 Pack Figures in Tube | H8238 |
| Chef Dora | H9124 |
| Bedtime Dora | H9125 |
| Giggle Grabber Ernie | H9186 |
| Giggle Grabber Oscar the Grouch | H9188 |
| Diego Talking Field Journal | J0338 |
| Go Diego Go Antarctic Rescue | J0343 |
| Go Diego Go Deep Sea Rescue | J0344 |
| Go Diego Go Mountain Rescue | J0345 |
| Go Diego Go Talking Rescue 4 x 4 | J0346 |
| Giggle Grabber Soccer Elmo | J5935 |
| Giggle Grabber Chef Cookie Monster | J5936 |
| Sesame Street Giggle Toolbelt | J6537 |
| Queen Mami | J6762 |
| Royal Boots and Tico | J6763 |
| Prince Diego | J6765 |
| Sesame Street Tub Pots & Pans | J7983 |

| Product Name | Product Number |
|---|---|
| Sesame Street Giggle Drill | J9518 |
| Dora's Talking Pony Place | J9692 |
| Twins Nursery | K0617 |
| Diego - Talking Gadget Belt | K3414 |
| Go Diego Go Mobile Rescue Unit | K3571 |
| Fairytale Adventure Dora | K3580 |
| Go Diego Go Dinosaur Rescue | K4139 |
| Toucan Motorcycle Rescue | K4140 |
| Dora Figure | L0305 |
| Suprise Inside Diego Eggs | L3194 |
| Sesame Street Elmo Jack-In-The-Box | L3215 |
| Sesame Street Birthday Figure Pack | L3488 |
| Sesame Street Super Boom Box | L3507 |
| Birthday Dora | L5202 |
| Diego Tub trike | L5813 |
| Pablo & Pals | L8905 |
| Dora Figures Dora & Kitty | M0351 |
| Dora Figures Diego & Bear | M0352 |
| Go Diego Go Talking Gadget | M0524 |
| Sesame Street Giggle Doodler | M0527 |
| Dora's Talking House | M0732 |
| Let's Go Rescue Center | M2051 |
| Fairytale Castle | M2052 |

# EXHIBIT B

**August 14, 2007 Recall of 253,000 "Sarge" die cast toy cars due to lead paint:**

| Product Name | Product Number |
|---|---|
| "Sarge" toy car | M1253 |
| "Sarge" toy car sold in a set of two | K5925 |

# EXHIBIT C

**September 4, 2007 Recalls of 675,000 Various Barbie Accessory Toys, 90,000 Geo Trax Locomotive Toys and 8,900 Big Big World 6-in-1 Bongo Band toys due to lead paint:**

| Product Name | Product Number |
|---|---|
| Barbie® Dream Puppy House™ (lead paint on dog) | J9485 |
| Barbie® Dream Kitty Condo™ Playset (lead paint on cat) | J9486 |
| Barbie® Table and Chairs Kitchen Playset (lead paint on dog, chip platter, dinner plates) | K8606 |
| Barbie® Bathtub and Toilet Playset (lead point on cat) | K8607 |
| Barbie® Futon and Table Living Room Playset (lead paint on cat) | K8608 |
| Barbie® Desk and Chair Bedroom Playset (lead paint on dog) | K8609 |
| Barbie® Couch & Table Living Room Playset (lead paint on purse) | K8613 |
| Geo Trax Freightway Transport | H5705 |
| Geo Trax Special Track Pack | K3013 |
| Big Big World 6-in-1 Bongo Band toys | K9343 |

# EXHIBIT D

**October 25, 2007 Recall of 38,000 Go Diego Go Animal Rescue Boats due to lead paint:**

| Product Name | Product Number |
|---|---|
| Go Diego Go Animal Rescue Boats | K3413 |

# EXHIBIT E

**November 21, 2006 Recall of 2.4 million Polly Pocket dolls and accessories with magnets:**

| Polly Pocket Magnetic Play Sets | Item Number |
|---|---|
| Polly Pocket!™ Polly Place™ Hangin' Out House™ | B2632 |
| Polly Pocket!™ Polly Place™ Treetop Clubhouse™ | B3158 |
| Polly Pocket!™ Spa Day™ | B3201 |
| Polly Totally!™ Polly Place™ Totally Tiki Diner™ | B7118 |
| Polly Pocket!™ Quik-Clik™ Boutique | G8605 |
| Polly Pocket!™ Quik-Clik™ City Pretty Playset | H1537 |
| Polly Pocket!™ Quik-Clik™ Sporty Style Playset | H1538 |
| Polly Pocket!™ Totally Zen™ Playset | H3211 |

