COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR. (141757)
RACHEL L. JENSEN (211456)
PAULA M. ROACH (254142)
655 West Broadway, Suite 1900
San Diego, California  92101
Telephone:  (619) 231-1058
Facsimile:    (619) 231-7423
johns@csgrr.com
rachelj@csgrr.com
proach@csgrr.com

WHATLEY, DRAKE & KALLAS, LLC
JOE R. WHATLEY, JR.
EDITH M. KALLAS
ELIZABETH ROSENBERG
1540 Broadway, 37th Floor
New York, New York  10036
Telephone:    (212) 447-7070
Facsimile:    (212) 447-7077
jwhatley@wdklaw.com
ekallas@wdklaw.com
erosenberg@wdklaw.com

Co-Lead Counsel for Plaintiffs

JONES DAY
ELWOOD LUI (45538)
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071-2300
Telephone:   (213) 489-3939
Facsimile:    (213) 243-2539
elui@jonesday.com

Counsel for Defendant Mattel, Inc.

JONES DAY
THOMAS E. FENNELL
MICHAEL L. RICE
2727 N. Harwood St.
Dallas, Texas  75201
Telephone:   (214) 220-3939
Facsimile:    (214) 969-5100
tefennell@jonesday.com
mlrice@jonesday.com

JONES DAY
HUGH R. WHITING
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:   (216) 586-3939
Facsimile:    (216) 579-0212
hrwhiting@jonesday.com

Counsel for Defendant Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| In re MATTEL, INC., TOY LEAD PAINT PRODUCTS LIABILITY LITIGATION | Case No. 2:07-ml-01897-DSF-AJW |
| | The Honorable Dale S. Fischer |
| | **MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................. 2

    A.    The Prior Proceedings ......................................................................... 2

    B.    The Toys Involved In The Lead Recalls ............................................. 5

    C.    The Toys Involved In The Magnet Recalls ......................................... 6

    D.    The History Of The Negotiations Leading Up To The Settlement ...... 6

III.    THE PROPOSED SETTLEMENT CLASS SATISFIES THE
       REQUIREMENTS FOR CERTIFYING A SETTLEMENT CLASS ............ 8

    A.    The Definition of the Proposed Settlement Class ................................ 8

    B.    The Settlement Class Satisfies the Requirements For
         Certification Of A Rule 23(B)(3) Settlement Class .............................. 9

         1.    The Settlement Class Satisfies Rule 23(a) ................................ 10

         2.    The Settlement Class Satisfies Rule 23(b)(3) ........................... 12

IV.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
       ADEQUATE AND SHOULD BE FINALLY APPROVED ....................... 14

    A.    Applicable Legal Standard For Final Approval ................................ 14

    B.    The Terms of The Settlement Are Fair, Reasonable and
         Adequate ............................................................................................ 16

         1.    Injunctive Relief ...................................................................... 16

         2.    Economic Relief ....................................................................... 18

         3.    Releases .................................................................................... 21

    C.    Under Settled Ninth Circuit Case Law, the Settlement Warrants
         Final Approval As Fair, Reasonable And Adequate ......................... 21

         1.    The Strength Of The Plaintiffs' Case/Risks Of Further
            Litigation/Risks Of Maintaining Class Action Status .............. 21

         2.    Amount Offered In Settlement ................................................. 22

         3.    Progress In The Litigation ........................................................ 22

         4.    The Reaction of the Vast Majority of Settlement Class
            Members to the Settlement Has Been Favorable, and the
            Few Objections Received Are Meritless ................................... 24

V.     Gilardi IMPLEMENTED THE NOTICE PROGRAM, WHICH
       PROVIDED ADEQUATE NOTICE TO THE SETTLEMENT CLASS ..... 29

    A.    The Three-Part Notice Program Provided The Best Practicable
         Notice, Including Direct Notice To All Identifiable Settlement
         Class Members ................................................................................... 30

         1.    Direct Notice Was Provided To Settlement Class
            Members For Whom Records Provided Address
            Information ............................................................................... 31

         2.    Notice Was Published In Twenty Targeted Publications ......... 32

1
2

**TABLE OF CONTENTS**
**(continued)**

Page

3     3.  Notice Was Disseminated on Internet Search Engines ............ 32

4  B.  The Notice Program Adequately Informed Settlement Class Members of The Settlement .................................................................. 33

5  C.  The Notice Program Adequately Explained The Procedures To Request Exclusion Or To Object ...................................................... 34

6  D.  The Notice Program Adequately Informed The Settlement Class Members of the Final Fairness Hearing ............................................... 34

  E.  The Notice Program Has Reached 85% Of The Target Audience ..... 35

8 VI. CONCLUSION ............................................................................................ 35

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

Acosta v. Trans Union, LLC,
   243 F.R.D. 377 (C.D. Cal. 2007) .......................................................................29

Amchem Prods., Inc. v. Windsor,
   521 U.S. 591 (1997).........................................................................9, 11, 14, 22

Browning v. Yahoo! Inc.,
   2007 WL 4105971 (N.D. Cal. 2007) ...................................................................29

Chavez v. Netflix, Inc.,
   162 Cal. App. 4th 43 (2008).................................................................................28

Churchill Village, L.L.C. v. General Electric,
   361 F.3d 566 (9th Cir. 2004)....................................................................passim

Class Plaintiffs v. City of Seattle,
   955 F.2d 1268 (9th Cir. 1992)..................................................................14, 15, 16

EEOC v. Hiram Walker & Sons, Inc.,
   768 F.2d 884 (7th Cir. 1985).................................................................................27

Hanlon v. Chrysler Corp.,
   150 F.3d 1011 (9th Cir. 1998).................................................................passim

In re Integra Realty Res., Inc.,
   262 F.3d 1089 (10th Cir. 2001)...........................................................................31

In re Mego Financial Corp. Sec. Litig.,
   213 F.3d 454 (9th Cir. 2000)....................................................................9, 11, 16

In re Pacific Enter. Sec. Litig.,
   47 F.3d 373 (9th Cir. 1995).................................................................................15

Int'l Union, et al. v. Gen. Motors Corp.,
   497 F.3d 615 (6th Cir. 2007)...............................................................................25

Linney v. Cellular Alaska Partnership,
   151 F.3d 1234 (9th Cir. 1998)..............................................................................16

Lobatz v. U.S. West Cellular of Cal., Inc.,
   222 F.3d 1142  (9th Cir. 2000).............................................................................25

Nat'l Rural Telecomm. Coop. v. *DIRECTV*, Inc.,
   221 F.R.D. 523 (C.D. Cal. 2004) .................................................................16, 23

Officers for Justice v. Civil Service Comm'n,
   688 F.2d 615 (9th Cir. 1982)....................................................................2, 14, 15, 16

1
2

## TABLE OF AUTHORITIES
### (continued)

3

Page

Rodriguez v. West Publishing Co.,
  563 F.3d 948 (9th Cir. 2009)..............................................................passim

Silberblatt v. Morgan Stanley,
  524 F. Supp. 2d 425 (S.D.N.Y. 2007)....................................................29

Six (6) Mexican Workers v. Arizona Citrus Growers,
  904 F.2d 1301 (9th Cir. 1990)...............................................................10

Synfuel Techs. Inc., v. DHL Express (USA), Inc.,
  463 F.3d 646 (7th Cir. 2006)..................................................................28

Torrisi v. Tucson Elec. Power Co.,
  8 F.3d 1370 (9th Cir. 1993)....................................................................16

## **Statutes**

Business & Professions Code § 17200 ........................................................4

Civil Code § 1750 .....................................................................................4

Civil Code § 1791 .....................................................................................4

Civil Code § 1792 .....................................................................................4

Federal Rules of Civil Procedure, Rule 23 ........................................passim

Federal Rules of Civil Procedure, Rule 30 ................................................5

## **Other Authorities**

109 S. Rpt. 14 (2005).................................................................................28

7A Wright, Miller & Kane, Federal Practices & Procedures (2d ed. 1986) ............13

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2:07-ml-01897 -  MEMO IN SUPP. OF FINAL
APPROVAL OF CLASS ACTION SETTLEMENT

1  The parties, by and through their attorneys, respectfully submit this

2  memorandum in support of their joint motion for final approval of their Class

3  Action Settlement.

4  **I.     <u>INTRODUCTION</u>**

5  The parties have entered into a settlement agreement that achieves an

6  excellent result for millions of parents and other consumers represented in the

7  twenty-two federal actions that comprise this Multi-District Litigation ("MDL").

8  This litigation concerns 15 million children's toys recalled or removed from market

9  ("Recalled Toys") by Mattel, Inc. and its subsidiary, Fisher-Price, Inc. (collectively,

10  "Mattel"), due to paint or plastic containing impermissible levels of lead, or small

11  magnets that could become loose.