# EXHIBIT F

**August 14, 2007 Recall of 7.3 million Various Polly Pocket dolls and accessories with magnets:**

| Product Name | Product Number |
|---|---|
| Polly Pocket!™ Polly Place™ Hangin' Out House™ Playset | B2632 |
| Polly Pocket!™ Polly Place™ Treetop Clubhouse™ Playset | B3158 |
| Polly Pocket!™ Spa Day™ Caboodle Asst. | B3201 |
| Polly Pocket!™ Polly Place™ Gameroom Garage™ Playset | B3211 |
| Polly Pocket!™ Polly Place™ Totally Tiki Diner™ Playset | B7118 |
| Polly Pocket!™ Quik-Clik™ Boutique | G8605 |
| Polly Pocket!™ Quik-Clik™ City Pretty™ Playset (Lila™) | H1537 |
| Polly Pocket!™ Quik-Clik™ Sporty Style™ Playset (Lea™) | H1538 |
| Polly Pocket!™ Quik-Clik™ Totally Zen™ Playset (Shani™) | H3211 |
| Polly Pocket!™ Fashion Polly™ Happenin' Pet Salon™ Playset | 55503 |
| Polly Pocket!™ Polly Place™ Magnetic Additions Assortment | B2631 |
| Polly Pocket!™ Lunchbox Cafe™ Playset | B3203 |
| Polly Pocket!™ School Time Fun™ Playset | B3204 |
| Polly Pocket!™ Lip Gloss Studio™ Playset | B3207 |
| Polly Pocket!™ Glitter Boutique™ Playset | B3209 |
| Polly Pocket!™ Polly Place™ Dip N' Dive Pool™ Playset | B3210 |
| Polly Pocket!™ Birthday Suprise (INTL) | B3396 |
| Polly Pocket!™ Dazzlin' Pet Show™ Divine Dogs™ | B7078 |
| Polly Pocket!™ Dazzlin' Pet Show™ Magic Rabbits™ | B7082 |
| Polly Pocket!™ Polly Place™ Sweet Treats™ Playset | B7125 |
| Polly Pocket!™ Mailbox Surprise™ Playset | B7127 |
| Polly Pocket!™ Stretch Polly Disco Lamp | B7128 |
| Polly Pocket!™ Jewlery Box Bedroom™ Playset | B7129 |
| Polly Pocket!™ Polly Place™ Party On The Go!™ Playset | B8478 |
| Polly Pocket!™ Spa Day™ Playset | B9521 |
| Polly Pocket!™ Lunchbox Cafe™ Playset | B9522 |
| Polly Pocket!™ School Time Fun™ Playset | B9523 |
| Polly Pocket!™ Glitter Puff | B9525 |
| Polly Pocket!™ Spa Day™ Playset | B9578 |