12  In early 2009, Plaintiffs and Mattel entered into intensive settlement

13  discussions to determine whether and on what terms the claims brought in this

14  action could be resolved in a fair and reasonable manner.  After extended and

15  intense negotiations, as well as several mediation sessions before the highly-

16  respected Judge Daniel Weinstein (Ret.) of JAMS, the parties entered into their

17  Stipulation of Class Action Settlement ("Stipulation" or "Settlement").  The Court

18  granted preliminary approval of the Settlement on October 23, 2009.

19  The Stipulation provides substantial economic relief, including cash refunds,

20  to the Settlement Class, with the amount and type of relief tailored appropriately to

21  the circumstances of each Settlement Class Member.  Further, the Stipulation

22  provides for valuable injunctive relief in the form of a Quality Assurance System

23  covering all Mattel products sold in the United States, with which Mattel will

24  certify to be in compliance to the Court for three years.  The Stipulation also

25  provides for payments to parents and guardians for the unreimbursed costs of lead

26  testing of their children done within six weeks of the recall announcements.

27  Finally, the Stipulation provides for *cy pres* relief to the National Association of

28  Children's Hospitals and Related Institutions ("NACHRI").

1    The Ninth Circuit consistently has held that a class action settlement

2  submitted for approval pursuant to Federal Rule of Civil Procedure 23(e) ("Rule

3  23") should be reviewed under "the universally applied standard [of] whether the

4  settlement is fundamentally fair, adequate, and reasonable."  Officers for Justice v.

5  Civil Service Comm'n, 688 F.2d 615, 625 (9th Cir. 1982).  Courts should examine

6  "the settlement taken as a whole, rather than the individual component parts . . . for

7  overall fairness."  Rodriguez v. West Publishing Co., 563 F.3d 948, 964 (9th Cir.

8  2009), quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).

9    Here, the Stipulation was the product of extended, arms' length negotiations

10  between the parties and with the assistance of a well-respected mediator.  The

11  Settlement will fairly resolve this litigation through the certification of a settlement

12  class comprised of all persons who purchased or acquired a new Recalled Toy

13  ("Settlement Class"), as detailed below.  The proposed Settlement Class meets all

14  of the requirements for certification of a settlement class; and the Notice Program

15  has satisfied all of the requirements of Rule 23(c)(2)(B) and (e)(B), and has

16  provided the best notice practicable under the circumstances to the Settlement

17  Class.

18    As discussed below, the valuable monetary and injunctive relief afforded to

19  the Settlement Class is indisputably fair, reasonable and adequate.  The parties

20  therefore move this Court for a final order and judgment:  (1) certifying the

21  Settlement Class; and (2) granting approval of the Settlement.

22  **II.    BACKGROUND**

23    **A.    The Prior Proceedings**

24    In August, September, and October 2007, Mattel announced the recall of

25  approximately 1.5 million toys because the levels of lead in the surface paint on

26

27

28

2:07-ml-01897 - MEMO IN SUPP. OF FINAL
APPROVAL OF CLASS ACTION SETTLEMENT

portions of certain toys[1] exceeded applicable federal standards (the "Lead Recalls"). Also in August 2007, Mattel announced the expansion of a November 2006 recall of toys that incorporated small, rare earth magnets.  The combined 2006 and 2007 magnet recalls covered approximately 12.6 million toys sold by Mattel in the U.S. between 2002 and August 2007 (the "Magnet Recalls," and together with the Lead Recalls, the "Recalls").  Finally, in November and December 2007, certain plastic cuffs from toy blood pressure monitors (the "Cuffs") were withdrawn from the retail market in Illinois because certain Cuffs contained lead that exceeded an Illinois statutory standard.  At the time, Mattel estimated that approximately 1.6 million Cuffs could be in the hands of consumers nationwide.

On August 7, 2007, the first consumer class action concerning the Recalled Toys was filed in this Court against Mattel and certain retailers.[2]  Over the next two months, a total of twenty-two lawsuits were filed in federal, state and the District of Columbia courts.  The state court and District of Columbia cases were removed to federal court.  On December 17, 2007, the Judicial Panel on Multidistrict Litigation established this coordinated proceeding ("MDL"), and all cases were subsequently transferred to this Court.

Thereafter, on May 16, 2008, Plaintiffs filed a Second Consolidated Amended Complaint (the "Complaint"), asserting a total of 13 Counts.  The Complaint includes claims for:  (1) breach of express warranty; (2) breach of implied warranty; (3) negligence in design, manufacturing, and warnings; (4) strict liability in design, manufacturing and warnings; (5) violations of the Consumer Product Safety Act ("CPSA"); (6) as to plaintiffs nationwide, violations of Cal.

---

[1]  Defendants represent that, due to the need for prompt action and the unique circumstances involved in the Lead Recalls, Mattel intentionally defined the recall populations to be overly-inclusive.

[2]  The Retailer Defendants in this MDL are Target Corporation, Toys "R" Us, Inc., Wal-Mart Stores, Inc., Kmart Corporation and KB Toys, Inc.

1    Bus. & Prof. Code § 17200 by Mattel; (7) as to California plaintiffs, violations of

2    Cal. Bus. & Prof. Code § 17200 by the Retailer Defendants; (8) as to plaintiffs

3    nationwide, violations of Cal. Consumer Legal Remedies Act (Cal. Civil Code

4    § 1750) by Mattel; (9) as to California plaintiffs, violations of Cal. Consumer Legal

5    Remedies Act (Cal. Civil Code § 1750) by the Retailer Defendants; (10) as to

6    California plaintiffs, violations of Cal. Song-Beverly Consumer Warranty Act

7    implied warranty of merchantability (Cal. Civ. Code §§ 1792 & 1791.1 (a)); (11) as

8    to California plaintiffs, violations of Cal. Song-Beverly Consumer Warranty Act

9    implied warranty of fitness for particular purpose (Cal. Civ. Code §§ 1792.1 &

10   1791.1(b)) by Mattel; (12) as to California plaintiffs, violation of Cal. Song-Beverly

11   Consumer Warranty Act implied warranty of fitness for particular purpose (Cal.

12   Civ. Code §§ 1792.2 & 1791.1(b)) by the Retailer Defendants; and (13) unjust

13   enrichment.

14          On June 24, 2008, the Defendants filed motions to dismiss the Complaint.

15   After a hearing and supplemental briefing, the Court granted in part and denied in

16   part the motions.  The Court upheld all of Plaintiffs' claims, except the CPSA

17   claims concerning toys with magnets and the Cuffs.  On the remaining claims,

18   Plaintiffs sought economic damages in the amount of the purchase price of the

19   Recalled Toys.  The Court also allowed Plaintiffs to proceed with claims for costs

20   of diagnostic screening and medical monitoring for Class Members with toys

21   involved in the Lead Recalls.  In the Complaint, Plaintiffs included a prayer for an

22   injunction and, under the CLRA and Song-Beverly Consumer Warranty Act,

23   asserted a claim for punitive damages.

24          Before and after the motions to dismiss were decided, the parties engaged in

25   significant discovery.  Plaintiffs served comprehensive document requests on

26   Defendants.  In response, and over the course of months of meet and confer

27   negotiations regarding topics such as electronically stored information ("ESI"),

28   document custodians and search terms, Defendants produced over 117,000 pages of

1   documents, including substantial electronic files.  In response to subpoenas *duces*

2   *tecum*, Plaintiffs also obtained nearly 40,000 pages of documents from nine third-

3   party retailers, toy industry groups, and laboratories that tested some of the toys at

4   issue.  Plaintiffs also drafted and negotiated letters rogatory to obtain discovery

5   from the Chinese manufacturing entities implicated by the Recalls.  Plaintiffs

6   propounded, and Mattel responded to, several sets of interrogatories as well as

7   requests for admissions.  Plaintiffs deposed Mattel pursuant to a Rule 30(b)(6)

8   deposition notice.  Likewise, the five retailer Defendants individually responded to

9   interrogatories and requests for admissions, and provided written information in

10   lieu of testimony in response to Rule 30(b)(6) deposition notices served by

11   Plaintiffs.  Plaintiffs also requested an inspection of, and Mattel provided access to,

12   Mattel's warehouse space in Redlands, California, at which toys subject to the

13   Recalls that Mattel withheld from sale or received as returns from retailers were

14   stored.  (Joint Declaration of John J. Stoia, Jr. and Joe Whatley, Jr. ("Joint Decl."),

15   ¶¶ 18-23).

16       In addition, Plaintiffs consulted experts, including toxicologists, recall

17   specialists, CPSC experts, and industry experts, to help formulate and substantiate

18   the claims in their case in preparation for a possible motion for preliminary

19   injunction, for dispositive motions, and ultimately for trial.  (Id., ¶ 24).

20       **B.    The Toys Involved In The Lead Recalls**

21       Many of the approximately 1.5 million toys involved in the Lead Recalls

22   contained lead in paint on portions of the toy that exceeded the federal regulatory

23   standard of 600 ppm.  Upon learning of the regulatory violations, Mattel notified

24   the CPSC and undertook voluntary, "fast-track" recalls of the affected products.