| Product Name | Product Number |
|---|---|
| Polly Pocket!™ Boutique On The Go™ Playset | B9929 |
| Polly Pocket!™ Mailbox Surprise™ Playset | C0504 |
| Polly Pocket!™ Jewelry Box Bedroom™ Playset | C0505 |
| Polly Pocket!™ Disco Lamp | C1341 |
| Polly Pocket!™ Disco Lamp | C1342 |
| Polly Pocket!™ Mermaid Stars™ Playset | G8602 |
| Polly Pocket!™ Quick Click™ Playset | G8606 |
| Polly Pocket!™ Snow Cool™ Hotel Playset | G8612 |
| Polly Pocket!™ Quik-Clik™ House of Style™ Playset | G8614 |
| Polly Pocket!™ Totally Beadiful™ Jewelry Maker | G8615 |
| Polly Pocket!™ Quick Click™ Penthouse | G8616 |
| Polly Pocket!™ Quik-Clik™ Movie Time™ Playset (Lila™) | H1553 |
| Polly Pocket!™ Pollywood™ Limo-Scene™ Vehicle | J1659 |
| Polly Pocket!™ Pollywood™ Dial-A-Style™ Lila™ Doll | J1661 |
| Polly Pocket!™ Pollywood™ Dial-A-Style™ Lea™ Doll | J1662 |
| Polly Pocket!™ Stickin' 2 Style™ Doll | J1670 |
| Polly Pocket!™ Pollyworld™ Rockin' Theme Park™ Playset | J1681 |
| Polly Pocket!™ Pollyworld™ Dress N' Drive™ Lounge Playset | J1687 |
| Polly Pocket!™ Pollyworld™ Theme Park Party™ Quick Clik™ Doll and Fashions | J1695 |
| Polly Pocket!™ Pollyworld™ Quick Clik™ Polly™ Doll | J4169 |
| Polly Pocket!™ Pollyworld™ Quick Clik™ Crissy™ Doll | J4170 |
| Polly Pocket!™ Pollyworld™ Quick Clik™ Lea™ Doll | J4171 |
| Polly Pocket!™ Pollyworld™ Quick Clik™ Shanil™ Doll | J4172 |
| Polly Pocket!™ Pollyworld™ Costume Cart (Lea™) Playset | J9305 |
| Polly Pocket!™ Pollyworld™ Gift Shop (Lila™) Playset | J9306 |
| Polly Pocket!™ Twirl & Swirl™ Beauty Case | J9648 |
| Polly Pocket!™ Pollyworld™ Dial-A Song Polly Fashions | J9965 |
| Polly Pocket!™ Pollyworld™ Kerstie Fashions | J9966 |
| Polly Pocket!™ Pollyworld™ Rockin' Tour Bus™ | K3460 |
| Polly Pocket!™ Quik-Clik™ Pool Party™ Playset (Lila™) | H1554 |

# EXHIBIT G

**August 14, 2007 Recall of 1 million Doggie Day Care™ play sets due to loose magnets:**

| Product Name | Product Number |
|---|---|
| Doggie Day Care Coco | H1532 |
| Doggie Day Care Sparley | H1533 |
| Doggie Day Care Lula and Baby | G4461 |
| Doggie Day Care Crockett and Baby | G4462 |
| Doggie Day Care Taffy and Baby | G4464 |
| Doggie Day Care Snack Time with Cookie | G4459 |
| Doggie Day Care Diaper Change with Ginger | G4460 |
| Doggie Day Care Ice Cream with Ranger | H1530 |
| Doggie Day Care Puppy Park with Dixie | G9703 |
| Doggie Day Care Dream House Nursery with Honey | G4457 |
| Doggie Day Care Bath Time with Beau | G4458 |

# EXHIBIT H

**August 14, 2007 Recall of 683,000 Barbie and Tanner™ play sets due to magnets:**

| Product Name | Product Number |
|---|---|
| Barbie and Tanner™ play sets | J9472 |
| Barbie and Tanner™ play sets | J9560 |

# EXHIBIT I

**August 14, 2007 Recall of Batman™ and One Piece™ magnetic action figure sets due to magnets:**

| Product Name | Product Number |
|---|---|
| Batman™ Magna Battle Armor™ Batman™ figure | J1944 |
| Batman™ Magna Fight Wing™ Batman™ figure | J1946 |
| Batman™ Secret ID™ figure | J5114 |
| Batman™ Flying Fox™ figure | J5115 |
| One Piece™ Triple Slash Zolo Roronoa™ | J4142 |

## DECLARATION OF SERVICE

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    That on May 16, 2008, declarant served by Federal Express, next day delivery, the SECOND CONSOLIDATED AMENDED COMPLAINT to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of May, 2008, at San Diego, California.

                                        _____
                                        HEATHER S. BROWN

MATTEL CONSUMER (MDL)

Service List - 5/16 /2008 (07-0178M)

Page 1 of 6

## Counsel For Defendant(s)

Hugh R. Whiting
Jones Day
717 Texas Avenue, Suite 3300 Houston, TX
77002
  832/239-3939
  832/239-3600 (Fax)

Elwood G. Lui
Jones Day
555 South Flower, 50th Floor Los Angeles, CA
90071
  213/489-3939
  213/243-2539 (Fax)

Michael L. Rice
Thomas E. Fennell
Jones Day
2727 N. Harwood Street Dallas, TX
75201-1515
  214/220-3939
  214/969-5100 (Fax)