25   The Cuffs that Mattel withdrew from the market contained lead in the plastic

26   substrate that exceeded the 600 ppm standard under Illinois law.  Mattel conducted

27   the withdrawal of the Cuff in cooperation with the Illinois Attorney General.

28

As discussed below, the Settlement provides reimbursement for lead tests conducted at the time of the Lead Recalls, when parents may have been concerned about exposure.  The releases set forth in the Stipulation ("Releases") exempt claims for personal injury.  (Ex. 1, § H.1.b.).   To date, however, no lawsuits have been filed against Mattel alleging bodily injury due to lead exposure from the toys that were subject to the Lead Recalls.  (Declaration of John Edwards, ("Edwards Decl."), ¶ 5).

### C.   The Toys Involved In The Magnet Recalls

In 2006, the American Society for Testing and Materials ("ASTM") formed a task force comprised of representatives of the public, the Consumer Product Safety Commission ("CPSC"), and the industry, including Mattel, to address magnets in toys.  The ASTM task force developed a standard for magnet retention in toys, which became effective in May 2007.  By January 2007, Mattel had developed a stronger retention system for the magnets in its toys that complied with the new ASTM standard.  The 2007 Magnet Recall encompassed those products that did not have magnet retention systems sufficient robust to pass the ASTM test protocol.  By undertaking that recall, Mattel retroactively applied the 2007 ASTM standard to its earlier products.  As alleged in the Complaint, Mattel has settled a small number of claims asserting alleged injury from the toys involved in the Magnet Recalls.  The Release in this action does not encompass "personal injury" claims; thus, if a personal injury claim were to arise in the future, that claim would not be affected.

### D.   The History Of The Negotiations Leading Up To The Settlement

The Settlement is the product of lengthy and intense arm's-length negotiations that took place in direct meetings between the parties and in mediation sessions spanning more than a year.  Though Plaintiffs made an initial settlement demand in 2008, negotiations regarding potential resolution of this case began in earnest in early 2009.

1       After exchanging proposed terms and meeting in person at least three times

2  for direct negotiations, Plaintiffs and Mattel agreed to mediate before the Honorable

3  Daniel H. Weinstein (Ret.) of JAMS to assist them in resolving terms on the issues

4  surrounding the provisions for consumer relief.  See Rodriguez, 563 F.3d at 956

5  ("The sessions were mediated by the Honorable Daniel Weinstein (Ret. Superior

6  Court of California, San Francisco County) of JAMS, a provider of ADR services,

7  who had extensive experience in this type of case.").  Plaintiffs and Mattel held a

8  day-long mediation session with Judge Weinstein on April 1, 2009, followed by

9  four substantive conference calls and three additional in-person meetings.

10  (Declaration of Hon. Daniel H. Weinstein (ret.) ("Weinsein Decl."), ¶¶ 7-8).  These

11  efforts resulted in a June 5, 2009 Term Sheet reflecting the principal terms of a

12  settlement.  At least five more substantive and lengthy conference calls followed

13  the Term Sheet, as the parties negotiated the Stipulation and the Exhibits.  The

14  parties exchanged over a dozen versions of the Stipulation and the various exhibits

15  attached thereto.  (Edwards Decl., ¶ 2; Joint Decl., ¶¶ 25-34).

16       During the negotiations and mediation, the parties did not address Plaintiffs'

17  attorneys' fees until after all of the material terms of the Settlement, including the

18  Stipulation and Exhibits thereto, had been fully and finally agreed upon.  After all

19  of the substantive terms of the Settlement had been agreed upon, a further

20  mediation session with Judge Weinstein was held to address Plaintiffs' request for

21  fees.  On September 30, 2009, Judge Weinstein oversaw a full day of mediation

22  after receiving briefing from the parties and Plaintiffs' Counsel's detailed time and

23  expense records.  As a result of the hard-fought negotiations, Mattel agreed to pay

24  up to $12.9 million in attorneys' fees and expenses, *separate and apart from* the

25  relief provided to the Settlement Class under the Stipulation.  (Weinstein Decl.,

26  ¶¶ 9-13).

27       Once the parties reached an agreement, they then submitted the Stipulation

28  that resulted from these lengthy discussions to the Court for preliminary approval.

2:07-ml-01897 -  MEMO IN SUPP. OF FINAL
APPROVAL OF CLASS ACTION SETTLEMENT

(Edwards Decl., ¶ 3; Joint Decl., ¶ 35).  On October 23, 2009, after a lengthy hearing, the Court granted preliminary approval of the Settlement; conditionally certified the proposed Settlement Class; appointed Gilardi as Claims Administrator; and appointed the named plaintiffs as Class Representatives, and Co-Lead Counsel as Class Counsel.  Order, dated Oct. 23, 2009.  Pursuant to the Court's Order, the claims period began shortly thereafter, and continues until May 29, 2010.  See id.

## III.   THE PROPOSED SETTLEMENT CLASS SATISFIES THE REQUIREMENTS FOR CERTIFYING A SETTLEMENT CLASS

In its Preliminary Approval Order, the Court conditionally certified this action as a class action, preliminarily finding that the Settlement Class meets the prerequisites for a class action under Rule 23.  See Oct. 23, 2009 Order, at 1-2.  The Court also found that Plaintiffs may serve as Class Representatives, and appointed Co-Lead Counsel to serve as Class Counsel pursuant to Rule 23(g)(1).  Id. at 2.

As explained here, the parties respectfully submit that the Court should now finally certify this action for class treatment for purposes of settlement and confirm its appointments of Plaintiffs as Class Representatives and Co-Lead Counsel as Class Counsel.

### A.   The Definition of the Proposed Settlement Class

The parties request that the Court finally certify, under Federal Rule of Civil Procedure 23(b)(3), the Settlement Class defined as follows:

> All Persons who (a) purchased or acquired (including by gift) a new "Recalled Toy" (as defined in the Agreement) for or on behalf of themselves or a minor child over whom they have custody and control as a parent or guardian, or to be given as a gift to another Person; or (b) are the parent or guardian of a minor child who purchased or acquired (including by gift) a new Recalled Toy.

("Settlement Class" or "Settlement Class Members"); (Ex. 1, Stipulation of Class Action Settlement, § A.50).  The following persons are to be expressly excluded from the Settlement Class:

> (i) all Persons who purchased or acquired a Recalled Toy for resale, or purchased or acquired a used Recalled Toy; (ii) all Defendants and their affiliated entities, legal representatives, successors and assigns; (iii) any Person who files a valid, timely Request for Exclusion; and (iv) the Judges to whom this Action is assigned and any members of their immediate families.

Id.  "Recalled Toy" is defined in the Agreement as:

> Recalled Toys means those toy products made by Mattel or for Mattel by a Vendor, sold in the United States, and subject to the Recalls as identified more particularly in [Exhibit A to the Stipulation].

(Id. at  § A.44).

**B.    The Settlement Class Satisfies the Requirements For Certification Of A Rule 23(B)(3) Settlement Class**

The Ninth Circuit has recognized that class action settlements are to be encouraged and certifying a settlement class to resolve a consumer lawsuit is part of that process.  Churchill Village, L.L.C. v. General Electric, 361 F.3d 566, 572 (9th Cir. 2004) (owners of allegedly defective dishwashers); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998) (owners of minivans with allegedly defective rear lift gate latches); Rodriguez, 563 F.3d 948 (antitrust case on behalf of consumers of bar review courses).

When presented with a class settlement, a court must first determine whether the proposed settlement class satisfies the requirements for class certification under Rule 23.  See, e.g. In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000); Hanlon, 150 F.3d at 1019, 1022.  But, in assessing those class-certification requirements, a court properly may consider that there will be no trial.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997)("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").  Considering the above factors, the Court should finally certify the Settlement Class.

### 1.        The Settlement Class Satisfies Rule 23(a)

Here, the proposed Settlement Class satisfies the four requirements of Rule 23(a).  First, the requirement of numerosity under Rule 23(a)(1) is satisfied in this case because the Settlement encompasses over 15 million toys sold throughout the United States and its territories.  While the precise number of Settlement Class Members is unknown, the Settlement Class unquestionably includes more than the 1,500,000 individuals for which the Defendants had contact information to provide direct notice of the proposed Settlement, and this number alone is more than sufficient to satisfy numerosity.  See <u>Six (6) Mexican Workers v. Arizona Citrus Growers</u>, 904 F.2d 1301 (9th Cir. 1990) (certifying class composed of 1349 class members); <u>Hanlon</u>, 150 F.3d at 1019 ("[A]s a nationwide class with millions of class members residing in fifty states, this [numerosity] requirement is clearly satisfied.")

Second, Rule 23(a)(2)'s requirement of commonality is satisfied.  Plaintiffs have raised the same claims – for economic damages and injunctive relief on behalf of all persons who purchased or acquired one or more of the Recalled Toys – and all of those claims have been settled on terms that are identical for Class Members who are in similar circumstances.  As the Ninth Circuit held in <u>Hanlon</u>:  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  150 F.3d at 1019.