Robert Bunzel
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
  415/956-1900
  415/956-1152 (Fax)

## Counsel For Plaintiff(s)

Gilbert Scott Bagnell
Bagnell and Eason
1201 Main Street, Suite 1980
Columbia, SC 29201
  803/748-1333
  803/748-1300 (Fax)

Ben Barnow
Barnow & Associates, P.C.
One N. LaSalle Street, Suite 4600
Chicago, IL 60602
  312/621-2000
  312/641-5504 (Fax)

Adam Balkan
John Patterson
Balkan & Patterson, LLP
601 S. Federal Highway, Suite 302
Boca Raton, FL 33432
  561 /750-9191
  561 /750-1574 (Fax)

Andrew S. Friedman
Francis J. Balint, Jr.
Bonnett, Fairbourn, Friedman & Balint, P.C.
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
  602/274-1100
  602/274-1199 (Fax)

MATTEL CONSUMER (MDL)
Service List - 5/16 /2008 (07-0178M)
Page 2 of 6

Michael D. Braun
Braun Law Group, P.C.
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
 310/442-7755
 310/442-7756 (Fax)

John J. Stoia, Jr.
Rachel L. Jensen
Thomas J. O'Reardon II
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
 619/231-1058
 619/231-7423 (Fax)

Pamela Gilbert
Cuneo Gilbert & LaDuca, L.L.P.
507 C Street, N.E.
Washington, DC 20002
 202/789-3960
 202/789-1813 (Fax)

Nicholas B. Roth
Eyster Key Tubb Roth Middleton & Adams LLP
402 East Moulton Street
P.O. Box 1607 (35602)
Decatur, AL 35501
 256/353-6761
 256/353-6767 (Fax)

Michael D. Gottsch
Kimberly M. Donaldson
Chimicles & Tikellis LLP
One Haverford Center
361 W. Lancaster Avenue
Haverford, PA 19041

 610/642-8500
 610/649-3633 (Fax)

Jack Reise
Elizabeth A. Shonson
Coughlin Stoia Geller Rudman & Robbins LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
 561 /750-3000
 561 /750-3364 (Fax)

Paul A. Traina
Gregory P. Waters
Engstrom, Lipscomb & Lack
10100 Santa Monica Blvd., Suite 1600
Los Angeles, CA 90067-4107
 310/552-3800
 310/552-9434 (Fax)

Rosemary M. Rivas
Mark Punzalan
Finkelstein Thompson LLP
100 Bush Street, Suite 1450
San Francisco, CA 94104
 415/398-8700
 415/398-8704 (Fax)

MATTEL CONSUMER (MDL)

Service List - 5/16 /2008 (07-0178M)
Page 3 of 6

Burton H. Finkelstein
Mila F. Bartos
Finkelstein Thompson LLP
1050 30th Street, N.W.
Washington, DC 20007
    202/337-8000
    202/337-8090 (Fax)

Ruben Honik
Richard M. Golomb
Stephen Matanovic
Golomb & Honik, P.C.
121 South Broad Street, 9th Floor
Philadelphia, PA 19107
    215/985-1109
    215/985-4169 (Fax)

Elizabeth A. Fegan
Timothy P. Mahoney
Hagens Berman Sobol Shapiro LLP
820 North Boulevard, Suite B
Oak Park, IL 60302
    708/776-5600
    708/776-5601(Fax)

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
    206/623-7292
    206/623-0594 (Fax)

Joseph L. Paller, Jr.
Jay Smith
Gilbert & Sackman, LC
3699 Wilshire Blvd., Suite 1200
Los Angeles, CA 90010
    323/938-3000
    323/937-9139 (Fax)

Jason A. Stuckey
Lauren Wagner Pederson
Gulas & Stuckey, P.C.
2031 2nd Avenue North
Birmingham, AL 35203
    205/879-1234
    205/879-1247 (Fax)

Elaine T. Byszewski
Lee M. Gordon
Hagens Berman Sobol Shapiro LLP
700 S. Flower Street, Suite 2940 Los
Angeles, CA 90017-4101
    213/330-7150
    213/330-7152 (Fax)

Steven M. Hayes
Jayne Conroy
Hanly Conroy Bierstein Sheridan Fisher & Hayes
LLP
112 Madison Avenue, 7th Floor
New York, NY 10016
    212/784-6400
    212/784-6420 (Fax)