Third, the related requirement of typicality under Rule 23(a)(3) is satisfied because the claims of the named Plaintiffs "are reasonably co-extensive with those of the absent class members; they need not be substantially identical."  <u>Hanlon</u>, 150 F.3d at 1020.  In <u>Hanlon</u>, the named plaintiffs represented a class of owners of automobiles with allegedly defective rear liftgate latches, and "[t]he narrow focus of the proposed class was to obtain a defect-free rear liftgate hatch . . . or to receive adequate non-personal injury compensatory damages."  <u>Id.</u>  The Ninth Circuit held

that "representative claims were sufficiently typical to pass muster under Rule 23(a)(3)."  Id.  Here, as detailed in the Complaint, the Plaintiffs represent all persons who purchased or acquired Recalled Toys under circumstances that mirror those of the Settlement Class Members, and the economic relief they seek parallels that sought by the Hanlon plaintiffs.  Thus, as in Hanlon, the typicality requirement is satisfied.

Finally, adequacy is satisfied pursuant to Rule 23(a)(4).  To determine adequacy, Ninth Circuit looks to: (1) the absence of any conflict between the named plaintiffs and class counsel, on the one hand, and the class members, on the other; and (2) whether the named plaintiffs and class counsel will vigorously prosecute the action on behalf of the class.  In re Mego Financial Corporation, 213 F.3d at 462; Hanlon, 150 F.3d at 1020; accord Amchem Products Inc., 521 U.S. at 125-26.

Here, no conflict of interest exists between the Plaintiffs who seek to serve as Class Representatives and the Class Members.  As discussed below, each Settlement Class Member will benefit from the quality assurance provisions in the Stipulation and each is entitled to economic relief.  To the extent there are differences in the form of compensation available to Settlement Class Members, those differences apply equally according to objective criteria and merely reflect variations in the Settlement Class Members' ability to prove that they purchased or received a Recalled Toy.[3]

---

[3] The Class Representatives have applied for modest Incentive Awards of $500 per family or address, as compensation for their time and efforts in prosecuting this action, which Mattel has agreed to pay, separate and apart from the Settlement Class relief, if awarded by the Court.

As the Ninth Circuit recently observed in Rodriguez: "Incentive awards are fairly typical in class action cases."  563 F.3d at 958; see also In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 463 (9th Cir. 2000) (approving incentive award of $5,000 to each class representative in a $1.725 million settlement).  Incentive awards are "intended to compensate class representatives for work done on behalf of the class,

The Court has observed Co-Lead Counsel's vigorous prosecution of the Settlement Class' claims, in motion practice on both procedural issues and on the merits.  See Hanlon 150 F.3d at 2022 (finding "counsel's prosecution of the case sufficiently vigorous to satisfy and Rule 23(a)(4) concerns.").  Co-Lead Counsel's extensive investigation, discovery efforts, and successful negotiation of this Settlement are detailed in their separate Declarations.  (See Joint Decl., ¶¶ 18-35).  Further, Co-Lead Counsel are well-respected members of the bar who are highly experienced in the areas of nationwide consumer class actions and high-stakes complex litigation.  (Id. at ¶ 64).  The difficult, lengthy, and arm's-length negotiations that lead to the Settlement produced a fair  reasonable and adequate result, also reflecting Co-Lead Counsel's vigorous representation of the Settlement Class throughout the course of this litigation.  (Id. at ¶ 66; Weinstein Decl., ¶ 2; Edwards Decl., ¶ 2).

Accordingly, the Class Representatives and Co-Lead Counsel are adequate representatives of the Settlement Class under Rule 23(a)(4).

**2.      The Settlement Class Satisfies Rule 23(b)(3)**

The Settlement Class also satisfies the requirements of Rule 23(b)(3) that common questions of law and fact predominate over individual issues and that

_____

(continued…)

to make up for financial risk undertaken in bringing the action, and sometimes, to recognize their willingness to act as a private attorney general." Rodriguez, 563 F.3d at 958.  The court in Rodriguez disapproved undisclosed *ex ante* incentive agreements that obligated class counsel to seek incentive awards of $10,000 to $75,000, depending on the size of a settlement or verdict.  The court also expressed concern with awards that incentivized the representatives to maximize their own recovery at the expense of the class.  In stark contrast, the modest Incentive Awards here provide no basis for asserting a conflict, and, in contrast to the *ex ante* arrangements in Rodriguez, the Class Representatives sought awards only after the parties had negotiated the other Settlement terms.  See id. at 959.

resolving the claims collectively through a class action is superior to litigating them individually.  As the Ninth Circuit stated in <u>Hanlon</u>, certification under Rule 23(b)(3) "is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'"  150 F.3d at 1022, <u>quoting</u> 7A Wright, Miller & Kane, <u>Federal Practices & Procedures</u> § 1777 (2d ed. 1986).

In <u>Hanlon</u>, the Ninth Circuit approved a settlement of claims of a nationwide class of owners of Chrysler minivans with allegedly defective rear liftgate latches, holding that the settlement class satisfied Rule 23(b)(3):

> In this case, although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification . . .  Individual claims based on personal injury or wrongful death were excluded from the class.  Thus, the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims.

<u>Id.</u> at 1022-23.  The Ninth Circuit also held the settlement class satisfied the "superiority" criterion of Rule 23(b)(3):

> The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case.  Wright, Miller & Kane, *supra* § 1779.  This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution.  In this instance, the alternative methods of resolution are individual claims for a small amount of consequential damages or latch replacement. . . .  Even if efficacious, these claims would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs.  In most cases, litigation costs would dwarf potential recovery.  In this sense, the proposed class action is paradigmatic.  A fair examination of alternatives can only result in the apodictic conclusion that a class action is clearly the preferred procedure in this case.

<u>Id.</u> at 1023.

Much like <u>Hanlon</u>, Plaintiffs seek a nationwide Settlement Class to resolve federal and state law claims that seek primarily to recover economic damages – the

purchase price of the Recalled Toys.  As in <u>Hanlon</u>, any idiosyncratic difference among the Settlement Class Members' claims is vastly dwarfed by predominating common issues of fact and law.  As such, the Court should find that predominance is satisfied.  Finally, even if differences in the factual and legal circumstances of Settlement Class Members were problematic in a litigation context, the United States Supreme Court has explained that a settlement class need not be manageable as a trial class action in order to be certified as a *settlement-only* class.  <u>Amchem</u>, 521 U.S. at 619.  Thus, irrespective of whether this case would be maintainable as a trial class, the Court can certify the Settlement Class because all requirements of Rule 23(a) and Rule 23(b)(3) are satisfied in this settlement context.

Accordingly, this Court should finally certify the Settlement Class proposed by the parties and confirm its decision to appoint Plaintiffs as Class Representatives and Co-Lead Counsel as Class Counsel for the Settlement Class.

## IV.   **THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE FINALLY APPROVED**

### A.   **Applicable Legal Standard For Final Approval**

Rule 23(e) provides that the "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. Pro. 23(e).  The Court may approve a settlement to the extent that it binds class members, "after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. Pro. 23(e)(2).

The standard for approval of class action settlements under Rule 23(e) is well settled in the Ninth Circuit: a class action settlement should be reviewed under "the universally applied standard [of] whether the settlement is fundamentally fair, adequate, and reasonable."  <u>Officers for Justice</u>, 688 F.2d at 625.  Approval of the settlement is committed to the sound discretion of the court.  <u>Class Plaintiffs v. City of Seattle</u>, 955 F.2d 1268, 1276 (9th Cir. 1992); <u>Officers for Justice</u>, 688 F.2d at 628.  However, settlements of complex class actions prior to trial are strongly

favored.  See Churchill Village, L.L.C., 361 F.3d at 576; In re Pacific Enter. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995).

In Officers for Justice, the Ninth Circuit described the reviewing court's role:

> [T]he court's intrusion upon what is otherwise a private consensual arrangement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that *the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned.* Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.

688 F.2d at 625 (emphasis added); accord Rodriguez, 563 F.3d at 963-64.

In approving a class action settlement, "[i]t is the settlement as a whole, rather than individual component parts, that must be examined for overall fairness." Hanlon, 150 F.3d at 1026; In re Pac. Enterps. Sec. Litig., 47 F.3d at 377; Class Plaintiffs, 955 F.2d at 1291.

The Ninth Circuit consistently has applied a non-exclusive list of eight factors to assess whether, taken as a whole, the settlement is fair:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the

1   reaction of the class members to the proposed settlement. See Hanlon, 150 F.3d at 1026.[4]

2

3   Churchill Village, L.L.C., 361 F.3d at 575-76; accord Rodriguez, 663 F.3d at 963

4   ("A district court 'may consider some or all of the following [8] factors' . . ."); In re

5   Mego Financial Corp. Sec. Litig., 213 F.3d at 454, 458; Linney v. Cellular Alaska

6   Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998); Class Plaintiffs, 955 F.2d at

7   1291; Officers for Justice, 688 F.2d at 625.