MATTEL CONSUMER (MDL)
Service List - 5/16/21 /2008 (07-0178M)
Page 4 of 6

Lance A. Harke
Sarah Clasby Engel
Harke & Clasby LLP
155 South Miami Avenue, Suite 600
Miami, FL 33130
   305/536-8220
   305/536-8229 (Fax)

Mitch Kalcheim
Amber S. Healy
Kalcheim Law Group
2049 Century Park East, Suite 2150
Los Angeles, CA 90067
   310/461-1200

Laurence D. King
Linda M. Fong
Kaplan, Fox & Kilsheimer LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
   415/772-4700
   415/772-4707 (Fax)

Lynn Lincoln Sarko
Juli E. Farris
Gretchen Freeman Cappio
Keller Rohrback LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
   206/623-1900
   206/623-3384 (Fax)

Julio J. Ramos
Julio J. Ramos, Attorney at Law
35 Grove Street, Suite 103
San Francisco, CA 94102
   415/948-3015
   415/469-9787 (Fax)

Frederic S. Fox
Kaplan, Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, NY 10022
   212/687-1980
   212/687-7714 (Fax)

Lori S. Brody
Kaplan, Fox & Kilsheimer LLP
1801 Century Park East, Suite 1460
Los Angeles, CA 90067
   310/785-0800
   310/785-0897 (Fax)

Michael L. Kelly
Behram V. Parekh
Kirtland & Packard, LLP
2361 Rosecrans Blvd., 4th Floor
El Segundo, CA 90245-4923
   310/552-9700
   310/552-0957 (Fax)

MATTEL CONSUMER (MDL)

Service List - 5/16 /2008 (07-0178M)

Page 5 of 6

Steven M. Nunez
Law Offices of Steven M. Nunez
3333 Camino Del Rio, Suite 215
San Diego, CA 92108
619/296-8400

Karen Hanson Riebel
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
 612/339-6900
 612/339-0981(Fax)

Chad A. McGowan
Steven Randall Hood
William A. McKinnon
McGowan Hood Felder and Johnson
1539 Healthcare Drive Rock
Hill, SC 29732
 803/327-7800

John Gressette Felder, Jr.
McGowan Hood Felder and Johnson
1405 Calhoun Street
Columbia, SC 29201
 803/779-0100

William N. Riley
Jamie Ranah Kendall
Christopher Allan Moeller
Price Waicukauski & Riley, P.C.
301 Massachusets Avenue
Indianapolis, IN 46204
 317/633-8787
 317/633-8797 (Fax)

Ronen Sarraf
Joseph Gentile
Sarraf Gentile LLP
11 Hanover Square, 2nd Floor
New York, NY 10005
 212/868-3610
 212/918-7967 (Fax)

Kenneth J. Brennan
Tor A. Hoerman
SimmonsCooper, LLC
707 Berkshire Blvd., P.O. Box
521 East Alton, IL 62024
 618/259-2222
 618/259-2251(Fax)

Michael G. Crow
The Crow Law Firm
1100 Poydras Street, Suite 1175
New Orleans, LA 70163
 504/599-5770
 504/262-8599 (Fax)

MATTEL CONSUMER (MDL)

Service List - 5/16 /2008 (07-0178M) Page 6 of 6

Aron D. Robinson
The Law Office of Aron D. Robinson
19 South LaSalle Street, Suite 1300
Chicago, IL 60603
  312/857-9050
  312/857-9054 (Fax)

Joe R. Whatley, Jr.
Edith M. Kallas
Joseph P. Guglielmo
Whatley Drake & Kallas, LLC
1540 Broadway, 37th Floor
New York, NY 10036
  212/447-7070
  212/447-7077 (Fax)

Karen Hanson Riebel
Lockridge Grindal Nauen
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401-2159
  612/339-6900
  612/339-0981 (Fax)

Amir Stark
The Stark Law Offices, P.C.
2766 Fischer Road
Hatfield, PA 19440
  215/275-2919
  215/855-6029 (Fax)

David L. Woloshin
Jeffrey B. Killino
Woloshin & Killino
1800 John F. Kennedy Blvd., 11th Floor
Philadelphia, PA 19103
  215/569-2711
  215/569-2741(Fax)