8   Additionally, where, as here, a proposed settlement has been reached after

9   discovery and arms' length negotiations conducted by capable counsel, and with the

10   assistance of a well-respected mediator, it is presumptively fair.  Nat'l Rural

11   Telecomm. Coop. v. *DIRECTV*, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004).

12   Each of the factors relevant to this Settlement weighs in favor of its approval.

13   **B.      The Terms of The Settlement Are Fair, Reasonable and Adequate**

14   As detailed herein, the Settlement terms are fair, reasonable and adequate in

15   accordance with Rule 23(e).  Indeed, the Stipulation provide valuable both

16   injunctive and monetary relief to the Settlement Class Members, as well as a sizable

17   *cy pres* award to fund programs relating to child safety.

18   **1.      Injunctive Relief**

19   Under the terms of the Stipulation, Mattel has agreed to implement a Quality

20   Assurance System ("QAS"), as defined in the Stipulation, more specific than

21   required by federal and state law, and Mattel's agreements with the State Attorneys

22   General ("AGs"), which incorporates testing for magnet retention, procedures to

23   identify and prevent the sale of products with impermissible levels of lead in the

24

25   _____

26   [4]  Because the settlement factors are non-exclusive, discussion of those

27   factors that parties do not believe to be relevant to this case has been omitted.  See Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993).

28

paint or plastic substrate in or on accessible toy parts, contractual requirements for third-party vendors manufacturing products for Mattel and reporting to the Court.[5]

Specifically, Mattel has agreed to:

- Implement and/or maintain a QAS designed to ensure that its Magnet Toys comply with ASTM F 963-08, with such QAS to include four specified testing protocols;

- Implement and/or maintain a QAS designed to identify and prevent the sale of Mattel Covered Products with Paint or Plastic Substrate in or on Accessible Parts containing Impermissible Lead, with such QAS to include:

  o Use of XRF Tests or Wet Chemistry Tests for screening and spot checking of Paint and Plastic Substrate;

  o Testing, inspection and auditing protocols designed to identify Paint and Plastic Substrate containing Impermissible Lead in or on Covered Products at various stages of the manufacturing process;

  o Procedures to verify the accuracy of any failures of such tests or audits;

  o Periodic inspections and/or audits of Vendors designed to prevent the manufacture of Covered Products with Paint or Plastic Substrate containing Impermissible Lead;

  o Periodic inspections and/or audits of certified Paint suppliers designed to prevent the manufacture of Covered Products with Paint or Plastic Substrate containing Impermissible Lead;

---

[5] A chart summarizing the valuable relief to Settlement Class Members is attached hereto as Exhibit 2.

 o Procedures designed to ensure that testing for Impermissible Lead in Covered Products is conducted by laboratories accredited in accordance with the Consumer Product Safety Improvement Act;

o A formalized procedure for Mattel Asia Pacific Sourcing, Ltd. ("MAPS") to report to Mattel any verified lead test failure involving Paint or Plastic Substrate in or on an Accessible Part of a Covered Product that contains Impermissible Lead; and

• Adopt contractual requirements obligating Vendors to comply with the QAS.

(Ex. 1, Stipulation of Class Action Settlement, § D.1.a.(1)(B)).

The Quality Assurance System is required to remain in effect for three years, during which Mattel will certify annually during that period to Co-Lead Counsel and the Court that it is in good faith compliance. (Id. at § D.1.a.3.). The QAS provisions of the Settlement are not easily quantified to a specific value. Nonetheless, they indisputably provide substantial benefit to the Settlement Class, all of whom are consumers or users of Mattel's products, because they help ensure that Mattel's worldwide operations will produce safe children's toys for sale in the United States.

### 2. Economic Relief

As set forth below, Settlement Class Members are eligible for valuable economic relief from Mattel during the Claims Period, which runs from this Court's Order of Preliminary Approval on October 23, 2009 until May 29, 2010. (Id. at § D.2.). The forms of compensation provided reflect the value of the Recalled Toy purchased or acquired by the Settlement Class Member, whether he or she already has participated in Mattel's voluntary Recalls or returned a Cuff to Mattel, and the degree of proof underlying the Settlement Class Member's claim.

Specifically, the following forms of monetary relief are provided to Settlement Class Members under the Stipulation:

- Each Settlement Class Member who earlier participated in Mattel's voluntary Recalls or returned a Cuff to Mattel will receive a cash payment.  Those persons, who *previously* received vouchers or replacement parts, will be sent a check equal to 50% of the voucher and/or parts they received or $10, whichever is higher.  Returned checks will become a *cy pres* contribution to NACHRI.  (Id. at § D.2.a.).

- Those Settlement Class Members who now return a Recalled Toy(s) will be entitled to choose either a check or voucher equal to the Recall Price(s) of the Recalled Toy(s) (or, if accompanied with valid Proof of Purchase, equal to the actual price paid).  (Id. at § D.2.b.).

- Those Settlement Class Members who discarded a Recalled Toy(s) because of the Recalls or Cuff withdrawal, but now submit a valid Proof of Purchase, will be entitled to choose either a check or voucher equal to the actual price they paid for the Recalled Toy(s).[6]  (Id. at § D.2.c.).

- Settlement Class Members who purchased or acquired Recall Toy(s) but discarded them because of the Recalls or Cuff withdrawal and no longer have Proof of Purchase may submit declarations and receive

---

[6] As set forth in section A.39 of the Stipulation, Proof of Purchase means documentation from a third-party commercial source reasonably establishing the fact of purchase of a Recalled Toy.  As set forth in section A.42 of the Stipulation, Recall Price(s) means the price(s) for Recalled Toys set forth in the notices of the Recalls identified on Exhibit A to the Stipulation, which price(s) include an amount to compensate Class Members for taxes paid at the time of the original purchase of a Recalled Toy.

1　　　　vouchers for the Recall Price of up to three toys per address/

2　　　　household.  The total relief available for this category is $10,000,000.

3　　　　(Id. at § D.2.d.).

4　　・　Settlement Class Members who purchased or acquired one of the small

5　　　　toys for which replacements were offered in a Recall or the Cuff

6　　　　withdrawal may submit claims for $4 per toy, up to $12 per household.

7　　　　Settlement Class Members who return one of the toys will also receive

8　　　　a free replacement toy, if available in Mattel's inventory.  (Id. at

9　　　　§ D.2.e.).

10　　・　Settlement Class Members who had lead testing performed on a minor

11　　　　child (of whom they are the parent or guardian) within six weeks of the

12　　　　announcement of the recall of the Recalled Toy to which the child was

13　　　　exposed may submit claims for the full amount of unreimbursed

14　　　　testing costs.  The total available for lead testing reimbursement is

15　　　　$600,000.  (Id. at § D.3.).

16　　In addition to the economic relief provided to Settlement Class Members,

17　Mattel will contribute $275,000 to NACHRI to fund programs related to child

18　safety.  (Id. at § D.4.).  NACHRI is an organization of children's hospitals that

19　promotes the health and well-being of all children and their families through

20　support of children's hospitals and health systems that are committed to excellence

21　in providing health care to children.  See www.childrenshospitals.net.

22　　Additionally, Mattel has, and will continue to, pay all costs of the Notice

23　Program which the Court earlier approved and for claims administration, including

24　the cost of establishing and maintaining the Settlement website

25　(www.MattelSettlement.com).  Mattel also agreed to pay Class Representatives'

26　Incentive Awards for up to $500 per family and Plaintiffs' attorneys' fees and

27　expenses up to $12.9 million, if approved by the Court.  (Edwards Decl., ¶ 4).

28　Those matters are addressed in separate filings.  See Plaintiffs' Motion for an

1  Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Award

2  Payments, filed on Mar. 8, 2010 ("Fee Brief").  Any fees and expenses awarded to

3  Plaintiffs by the Court will be paid by Mattel separately and will not affect the relief

4  to the Settlement Class Members.

5            **3.**    **Releases**

6        Final approval of the Settlement will result in the dismissal with prejudice of

7  all of the class actions pending against Defendants and the release of all individual

8  and all class-based claims that were or could be raised against the Defendants

9  relating to the Recalled Toys, with the exception that the Settlement Class Members

10  will not release any individual claims for personal injury.  (Ex. 1, Stipulation of

11  Class Action Settlement, §§ G, H).

12      **C.**    **Under Settled Ninth Circuit Case Law, the Settlement Warrants**

13               **Final Approval As Fair, Reasonable And Adequate**

14        As outlined above, the factors enumerated by the Ninth Circuit applicable to

15  review of class action settlements indicate that the Settlement should be finally

16  approved.

17            **1.**    **The Strength Of The Plaintiffs' Case/Risks Of Further**

18                  **Litigation/Risks Of Maintaining Class Action Status**

19        The parties vigorously have disputed the merits of the claims and defenses at

20  issue throughout the case.  Though Plaintiffs believe they have a good case for

21  liability, they recognize that they faced risks and uncertain outcome if they

22  proceeded to trial.

23        Similarly, Mattel believes that it has substantial defenses to Plaintiffs' claims.

24  In addition to the risk of not recovering at all or not recovering relief as extensive as

25  that provided by the Settlement, Mattel believes Plaintiffs would face the risk of a

26  determination that the case is not manageable as a class action for purposes of trial.

27  However, as discussed above, for purposes of this motion, the Court may disregard

28

2:07-ml-01897 -  Memo in Supp. of Final
Approval of Class action Settlement

1   class management issues that could arise at trial when considering a settlement

2   class.  Amchem Prods. Inc., 521 U.S. at 621.

3        Regardless of the ultimate outcome of the case, it is indisputable that further

4   proceedings in this matter would be contentious, protracted, costly to the parties,

5   and a drain on the Court's time and resources.  The Settlement allows all parties to

6   put to rest the recalls and the related Claims relating thereto.

### 2.    Amount Offered In Settlement

8        The terms of the Stipulation thus meet the standard for "overall fairness."

9   See Hanlon, 150 F.3d at 1026.  The Settlement provides the Settlement Class

10  Members with full relief that they could seek in trial, and possibly more than they

11  would receive.

12       The relief offered to Settlement Class Members both provides the principal

13  relief sought in this action – a refund for anyone possessing either a Recalled Toy

14  or proof of purchase – while also providing compensation to other Settlement Class

15  Members who lack proof of having purchased or received a Recalled Toy, and

16  reimburses Settlement Class Members for past lead level testing.  The Settlement

17  extends relief to both purchasers and gift recipients, thus providing relief without

18  litigating questions of privity or standing.  It also incorporates QAS provisions

19  designed to help avoid the recurrence of such incidents in the future injunctive

20  relief that the Class may not have obtained at trial.

21       Finally, in the Stipulation, the parties have agreed to a Release that is

22  properly tailored to this case and is fair and reasonable, in that it extends to

23  economic claims but excludes claims for personal injury.  (See Ex. 1, Stipulation of

24  Class Action Settlement, § H.).

### 3.    Progress In The Litigation

26       The parties agreed upon the terms of the Stipulation following substantial

27  fact investigation, discovery, expert consultations, and litigation on the merits of

28  Plaintiffs' claims, including the resolution of Defendants' motions to dismiss, and

only after extensive, arms'-length negotiations by experienced counsel with the assistance of a skilled mediator.  (See Weinstein Decl., ¶ 14; Joint Decl., ¶¶ 51-52; Edwards Decl., ¶¶ 2-3).

For these reasons, the parties and the Court are in a position to assess realistically the strength of this case and the comparative benefits of the proposed settlement.  Cf. Hanlon, 150 F.3d at 1026 (providing that a court should consider "the extent of discovery completed and the stage of the proceedings" in making a final-approval determination).  This is not a case where the lawsuit was filed and the proposed settlement arose quickly.  Here, from the discovery completed to date and the issues raised in the motions to dismiss, the parties are in a position to assess the risks and possible litigation outcomes, as compared to the benefits to be gained from the specific terms of the Stipulation, including both valuable monetary and injunctive relief for Settlement Class Members.  Thus, the progress in the litigation also favors approval of the Settlement as fair.

In addition to the litigation on the merits to date, the well-informed, lengthy and intensive arm's-length settlement negotiations also indicate the fairness of the Settlement.  The history of the negotiations recounted above and the Declarations submitted by Judge Weinstein and counsel creates a presumption that the Stipulation's terms are facially fair, adequate, and reasonable.  Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arm's-length negotiation is presumed fair."); (see Weinstein Decl., ¶ 2; Joint Decl., ¶ 53; Edwards Decl., ¶ 2).

Moreover, there is no evidence or even accusation of collusion between Co-Lead Counsel and Defendants.  Class Members and Class Representatives stand to benefit equally from the Settlement, "a fact which lessens the likelihood that the named plaintiffs and their attorneys colluded with [Defendants] to increase their recovery at the expense of the unnamed plaintiffs who class counsel has a duty to represent."  Hanlon, 150 F.3d at 1027.

1    Based on the foregoing factors, the parties respectfully submit that the

2    Stipulation is fair, reasonable, and adequate, and should be finally approved.

3    **4.     The Reaction of the Vast Majority of Settlement Class Members to the Settlement Has Been Favorable, and the Few Objections Received Are Meritless**

4

5    The vast majority of the millions of parents and other consumers who

6    comprise the Settlement Class Members have chosen to remain in the Settlement

7    Class.  As of the February 22, 2010 Objection and Opt-Out Deadline, the parties

8    had received just thirty-five (35) opt-outs and only seven (7) objections to the

9    Settlement – out of millions of Class Members.[7]  (Karin Carmin Declaration,

10   ("Carmin Decl."), ¶ 9).

11   The very low numbers of opt-outs and objections by Settlement Class

12   Members compare favorably to the numbers of opt-outs and objections that other

13   courts have considered when approving similar settlements.  See Rodriguez, 563

14   F.3d at 967 (finding a favorable reaction by class members where of the 376,301

15   putative class members who received notice, 54 submitted objections); Churchill

16   Village, 361 F.3d at 577 (finding a favorable reaction by class members where of

17   the 90,000 putative class members who received notice, 45 submitted objections

18   and 500 submitted opt-outs).  These numbers reflect a positive reaction from the

19   Settlement Class that also weighs in favor of the fairness of the Settlement.  See

20   Hanlon 150 F.3d at 1027 ("the fact that the overwhelming majority of the class

21   willingly approved the offer and stayed in the class presents at least some objective

22   positive commentary as to its fairness.").

23   The few objections that were lodged are baseless and largely originate from

24   professional objectors who seek to hold up this Settlement on the basis of flimsy,

25   _____

26   [7] The lists of persons who have opted out or objected are attached as

27   Exhibit C, to the Carmin Decl.

28

unsubstantiated claims.[8]  Aside from Tucciarelli's unsupported objection to the fee request, which is addressed separately in the Fee Brief submitted by Co-Lead Counsel, the Tucciarelli objection substitutes pejorative rhetoric for substance.  If, as she claims, she has a Recalled Toy, she needs only to return it (at Mattel's cost) to obtain a full cash refund.  Yet, she has failed to file a claim or to opt-out. (Carmin Decl. ¶ 9 and Exhibit C).  Moreover, in an apparent fishing expedition, Tucciarelli asks for discovery, but she is not entitled to it because she presents no evidence of collusion.[9]  See Lobatz v. U.S. West Cellular of Cal., Inc., 222 F.3d 1142 , 1148 (9th Cir. 2000) (denying discovery requested by an objector and determining that "discovery of [settlement negotiations] is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive"); Int'l Union, et al. v. Gen. Motors Corp., 497 F.3d 615, 637 (6th Cir. 2007) (Objectors "'are not automatically entitled to discovery'"; "[a] district court need grant discovery only if the objectors make a colorable claim that the settlement should not be approved.").  Tucciarelli's inability to articulate any argument of substance as to why this full-relief Settlement should not be approved is a testament to the fairness, reasonableness and adequacy of the Settlement.  The Tucciarelli objection should be disregarded.

_____

[8] Co-Lead Counsel have concurrently filed all objections received under seal pursuant to Court's request at the Preliminary Approval Hearing on October 19, 2009.  Tr. at 44-46.

[9]      The parties reserve their right to seek discovery from Tucciarelli in the event that the Court determines she may seek discovery.

The other objections also lack merit.[10]  Despite the valuable relief provided, Objector Stone erroneously claims that Class Members cannot "accurately approximate their recovery."  (Stone Objection at pp. 4-5).  However, both the Class Notices and the Settlement website contain all the information necessary for Class Members to determine the precise relief that is made available to them.  Moreover, the Settlement website performs a calculation automatically and provides an instantaneous summary to any Settlement Class Member who submits a claim.  Indeed, Stone's own objection belies her contention.  She states that she purchased two Polly Pocket toys for a total Recall Price of $29.  Id. at 2.  If she returns the toys or has a Proof of Purchase, she can choose either a check or a voucher in the amount of $29.  (Ex. 1, Stipulation of Class Action Settlement, §§ D.2.b.3. and D.2.c.).  Stone's objection is thus meritless.

Objector Sweeney mischaracterizes the potential value of the monetary relief portion of the Settlement.  (Sweeney Objection at pp. 1-2).  Her mischaracterization greatly understates the potential value.  The Settlement encompasses over 15 million toys, all of which are eligible for reimbursement.  Contrary to Objector Sweeney's misstatements, there are no limits on the relief available to Class Members who return Recalled Toys or have Proof of Purchase.  The only limits on relief are the $10 million cap on relief to Class Members who have no Recalled Toys or Proofs of Purchase, but seek relief by Declaration only; and the $600,000

---

[10] Objectors' unsupported objections to Co-Lead Counsel's fee request are addressed separately in Co-Lead Counsel's filing.  Noting that Tucciarelli and Thompson attested to the purchase of a Recalled Toy, the parties do not contest their standing to lodge an objection per se, but do, of course, contend that their objections lacks merit.  The Parties do not contest the standing of any objectors based on their written submissions but reserve the right to seek discovery from Sweeney, Hawley, Stone, Deachin and Padgett concerning their qualifications as Class Members, and further contend that their objections also lack merit.

limit on lead test reimbursements.  Thus, Objector Sweeney is incorrect in his effort to minimize the extensive value of the Settlement.

Thompson's objection that he should receive a cash refund is tantamount to complaining that the Settlement should be "better," which is not a valid objection. Hanlon, 150 F.3d at 1027.  Thompson fails to recognize that settlement, as the product of compromise, tends to offer less than a full recovery.  See EEOC v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1985).  Thompson's objection also fails to consider his limited ability to prove his claim (because he no longer possesses the Recalled Toy or Proof of Purchase), the risk of proceeding on the merits, and the limited nature of the Release.

Moreover, there are legitimate reasons to differentiate Settlement Class Members who have proof that they actually possessed a Recalled Toy from those who do not.  Contrary to the arguments in Thompson's and Stone's objections, vouchers do not result in "additional profits" for Mattel – they result in losses.[11]  In the context of this case, vouchers have the virtue of ensuring that the actual owners of the Recalled Toys – the children – get replacements while limiting any incentive to file fraudulent claims for cash.  Issuing full-value vouchers to Settlement Class Members who do not have evidence that they purchased or received a Recalled Toy serves the purpose of providing relief to Settlement Class Members who are genuinely interested in replacing their children's toys.

_____

[11] Vouchers are issued for the full retail price of the Recalled Toys, increased to account for taxes.  The voucher is used to acquire a replacement Mattel toy from a retailer, and the retailer then redeems the voucher for the full amount from Mattel, through a clearinghouse.  The toy acquired by the consumer was purchased by the retailer at a wholesale price, which is below the retail price.  Therefore, issuing a voucher requires Mattel to pay the retail mark-up, sales tax, and the processing costs for the voucher, all of which contribute to a loss on each voucher transaction.

1    Finally, the Settlement can in no way be considered a "coupon settlement,"

2    as Objector Sweeny concedes.  (Sweeney Objection at 6:17).  All Settlement Class

3    Members will greatly benefit from the Settlement's QAS provisions which will

4    help to ensure the safety of Mattel's toys.  Further, as described above, the

5    Settlement provides for full cash relief or its equivalent.  All Class Members who

6    previously returned Recalled Toys to Mattel are entitled to receive a check for the

7    higer of 50% of the voucher(s) they already received or $10.00.  Those who submit

8    Recalled Toys or Proof of Purchase of Recalled Toys to the Claims Administrator,

9    are entitled to choose either a voucher or a check for the full Recall Price of the

10   Recalled Toys, which includes provision for sales tax, or the actual price paid,

11   including tax.  Likewise, Class Members who had lead testing performed on a

12   minor child (of whom they are the parent or guardian) within six weeks of the recall

13   announcement may submit claims for a check in the full amount of their

14   unreimbursed testing costs.  As such, the Settlement is not a coupon settlement.

15   Moreover, Settlement Class Members who did not return Recalled Toys to

16   Mattel and no longer possess their Recalled Toys or Proofs of Purchase – *i.e.*, Class

17   Members who lack any documentary or physical evidence to support their claims –

18   are eligible for vouchers for the full Recall Price of up to three toys per household,

19   including provision for sales taxes.  The vouchers are not "coupons" because they

20   are not offers for discounts where a class member must expend additional funds out

21   of pocket to realize the benefit of the relief; rather, they cover the ***full*** cost of a

22   Mattel toy up to the Recall Price, including provision for sales tax.  See 109 S. Rpt.

23   14 (2005); Synfuel Techs. Inc., v. DHL Express (USA), Inc., 463 F.3d 646, 654

24   (7th Cir. 2006) (finding that free express mail envelopes "are not identical to

25   coupons, since they represent an entire product, not just a discount on a proposed

26   purchase."); Chavez v. Netflix, Inc., 162 Cal. App. 4th 43, 53 (2008) (referring to

27   CAFA for guidance, affirming the trial court's approval of the settlement, and

28

2:07-ml-01897 -  MEMO IN SUPP. OF FINAL
APPROVAL OF CLASS ACTION SETTLEMENT

finding that vouchers for free video rentals are not "pure coupons" because they cover the full cost of the rental).

Thus, the Settlement is not a "coupon settlement," because it does not require Class Members who receive vouchers to spend *any* money to benefit from the Settlement voucher. Id.  The voucher provides a full and free replacement for the Recalled Toy for which it is issued. Id.  Other courts have concluded as such. Browning v. Yahoo! Inc., rejected a similar objection purportedly based on CAFA, holding: "the in-kind relief offered in this case is not a 'coupon settlement' because it does not require class members to spend money in order to realize the settlement benefit."  C04-01463 HRL, 2007 WL 4105971, *5 (N.D. Cal. 2007).  Moreover, the fact that the vouchers are fully transferable increases their value because, even if a Class Member does not wish to use a voucher, he or she may sell the voucher or give it to another person.  See Acosta v. Trans Union, LLC, 243 F.R.D. 377, 390 (C.D. Cal. 2007); Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 432 (S.D.N.Y. 2007).

## V.   GILARDI IMPLEMENTED THE NOTICE PROGRAM, WHICH PROVIDED ADEQUATE NOTICE TO THE SETTLEMENT CLASS

Pursuant to the Court's Preliminary Approval Order, the Claims Administrator, Gilardi & Co., L.L.C. ("Gilardi"), implemented the approved Class notice program ("Notice Program"), with the result that:

- Gilardi mailed individual notice to all potential Settlement Class Members whose names and addresses were ascertainable from records of Mattel and the Retailer Defendants.
- Of the 1,492,763 direct notices that Gilardi mailed, only 147,458 were returned, of which 113,355 Gilardi resent to a new address.
- Gilardi published notice of the Settlement from November 2009 through February 2010 in twenty (20) national publications whose readership demographics match closely the demographics of the

1               Settlement Class Members.  The publications reached an estimated

2               68% of the Settlement Class.

3       •     Gilardi also disseminated notice of the Settlement through an online

4               Search Engine Marketing ("SEM") campaign, through which

5               keywords were purchased on the most popular search engines (Google,

6               AOL.com, Ask.com, Bing, Yahoo! Search, and Netscape) to trigger

7               the Settlement website.  The SEM Campaign will continue until the

8               claims deadline on May 29, 2010.

9       •     Gilardi maintained, and continues to maintain, the Settlement website

10              www.MattelSettlement.com, which it designed in consultation with

11              Co-Lead Counsel and Mattel's Counsel.  Co-Lead Counsel and Mattel

12              also provided information to Settlement Class Members about the

13              Settlement prominently displayed on their respective websites.

14 The Notice Program and its results are described more particularly in the

15 Declaration of Alan Vasquez of Larkspur Design Group ("LDG") and Karin

16 Carmin of Gilardi, filed concurrently herewith.

17      **A.**     **The Three-Part Notice Program Provided The Best Practicable Notice, Including Direct Notice To All Identifiable Settlement Class Members**

18

19       As provided in the Stipulation, the Court approved a comprehensive Class

20 Notice Program to ensure the best notice practicable was directed to the Settlement

21 Class Members.  To facilitate the notice process, the parties requested, and the

22 Court approved, Gilardi, an experienced and qualified settlement administrator, as

23 the Claims Administrator to assist and provide professional guidance in the

24 implementation of the Notice Program, as well as the claims filing process and

25 other aspects of the settlement administration.  Gilardi worked with Larkspur

26 Design Group, LLC ("LDG") to develop the Notice Program for this Settlement.

27       The specific elements of the Notice Program are described further below.  It

28 was designed to maximize exposure to a target audience of parents or guardians of

children under the age of 12.  A particular focus was placed upon women with children under the age of 12, because demographic data show that women are two times more likely to be the purchasers of the products at issue here.  The publications selected for the Notice Program reflect an emphasis on this target audience.

The Notice Program has accomplished over a 85% reach to this target audience.  (Alan Vasquez Declaration, ("Vasquez Decl."), ¶ 14).  This is more than sufficient under the applicable the caselaw concerning the target reach required of class notice.  In re Integra Realty Res., Inc., 262 F.3d 1089, 1110-11 (10th Cir. 2001) (holding Rule 23 and Due Process requisites satisfied where the record indicated that only 77% of class members actually received notice of the settlement).

### 1.    Direct Notice Was Provided To Settlement Class Members For Whom Records Provided Address Information

First, the Court-Approved Notice Program outlined in the Stipulation provides that a summary notice postcard directing individuals to the Settlement website be mailed to Settlement Class Members for whom address information is known.  The notice also provides an option by which Settlement Class Members can contact Gilardi and request that a printed long-form notice and a paper claim form be mailed to them.  Names and contact information for Class Members were collected from the records of Mattel and all Retailer Defendants, except KB Toys, which is in bankruptcy.  After deleting duplicate purchasers, Gilardi mailed the summary notice postcard to 1,492,763 addresses.  Of that number, only 147,458 were returned to Gilardi; and Gilardi was able to find updated address information and resend summary notice to 113,355 of those potential purchasers.  (Carmin Decl., ¶ 5).

### 2. Notice Was Published In Twenty Targeted Publications

Second, LDG coordinated a published Notice Program through one-third page or half page ads in USA Today and consumer magazines, with equivalent space in targeted Sunday supplement magazines. To develop the list of publications, LDG identified the demographics of the target audience for class notice in this case, and then ranked the consumer magazines and national newspapers by composition and coverage. After ranking the magazines and national newspapers by composition and coverage, LDG chose the most effective magazines and newspapers for this specific class. (Vasquez Decl., ¶ 5). The published notice directed individuals to the Settlement website where they can file their claims online. For those Settlement Class Members without internet access, the summary notice included an option by which the Settlement Class Members can contact Gilardi and request that a printed long-form notice and a paper claim form be mailed to them. (Carmin Decl., ¶ 7).

### 3. Notice Was Disseminated on Internet Search Engines

In addition to print publication, LDG developed a comprehensive online Search Engine Marketing ("SEM") campaign. LDG purchased sponsored links on all major search engines, including Yahoo, Bing, and AOL, but primarily on Google, because the Google content and search network has the potential to reach over 75% of unique Internet users in more than 20 languages and over 100 countries. LDG positioned the case website URL within the top five sponsored links of any search related to the keywords selected for the campaign. The use of the sponsored link campaign was intended to enhance the effectiveness of the published notice by providing a secondary mechanism for Settlement Class Members who saw the published notice to find the case website for more information.

### B.      The Notice Program Adequately Informed Settlement Class Members of The Settlement

In their motion for preliminary approval of the Settlement, the parties provided the Court with the three forms of notice, which we attached to the Stipulation as Exhibits B, C & L, respectively.

As required by Rule 23(c)(2)(B), the three forms of notice "concisely and clearly state[s] in plain, easily understood language:" (1) the nature of the action (see Ex. B to Carmin Decl. at ¶ 3); (2) the Settlement Class definition (see id. at ¶ 4); (3) the class claims, issues, and defenses (see id. at ¶ 3); (4) that if a Settlement Class Member desires, he may enter an appearance through counsel (see id. at ¶¶ 17 and 20); (5) that the Court will exclude from the Settlement Class any member who requests exclusion, stating when and how members may elect to be excluded (see id. at ¶¶ 12 and 15); and (6) the binding effect of a class judgment on Settlement Class Members under Rule 23(c)(3) (see id. at 11).  Fed. R. Civ. P. 23(c)(2)(B).

In addition, to provide adequate notice of a class-action settlement, the notice should "'generally describe[] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" Churchill Village, L.L.C., 361 F.3d at 575 (internal citations omitted).  Here, the Notice Program adequately informed Settlement Class Members of the Settlement terms, and explained that, when the Court considers final approval at the Fairness Hearing, Settlement Class Members who object to the Settlement may be heard.  As explained below, the Notice also informed objectors to file written objections with the Court and to give notice if they intend to appear at the Fairness Hearing.  See Manual § 21.633.

Finally, Rule 23(h)(1) requires that notice of Co-Lead Counsel's request for attorneys' fees must be "directed to class members in a reasonable manner."  For settlement classes under Rule 23(e), "'notice of class counsel's fees motion should

be combined with notice of the proposed settlement.'"  Manual § 21.722 (internal citations omitted).  Here, the Notice Program apprised the Settlement Class Members of Co-Lead Counsel's fee and expenses request, which will be presented at the Final Fairness Hearing.  (See Ex. B to Carmin Decl. at ¶ 21.)

C.     **The Notice Program Adequately Explained The Procedures To Request Exclusion Or To Object**

Notice of a class action settlement should alert class members of the procedures to request exclusion or object.  See Manual §§ 21.312, 21.633.  The Notice Program here notified Settlement Class Members of their right to exclude themselves from the Settlement Class by sending a written request for exclusion to the Claims Administrator.  (Carmin Decl., Ex. A).  The Notice Program also advised Settlement Class Members that their request must contain the original signature of the Settlement Class Member; the Settlement Class Member's name, current address, and current telephone number; and a specific statement that the Settlement Class Member wants to be excluded from the Settlement Class.  Id.  It also informed Settlement Class Members that a request for exclusion must be postmarked no later than February 22, 2010, the date established by the Court.  As of March 8, 2010, only 36 people had elected to opt out of the Settlement Class.  (Carmin Decl., ¶ 9).

Consequently, the Notice that has been provided to the Settlement Class Members under the Notice Program fully apprised the Settlement Class Members of the procedures to request exclusion or to object.

D.     **The Notice Program Adequately Informed The Settlement Class Members of the Final Fairness Hearing**

Notice of a Final Fairness Hearing should inform the class that they can present their views on the settlement, as well as present arguments for and against the settlement, when the Court addresses the fairness, reasonableness, and adequacy of a proposed settlement.  See Manual §§ 21.633, 21.634.

The Notice Program informed putative Settlement Class Members of the details of the Final Fairness Hearing.  The Notice Program specified that the Court would consider the fairness of the Settlement on March 15, 2010, and alerted Settlement Class Members that if they filed timely, written objections and complied with the requirements set forth in the notices, they may appear at the Final Fairness Hearing in person or by counsel and be heard.  (See Ex. B to Carmin Decl. at ¶ 14.)  Finally, the Notice Program addressed Co-Lead Counsel's request for attorneys' fees and expenses.  (See id. at 21.)  The Notice Program also provided a toll-free number for a Settlement Class Member to call for more information.  That toll-free number is administered by Gilardi.  Hence, the Notice Program adequately notified the Settlement Class Members of the Final Fairness Hearing to be held before the Court.

### E.    The Notice Program Has Reached 85% Of The Target Audience

LDG estimates that the Notice Program as a whole has achieved a total reach for the defined target audience of nearly 85% and, perhaps more importantly, a total reach of 90% of the women in the target audience, who are more likely to purchase Mattel toy products for their children.  (Vasquez Decl., ¶ 14).  Consequently, the parties respectfully submit that the Court should find that the Notice Program has been adequate and reasonable, has met the requirements of Rule 23, comports with Ninth Circuit precedent, and has constituted the best notice practicable under the circumstances.

## VI.    __CONCLUSION__

As explained in detail above, this Settlement Class meets the Rule 23 requirements for class certification; the Settlement fairly resolves the putative Settlement Class Members' claims; and the Notice Program constituted the best notice practicable under the circumstances.  Consequently, the parties respectfully move this Court to issue an Order finally:  (1) finding that the Notice Program has been adequate and reasonable, has met the requirements of Rule 23, and has

1    constituted the best notice practicable under the circumstances; (2) certifying the

2    Settlement Class, appointing Plaintiffs as Class Representatives and Co-Lead

3    Counsel as Class Counsel; and (3) granting approval of the Settlement.

4    Dated: March 8, 2010                    Respectfully submitted,

5                                            COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
6                                            JOHN J. STOIA, JR.
                                             RACHEL L. JENSEN
7                                            PAULA M. ROACH

8
                                             /s/ John J. Stoia, Jr.
9                                            _____
                                                   JOHN J. STOIA, JR.

10                                           655 West Broadway, Suite 1900
                                             San Diego, California  92101
11                                           Telephone:  619/231-1058
                                             Facsimile    619/231-7423
12
                                             WHATLEY, DRAKE & KALLAS,
13                                           LLC
                                             JOE R. WHATLEY, JR.
14                                           EDITH M. KALLAS
                                             ELIZABETH ROSENBERG
15                                           1540 Broadway, 37th Floor
                                             New York, New York  10036
16                                           Telephone:  212/447-7070
                                             Facsimile:   212/447-7077
17
                                             ***Co-lead Counsel for Plaintiffs***
18

19
                                             JONES DAY
20                                           ELWOOD LUI

21
                                             /s/ Elwood Lui
22                                           _____
                                                   ELWOOD LUI

23                                           555 South Flower Street, 50th Floor
                                             Los Angeles, California  90071
24                                           Telephone:  (213) 489-3939
                                             Facsimile:   (213) 243-2539
25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JONES DAY
THOMAS E. FENNELL
MICHAEL RICE
2727 North Harwood Street
Dallas, Texas  75201
Telephone:   (214) 220-3939
Facsimile:    (214) 969-5100

JONES DAY
HUGH R. WHITING
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:   (216) 586-3939
Facsimile:    (216) 579-0212

*Counsel for Defendant Mattel, Inc.*

SVI-77462v9

2:07-ml-01897 -  MEMO IN SUPP. OF FINAL
APPROVAL OF CLASS ACTION SETTLEMENT